**MAYALL, HURLEY, P.C.**
A Professional Corporation
2453 Grand Canal Boulevard, Second Floor
Stockton, California 95207-8253
Telephone (209) 477-3833
MARK E. BERRY, ESQ.
CA State Bar No. 155091
DERICK KONZ, ESQ.
CA State Bar No. 286902

Attorneys for Defendant,
Deputy Sheriff JOHN NESBITT

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIONNE SMITH-DOWNS and JAMES E. RIVERA, SR., both individually and as Successors-In-Interest to the Estate of JAMES E. RIVERA, JR., | No.  2:10-CV-02495-MCE-CKD |
| Plaintiffs, | **DEFENDANT JOHN NESBITT'S EXPERT WITNESS DISCLOSURE** |
| vs. | **[FRCP RULE 26(a)(2)]** |
| Police Officer ERIC AZARVAND; Police Officer GREGORY DUNN; Deputy Sheriff JOHN NESBITT, | |
| Defendants. | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to this court's Pre-Trial Scheduling Order (ECF No. 84) and Fed. Rules Civ. Proc., rule 26(a)(2), Defendant JOHN NESBITT ("NESBITT") submits the following expert witnesses disclosure.

The following disclosure of witnesses and documents is limited to those documents and witnesses defendant intends to use in support of his defense.  In submitting these documents and witnesses, defendant does not waive any privileges or protections defendant may be entitled to, including, but not limited to, the protection afforded by the work product rule, attorney client

privilege, government and official information privilege, self-critical analysis privilege, and the right to privacy under the United States and California Constitutions.

Defendant reserves the right to supplement and/or amend this disclosure pursuant to Fed. Rules Civ. Proc., rule 26(a)(2)(E) and the stipulation to extend the last day to serve and file Fed. Rules Civ. Proc., rule 26(a)(2) disclosures to February 8, 2017.  (ECF No. 92.)

As used herein, the term "incident" refers to the acts alleged in Plaintiffs' operative complaint (ECF No. 52).

A.    **NON - RETAINED EXPERTS**

1. **John Nesbitt**
   c/o Mayall Hurley, P.C.
   2453 Grand Canal Blvd.
   Stockton, CA 95207

NESBITT was a San Joaquin County Sheriff Deputy involved in the incident.

(i)    Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)   Summary of Facts and Opinions: NESBITT will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

2. **Eric Azarvand**
   c/o Angelo, Kilday & Kilduff, LLP
   601 University Avenue, Suite 150
   Sacramento, CA 95825

Mr. Azarvand was a City of Stockton Police Officer involved in the incident.

(i)    Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)   Summary of Facts and Opinions: Mr. Azarvand will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

///

///

///

**3. Gregory Dunn**
   c/o Angelo, Kilday & Kilduff, LLP
   601 University Avenue, Suite 150
   Sacramento, CA 95825

Mr. Dunn was a City of Stockton Police Officer involved in the incident.

(i)     Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)    Summary of Facts and Opinions: Mr. Dunn will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

**4. Michael Hughes**
   22 East Market Street
   Stockton, CA 95202

Mr. Hughes was a City of Stockton Police Officer involved in the incident.

(i)     Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)    Summary of Facts and Opinions: Mr. Hughes will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified

**5. Sophal Nhem**
   22 East Market Street
   Stockton, CA 95202

Mr. Nhem was a City of Stockton Police Officer involved in the incident.

(i)     Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)    Summary of Facts and Opinions: Mr. Nhem will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

///
///
///
///
///
///
///

**6.  Scott Fogg**
22 East Market Street
Stockton, CA 95202

Mr. Fogg was a City of Stockton Police Officer involved in the incident.

(i)      Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)     Summary of Facts and Opinions: Mr. Fogg will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.


**7.  Nickolas Nunez**
22 East Market Street
Stockton, CA 95202

Mr. Nunez was a City of Stockton Police Officer involved in the incident.

(i)      Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)     Summary of Facts and Opinions: Mr. Nunez will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.


**8.  Michael Reynosa**
22 East Market Street
Stockton, CA 95202

Mr. Reynosa was a City of Stockton Police Sergeant involved in the incident.

(i)      Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)     Summary of Facts and Opinions: Mr. Reynosa will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

///
///
///
///
///

**9.  Tatiana Shlafer**
     22 East Market Street
     Stockton, CA 95202

Ms. Shlafer was a City of Stockton Police Department Evidence Technician who processed the scene of the incident.

(i)      Subject Matter: Forensic evidence and scene reconstruction.

(ii)     Summary of Facts and Opinions: Ms. Tatiana will give opinions regarding the mechanics and positions of the physical items (e.g., vehicles) and individuals involved in the incident.   Ms. Shlafera will give opinions regarding her reconstruction of the incident and the scene.

**10. Monte Stickles**
     5179 North Gates Avenue
     Fresno, CA 93722

Mr. Stickles was a California Highway Patrol Officer involved in the incident.

(i)      Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)     Summary of Facts and Opinions: Mr. Stickles will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

**11. Will Inskip**
     5179 North Gates Avenue
     Fresno, CA 93722

Mr. Inskip was a California Highway Patrol Officer involved in the incident.

(i)      Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)     Summary of Facts and Opinions: Mr. Inskip will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

///

///

///

**12. Tony Benetar**
     5179 North Gates Avenue
     Fresno, CA 93722

Mr. Benetar was a California Highway Patrol Officer involved in the incident.

(i)     Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)    Summary of Facts and Opinions: Mr. Benetar will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

**13. Wendy Correll**
     24 South Hunter Street
     Stockton, CA 95202

Ms. Correll was a San Joaquin County Probation Officer involved in the incident.

(i)     Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)    Summary of Facts and Opinions: Ms. Correll will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

**14. Kelsi Knoll**
     24 South Hunter Street
     Stockton, CA 95202

Ms. Knoll was a San Joaquin County Probation Officer involved in the incident.

(i)     Subject Matter: Law enforcement use of force policies, practices and procedures.

(ii)    Summary of Facts and Opinions: Ms. Knoll will offer opinions regarding whether law enforcement's use of force during the incident was reasonable and justified.

///
///
///
///
///

**15. Sara Yoshida**
   1306 Hughes Lane
   Ripon, CA 95366

Ms. Yoshida was a Senior Criminalist with the California Department of Justice Bureau of Forensic Services who processed the scene of the incident and analyzed the ballistics.

   (i)      Subject Matter: Forensic evidence and scene reconstruction.

   (ii)     Summary of Facts and Opinions: Ms. Yoshida will give opinions regarding the mechanics and positions of the physical items (e.g., vehicles) and individuals involved in the incident, including a ballistics analysis.  Ms. Yoshida will give opinions regarding her reconstruction of the incident and the scene.

**16. Kristie Lawson**
   4949 Broadway, Room F163
   Sacramento, CA 95820

Ms. Lawson was a Latent Print Analyst with the California Department of Justice Bureau of Forensic Services Latent Print Program who processed the Chevy Astrovan that was involved in the incident.

   (i)      Subject Matter: Forensic evidence and latent print analysis.

   (ii)     Summary of Facts and Opinions: Ms. Lawson will give opinions regarding the latent print analysis she performed on the Chevy Astrovan.

**17. Bennet Omalu**
   7000 Michael N. Canlis Blvd.
   French Camp, CA 95231

Dr. Omalu was the Chief Medical Examiner with County of San Joaquin Office of the Sheriff-Coroner who performed the autopsy of the decedent, James Rivera, Jr.

   (i)      Subject Matter: Pathological diagnoses and cause of death.

   (ii)     Summary of Facts and Opinions: Dr. Omalu will give opinions regarding gunshot wound entrances, pathways and trajectories.  Dr. Omalu will give opinions regarding which gunshot wounds possessed lethal capacity.

**18. Ken Laver**
      3019 McNabb St.
      Stockton, CA 95209

Mr. Laver was a Firefighter Paramedic with the City of Stockton Fire Department who was involved in providing emergency medical services to the decedent at the scene of the incident.

    (i)        Subject Matter: Emergency medical response.

    (ii)       Summary of Facts and Opinions: Mr. Laver will give opinions regarding whether the post-shooting response was reasonable.

**19. Danny Vickers**
      3019 McNabb St.
      Stockton, CA 95209

Mr. Vickers was a Firefighter Paramedic with the City of Stockton Fire Department who was involved in providing emergency medical services to the decedent at the scene of the incident.

    (i)        Subject Matter: Emergency medical response.

    (ii)       Summary of Facts and Opinions: Mr. Vickers will give opinions regarding whether the post-shooting response was reasonable.

**20. Tim Moyles**
      3019 McNabb St.
      Stockton, CA 95209

Mr. Moyles was an Engineer with the City of Stockton Fire Department who was involved in providing emergency medical services to the decedent at the scene of the incident.

    (i)        Subject Matter: Emergency medical response.

    (ii)       Summary of Facts and Opinions: Mr. Moyles will give opinions regarding whether the post-shooting response was reasonable.

///

///

**21. Scott Parrett**
   1767 W. Hammer Ln.
   Stockton, CA 95209

Mr. Parrett was a Firefighter Paramedic with the City of Stockton Fire Department who was involved in providing emergency medical services to the decedent at the scene of the incident.

   (i)     Subject Matter: Emergency medical response.

   (ii)    Summary of Facts and Opinions: Mr. Parrett will give opinions regarding whether the post-shooting response was reasonable.

**22. Joe Mochetti**
   1767 W. Hammer Ln.
   Stockton, CA 95209

Mr. Mochetti was a Paramedic Intern with the City of Stockton Fire Department who was involved in providing emergency medical services to the decedent at the scene of the incident.

   (i)     Subject Matter: Emergency medical response.

   (ii)    Summary of Facts and Opinions: Mr. Mochetti will give opinions regarding whether the post-shooting response was reasonable.

**23. Michael Lillianthal**
   1767 W. Hammer Ln.
   Stockton, CA 95209

Mr. Lillianthal was a Chief with the City of Stockton Fire Department who was involved in providing emergency medical services to the decedent at the scene of the incident.

   (i)     Subject Matter: Emergency medical response.

   (ii)    Summary of Facts and Opinions: Mr. Lillianthal will give opinions regarding whether the post-shooting response was reasonable.

///

///

///

**24. Vincent Mejia**
    400 S. Fresno Ave.
    Stockton, CA 95209

Mr. Mejia was an Emergency Medical Technician with American Medical Response who was involved in providing emergency medical services to the decedent at the scene of the incident.

(i)     Subject Matter: Emergency medical response.

(ii)    Summary of Facts and Opinions: Mr. Mejia will give opinions regarding whether the post-shooting response was reasonable.

**25. Keith Daniel**
    400 S. Fresno Ave.
    Stockton, CA 95209

Mr. Daniel was a Paramedic with American Medical Response who was involved in providing emergency medical services to the decedent at the scene of the incident.

(i)     Subject Matter: Emergency medical response.

(ii)    Summary of Facts and Opinions: Mr. Daniel will give opinions regarding whether the post-shooting response was reasonable.

**26. Person Most Knowledgeable re Plaintiff's Treatment at Pacific Urgent Care**
    1782 W. Hammer Lane
    Stockton, CA 95209

Plaintiff Dionne Smith-Downs has identified Pacific Urgent Care as a healthcare provider with whom she treated for injuries that she attributes to the incident.

(i)     Subject Matter: Plaintiff Dionne Smith-Downs's healthcare treatment.

(ii)    Summary of Facts and Opinions: Opinions regarding the reasonableness and necessity of Plaintiff Dionne Smith-Downs' healthcare treatment and whether her symptoms were a result of the incident.

///

///

**27. Person Most Knowledgeable re Plaintiff's Treatment at Dameron Hospital**
    525 W. Acacia St.
    Stockton, CA 95209

Plaintiff Dionne Smith-Downs has identified Dameron Hospital as a healthcare provider with whom she treated for injuries that she attributes to the incident.

    (i)       Subject Matter: Plaintiff Dionne Smith-Downs's healthcare treatment.

    (ii)      Summary of Facts and Opinions: Opinions regarding the reasonableness and necessity of Plaintiff Dionne Smith-Downs' healthcare treatment and whether her symptoms were a result of the incident.

**28. Person Most Knowledgeable re Plaintiff's Treatment at St. Joseph Hospital**
    1800 N. California St.
    Stockton, CA 95204

Plaintiff Dionne Smith-Downs has identified St. Joseph Hospital as a healthcare provider with whom she treated for injuries that she attributes to the incident.

    (i)       Subject Matter: Plaintiff Dionne Smith-Downs's healthcare treatment.

    (ii)      Summary of Facts and Opinions: Opinions regarding the reasonableness and necessity of Plaintiff Dionne Smith-Downs' healthcare treatment and whether her symptoms were a result of the incident.

**B.     RETAINED EXPERTS**

**1.  Ronald K. Miller**
    P.O. Box 5268
    Orange, CA 92867

Mr. Miller's Fed. Rules Civ. Proc., rule 26(a)(2)(B) expert report, curriculum vitae, litigation history and fee schedule are attached hereto as **Exhibit A**.

Mr. Miller has agreed to testify at trial if called as a witness.

Mr. Miller will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the specifics of his testimony including any opinion and its basis that he is expected to give at trial.

---

1

2   **2.   Craig Fries**
        115 South Church St.
        Grass Valley, CA 95945

3   Mr. Fries has been retained to perform a forensic analysis and scene reconstruction.

4   Mr. Fries' <u>Fed. Rules Civ. Proc., rule 26(a)(2)(B)</u> expert report, curriculum vitae,

5   litigation history and fee schedule are attached hereto as **Exhibit B**.  Mr. Fries' animated scene

6   reconstruction (referenced in his report as, "Exhibit T – Video Presentation of Events Leading up

7   to the Shooting" and "Exhibit U – 3D Visualization of Event") has been lodged with the court

8   (ECF No. 95) and served on Plaintiffs by Defendants ERIC AZARVAND and GREGORY

9   DUNN.  Mr. Fries' animated scene reconstruction is incorporated herein.

10  Mr. Fries has agreed to testify at trial if called as a witness.

11  Mr. Fries will be sufficiently familiar with the pending action to submit to a meaningful

12  oral deposition concerning the specifics of his testimony including any opinion and its basis that

13  he is expected to give at trial.

14

15

16

17  DATED: February 8, 2017                          **MAYALL HURLEY, P.C.**

18

19                                                   By_____/s/ Mark E. Berry _____

20                                                        MARK E. BERRY, ESQ.
                                                          Attorney for JOHN NESBITT

21

22

23

24

25

26

27

28

---

**Defendant John Nesbitt's Expert Witness Disclosure [FRCP RULE 26(a)(2)]**
**Page 12 of 12**

# EXHIBIT A

Case No. 2:10-CV-002495-MCE-CKD

Fed. Rules Civ. Proc., rule 26(a)(2)(B) report of

## Ronald K. Miller

submitted by

## Defendant John Nesbitt

R. K. Miller
P. O. Box 5268
Orange, CA 92863

# Expert Witness Declaration

1.    My full name is Ronald Keith "R.K." Miller.  I am a native of California. I presently reside in Orange County (CA) where I also maintain a resource library and business office.  I am a retired police lieutenant with experience in local and state enforcement activities. I retired as a lieutenant/watch commander from the Huntington Beach (CA) Police Department in 2005.   I have over 40 years of law enforcement experience and 25 years of tactical team experience including 9 years as SWAT Team Leader.  I currently serve as a reserve police officer with the Orange Police Department. I am also an instructor for both the Basic Recruit Academy and the SWAT Academy at the Criminal Justice Training Center, Golden West College, Huntington Beach, Calif. In the latter case, I am the Officer in Charge of the SWAT Academy.   My law enforcement career to this date is more fully outlined in my professional resume, which is attached as an exhibit to this expert declaration.

2.    In addition to my active law enforcement career, I have earned recognition within the professional law enforcement community as an author, trainer and lecturer.  For example, in the last three years I have conducted or been directly involved in delivering over 2,500  hours of training to police officers of almost all ranks on such topics as use of force, tactics, firearms, critical incident management, decision making and leadership.  I maintain unique qualifications that allow me to teach at the college level.  I am a graduate of the California Commission on Police Standards and Training's (P.O.S.T.) "Basic Course Instructor" Certification Program, the POST Academy Instructor Certification Course and the Institute of Criminal Investigation's Instructor Workshop. I have assisted California POST in the development of instructional material and various training courses on "Street Gangs", "White Supremacists", "SWAT Training", "SWAT Response to Terrorist Attacks" and "Active Shooter Response".

3.    In accordance with FEDERAL RULE 26, I have attached the following exhibits:
   - Testimonial Records
   - Fee Schedule
   - Professional Resume

1

**4.** I have been retained by Mr. Mark Berry of Mayall Hurley representing Deputy John Nesbitt as a consultant and expert witness in the following matter: **Smith Downs v. City of Stockton, Azarvand, et. al (United States District Court, Eastern District of California, Case No. 2:10-cv-02495 MCE-GGH)**

5. I have been provided with the following research materials for review and consideration:

 5.1 San Joaquin Co. Sheriff Dispatch Log
 5.2 Stockton Police Dept. Crime Scene Sign In Sheet
 5.3 Crime Scene Log
 5.4 Stockton P.D. Report 10-29672 by Robert Faine #2312
 5.5 Stockton P.D. Report 10-29672 by Lawrence Parino #1067
 5.6 Stockton P.D. Report 10-29672 by Eric Azarvand #1297
 5.7 Stockton P.D. Report 10-29672 by Jesus Zavala #1653
 5.8 Stockton P.D. Report 10-29672 by Eric Azarvand #1297 (Second report)
 5.9 Stockton P.D. Report 10-29672 by Scott Fogg #1514
 5.10 Stockton P.D. Report 10-29672 by Barry Oaks #1228
 5.11 Stockton P.D. Report 10-29672 by Edward Webb #2204
 5.12 Stockton P.D. Report 10-29672 by James Manor #2200
 5.13 Stockton P.D. Report 10-29672 by Phirun Var, #2094
 5.14 Stockton P.D. Report 10-29672 by Ashley Holt, #2054
 5.15 Stockton P.D. Report 10-29672 by Brian Breckenridge #1295
 5.16 Stockton P.D. Report 10-29672 by Michelle Guthrie #1524
 5.17 Stockton P.D. Report 10-29672 by Anthony Perry #1489
 5.18 Stockton P.D. Report 10-29672 by Nickolas Nunez #1549
 5.19 Stockton P.D. Report 10-29672 by Scott Graviette #1435
 5.20 Stockton P.D. Report 10-29672 by Kenneth Southwick #7295
 5.21 Stockton P.D. Report 10-29672 by Robert Faine
 5.22 San Joaquin S.O. Report 10-20638 by Detective K. Ming
 5.23 San Joaquin S.O. Report 10-20638 #14 by Det. K. Ming
 5.24 San Joaquin D.A. Report 10-103 DD-1by DAI E. Derksen
 5.25 Stockton P.D. Report 10-29672 Supp. #22 by Det. M. Reynolds
 5.26 Stockton P.D. Report 10-29672 Supp. #24 by Det. J. Silva
 5.27 Stockton P.D. Report 10-29672 Supp #26 by Det. K. Nance
 5.28 San Joaquin D.A. Report 10-103 DD-2 by DAI Derksen
 5.29 San Joaquin D.A. Report 10-103 DD-3 by DAI Derksen
 5.30 San Joaquin D.A. Report 10-103 DD-4 by DAI Derksen
 5.31 San Joaquin D.A. Report 10-103 DD-5 by DAI Derksen
 5.32 San Joaquin D.A. Report 10-103 DD-6 by DAI Derksen
 5.33 San Joaquin D.A. Report 10-103 DD-7 by DAI Derksen
 5.34 San Joaquin D.A. Report 10-103 DD-8 by DAI Derksen

5.35     San Joaquin D.A. Report 10-103 DD-9 by DAI Derksen
5.36     San Joaquin D.A. Report 10-103 by DAI A. Garcia
5.37     San Joaquin D.A. Report 10-109 by DAI R. Moreno
5.38     San Joaquin D.A. Report 10-103 by DAI J. Buzo (2 reports)
5.39     San Joaquin S.O. Report 10-20638 Sup#1 by Det. S. Oliver
5.40     San Joaquin S.O. Report 10-20638 Supp #2 by Det. R.
         Johnson
5.41     San Joaquin S.O. Report 10-20638 Supp #3 by Det. P.
         Mears
5.42     San Joaquin S.O. Report 10-20638 Supp #5 by Det. K. Ming
5.43     San Joaquin S.O. Report 10-20638 Supp #6 by Det. K. Ming
5-44     San Joaquin S.O. Report 10-20638 Supp #7 by Det. K. Ming
5-45     San Joaquin S.O. Report 10-20638 Supp #8 by Det. S.
         Oliver
5.46     San Joaquin S.O. Report 10-20638 Supp #9 by Det. S.
         Oliver
5.47     San Joaquin S.O. Report 10-20638 Supp #10 by Det. S.
         Oliver
5.48     San Joaquin S.O. Report 10-20638 Supp #11 by Det. K.
         Ming
5.49     San Joaquin S.O. Report 10-20638 Supp #13 by Det. K.
         Ming
5.50     San Joaquin S.O. Report 10-20638 Supp #15 by Det. K.
         Ming
5.51     San Joaquin S.O. Report 10-20638 Supp #16 by Det. K.
         Ming
5.52     Stockton P.D. Report 10-29672 Supp #25 by Det. T. De
         Simone
5.53     Stockton P.D. Report 10-29672 Supp #17 by Det. C. Harris
5.54     San Joaquin S.O. Report 10-20638 Supp #4 by Det. P.
         Mears
5.55     San Joaquin S.O. Report 10-20638 Supp #12 by Det. K.
         Ming
5.56     Stockton P.D. FET Report 10-29672 Supp #15 by FET T.
         Shlafer
5.57     Stockton P.D. FET Report 10-29672 Supp #18 by FET K.
         Weldon
5.58     Stockton P.D. FET Report 10-29672 Supp #21 by FET T.
         Shlafer
5.59     Stockton P.D. FET Report 10-29672 Supp #123 by FET T.
         Beggs-Cassin
5.60     Stockton P.D. Crime Scene Scketches
5.61     Calif. DOJ Crime Scene Report by Sr. Criminalist S. Yoshida
         (Case # 10-006215-0001)
5.62     Calif. DOJ Physical Evidence Report by Sr. Criminalist S.
         Yoshida (Case # 10-006215-0001)

3

5.63    Calif. DOJ Physical Evidence Report by Sr. Criminalist S. Yoshida (Case # 10-006215-0001)

5.64    Calif. DOJ Field Investigation Report by Criminalist K. Lawson (Case # 10-000445-0001)

5.65    San Joaquin Coroner's Report by Dep. Coroner S. Mendez et. al. (Case # 2010-1467)

5.66    Stockton P.D. Property Record Printouts 10-29672

5.67    Stockton P.D. TRAKS Flyer on James Rivera by Det. Thrush

5.68    James Earl Rivera Probation file (Court # 66602)

5.69    San Joaquin Co. Probation report on James Rivera's escape from custody on 5/09/2010 by Michael Turner

5.70    San Joaquin County Mugshots of James Rivera

5.71    Calif. Dept. of Motor Vehicles Photo of James Rivera

5.72    Calif. Dept. of Motor Vehicles Print out for James Rivera, Jr. #X7892656

5.73    Printout of Local No Bail Warrant from San Joaquin County for James Rivera

5.74    Stockton P.D. RMS print out for James Rivera

5.75    Calif. Dept. of Justice Criminal History printout for James Rivera CII A29032475

5.76    Stockton P.D. GSET Daily for July 21, 2010

5.77    Officer Guthrie e mail re: James Rivera

5.78    Stockton P.D. Report 10-22701 (Residential Burglary)

5.79    Stockton P.D. Report 10-22993 (Residential Burglary)

5.80    Stockton P.D. Report 10-23133 (Business Burglary)

5.81    Stockton P.D. Report 10-24196 (Residential Burglary)

5.82    Stockton P.D. Report 10-29321 (Assault with a Deadly Weapon)

5.83    Stockton P.D. Report 10-29323 (Robbery)

5.84    Stockton P.D. Report 10-29324 (Disturbance)

5.85    Stockton P.D. Report 10-29476 (Carjacking)

5.86    Stockton P.D. Report 10-29478 (Robbery)

5.87    Stockton P.D. Report 10-29612 (Robbery Strong Arm)

5.88    Various Media Articles

5.89    Search warrant documents re: CBS news footage at termination of the James Rivera vehicular pursuit

5.90    Copies of Witness Diagrams and Photographs

5.91    Title page for Stockton P.D. Evidence Technicians' Photos at crime scene

5.92    Miscellaneous documents

5.93    San Joaquin S.O.  Training files for Dep. Nesbitt

5.94    San Joaquin S. O. Dispatch logs for 7-22-10

5.95    San Joaquin S.O. Report 10-20638 (Investigation— Supplement Report Numbers 0001—0015, & 0017)

5.96    San Joaquin Co. District Attorney protocol investigation report

| | | |
|---|---|---|
| 5.97 | Video and transcripts of Officer Eric Azarvand's interview | |
| 5.98 | Video and transcripts of Officer Gregory Dunn's interview | |
| 5.98 | Video interviews of Probation Officers Correll & Knoll | |
| 5.99 | Video interviews of Witnesses Roger Ulmer & Kevin Taylor | |
| 5.100 | Dep. Nesbitt's personnel file consisting of 262 pages of documents | |
| 5.101 | Transcripts for Det. Nesbitt, Officer Azarvand and Officer Dunn's depositions | |
| 5.102 | Superior Court of California, County of San Joaquin, Juvenile Court documents relevant to Mr. James Rivera | |

6.      In addition, I have interviewed Det. Nesbitt by phone in preparation for this Report.

7.      I am aware that additional research materials such as depositions and additional reports may be discovered or produced at some future time. Such information may necessitate the modification or revision of my original expert analysis

8.      I recognize that the involved parties often present factual disputes and discrepancies that might affect the original expert analysis. However, it is not the proper role of the police practices expert to resolve or reconcile such disputes or to attempt to validate any particular fact pattern. In cases with multiple fact patterns, the competent expert must consider each variation as being potentially valid. Consequently, multiple opinions may be appropriate, depending on the fact pattern presented.

9.      I fully recognize that factual disputes and discrepancies may be the innocent result of human perception and recall, particularly if the dynamic is highly unusual or stressful as is the case in this matter. Individual perceptions and other human factors will often result in factual disputes, inconsistencies and other discrepancies that are innocent, understandable and even expected. However, careful expert analysis may produce a "common fact pattern" based on significant central facts or specialized knowledge.

10.     Summary of Events:
        As of the morning of July 22, 2010, Mr. James Rivera had already established himself as a wanted felon, even though he was still only 17 years of age. Prior to that date, on May 10th, 2010, he had escaped from custody at the San Joaquin County Juvenile Justice Center located in the city of French Camp, CA. At that time, he was incarcerated for burglary, grand theft and terrorist threats. A warrant for his arrest due to the escape was subsequently issued.

5

In reviewing the Juvenile Court documents generated prior to Mr. Rivera's escape, I noted the following pertinent entries:

- **December 16, 2008**:  Mr. Rivera was found in violation of 459 P.C. (First Degree Burglary) and 496 P. C. (Receiving Stolen Property)
- **April 8, 2009**:  Mr. Rivera was suspended from school for "threats against another student".
- **May 8, 2009**:  Mr. Rivera was found on another school's grounds.  This appears to have been in violation of one of the conditions of his probation in that he was "not to be on any school grounds unless enrolled or had prior administrative approval."  During the latter event, he verbally assaulted a school custodian who had challenged his presence on the school grounds calling the latter a "punk faggot."
- **July 2009:**  Violation of Probation report documenting numerous EMP (Electronic Monitoring Program) violations in respects to previous Court orders that Mr. Rivera obey the terms and conditions of the program and be in his legal residence from 8:00 PM to 6:00 AM
- **September 23, 2009**:  Mr. Rivera was charged with violation of 211 P.C. (Robbery) and 182 (a)(1) P. C. (Conspiracy).  The documents also reflect that the charges were apparently reduced to 487 (c) P.C. (Grand Theft).
- **November 2, 2009**:  The Court ordered Mr. Rivera to
  - Obey all laws participate in the EMP (Electronic Monitoring Program)
  - Not to own or possess any dangerous and/or deadly weapons or firearms
  - Not drive a motor vehicle unless he/she is properly licensed and insured.
- **February 12, 2010**:  Mr. Rivera was arrested for 496 (a) PC (Receiving Stolen Property.)
- **March 5, 2010**: Mr. Rivera violated his probation by leaving his guardian's home without permission for at least 5 days.  The guardian stated that Mr. Rivera "continues to do whatever he wants."
- **April 12, 2010**: Court documents recount that "S.U.S.D. police officers (presumably Stockton Unified School District) had questioned Mr. Rivera regarding a report from a citizen that Rivera had been seen in possession of a shotgun and a handgun. He had also tampered with his Electronic Monitoring Program (EMP) ankle device and was taken into custody for the latter.
- **April 20, 2010**:  Court documents record that Mr. Rivera "had a disobedience to Hall staff during an emergency situation."

6

After his escape, Mr. Rivera next came to the attention of law enforcement in Stockton, CA.  On June 3, 2010, he was named by his uncle, Edward Smith as the suspect in a burglary of the Smith residence. At the time of the report, Edward Smith's wife Nancy told officers she believed that James Rivera possessed a gun and was going to "smoke" (a colloquialism for killing) her.  Stockton PD report # 10-22701 & 10-22993.

On June 12, 2010, James Rivera was named as a suspect in a residential burglary.  Stockton P.D. report # 10-24196

On July 20th, 2010, James Rivera was implicated but not identified as being involved in a robbery where the victim was threatened with a knife as well as told by the suspects that they had a firearm.  Stockton P. D. Report # 10-29323

On July 20th, 2010, a short time after the above incident of the same day, James Rivera was named as a suspect in a disturbance report. At that time he was driving a car that was very similar in description to the suspect vehicle in the previous crime of that date.  In a supplemental police report on July 21st, 2010, Witness Shanee Lambert stated that Mr. Rivera's criminal actions and reckless driving through her residential area had infuriated the neighborhood.  She also stated that "if the police don't catch him soon, some citizen from the neighborhood is probably going to kill James (Rivera) as a result of his actions."

The investigating officer learned that Mr. Rivera was now driving a light blue minivan.  Further investigation revealed that a similar vehicle had been carjacked the morning of July 21st. (See below)  In the same report, Witness Ivan Utsey added that he had previously seen Mr. Rivera driving a possibly stolen Suburban waving a handgun at him. Stockton P. D. Report # 10-29324.

On July 21st, 2010, at 0340 hours, a blue 1995 Chevrolet Astro van was stolen from three victims by four armed male/black suspects. One of the latter was armed with a shotgun while two others used a rifle and a handgun. During this "carjacking" robbery, one of the suspects pressed a firearm against a victim's head. At least one victim was also physically assaulted. In addition to the vehicle, cash and personal property was taken at gunpoint from the victims. At some point it was determined that the stolen vehicle was distinctive in that it had a large decal of the Virgin Mary on the back window.   Mr. Rivera was subsequently identified as a suspect in this crime. Stockton P.D. Report # 10-29476

7

Again on July 21st, 2010 at 4:24 AM, four male/black suspects robbed a citizen at gunpoint with a shotgun.  In addition, the victim was punched in the face a number of times.  Stockton P. D. Report # 10-29478

In addition to James Rivera's relationship to the above ongoing criminal activity, it should be noted that Officer Azarvand recounted an earlier incident involving Mr. Rivera. In a post-shooting interview, the officer explained that several days prior, he had encountered three black males who were attempting to burglarize a vehicle in the area of Comstock Drive and Cody Way.  The suspects attempted to flee in a golf cart.  The driver then rammed the cart head-on into his police unit. The suspects subsequently escaped on foot. Officer Azervand was later shown a photo of Mr. Rivera taken some time prior to this incident.  Azervand stated he believed that this was the driver of the stolen golf cart.    Stockton P.D. Report #10-29672 Supplement No 0027.

By the morning of July 22, 2010, Stockton P. D. officers and members of the Delta RATT team had all been briefed in one manner or another regarding Mr. Rivera's armed participation in the previous day's carjacking.   In addition, to one degree or another they may have been aware of James Rivera's escape from custody at San Joaquin County Juvenile Hall, the warrant issued on the heels of that escape and the subsequent criminal behavior where he had been identified as a suspect.  It was reasonable for these officers to consider the possibility that Mr. Rivera might be involved in the above criminal acts even though he had not yet been identified as a participant.

On July 22nd at 1016 hours, information was received that the stolen Astro van was in the area of 8800 Kelly Drive in the City of Stockton. The reporting party stated that the van had been used in a residential burglary the previous day.  The party further related that he believed the Astro van was stolen and that James Rivera was responsible for that carjacking robbery.

Both marked Stockton PD patrol units and unmarked Delta RATT units including Det. John Nesbitt (San Joaquin Co. Sheriff's Dept.) converged on the area.  Shortly thereafter at 1034 hours, Dept. Nesbitt located the van at Comstock Drive and Cody Way. It was being driven by James Rivera.   It should be noted that this was the same geographic location where Officer Azavand encountered Mr. Rivera attempting a vehicle burglary a few day prior.  In addition, photographs from the scene show that the stolen vehicle had been "cold plated" with a "Tow Yard Bargain" (auto dealership) paper plate.  This is a criminal

tactic to deter identification of the van's status by replacing the original California license plate with the generic paper plate.

A vehicular pursuit of the Astro van driven by James Rivera now took place.  While there were various unmarked police units such as Det. Nesbitt's in the area, the pursuit itself was conducted by marked Stockton P. D. patrol units.  Mr. Rivera did not stop as required by the California vehicle code.  During his efforts to escape he committed a series of vehicle code violations recklessly driving through residential areas at speeds of up to an estimated 60mph.  An attempt to stop him through the use of "spike strips" was ineffective when he drove around them.

At one point while traveling through the residential areas, Mr. Rivera lost control of the Astro van.  The vehicle plowed through a fence knocking it down as well as a "STOP" sign.  This was followed by Mr. Rivera leaving the road and driving across the front lawn of a residence.  Mr. Rivera's driving violations collectively presented a very real threat to the citizens of this area as well as the officers involved. Due to these facts, at least one attempt at lawful intervention through the authorized use of the "PIT" (pursuit intervention technique) maneuver failed to stop Mr. Rivera's escape.  This was authorized by Sgt. Reynosa who was supervising the pursuit.

Officer Greg Dunn then initiated a second PIT maneuver against the Astro van which eventually met with success in stopping Mr. Rivera. However, it set in motion a chain reaction that resulted in the van first striking a parked car, then a large community mail box and finally slamming through the side wall of the garage of the residence at 9559 Bancroft Way, Stockton, CA.  The majority of the Astro van came to rest inside the garage with only the rear of the vehicle outside. Simultaneously, due to the impact from the Astro van, the parked car was sent spinning around in the same area.  It came to rest on the grass outside the 9559 Bancroft address a short distance from the van with its rear bumper pointed in that direction.

At this point, Mr. Rivera was still in control of the Astro van.  He began driving the vehicle back and forth trying to break it free from being lodged in the garage.  He succeeded in moving the van backwards to the degree that its rear bumper came into contact with the front bumper of Officer Dunn's marked police unit.  The force behind this effort pushed Officer Dunn's unit rearwards.  Dunn—who had taken up a position at the driver's door—became concerned for his safety as the Astro van continued its rearward movement which also forced Dunn's unit further to the rear.  Dunn was on the verge of being caught between his police unit and the parked vehicle.  It had come to rest

immediately adjacent to his unit creating an area that was compressing in on Officer Dunn as his vehicle was pushed backwards by Mr. Rivera.  Dunn feared that he was about to be crushed and killed between the two vehicles.  He was also alert to the fact that Mr. Rivera was a suspect in the armed carjacking of the van.  As this developed a number of police officers in addition to Officer Dunn had arrived on scene.   Multiple officers were yelling commands to Mr. Rivera, including Dunn, Officer Azervand and Det. Nesbitt. The latter two officers were close to Officer Dunn's position but not at his vehicle. These verbalizations focused on identifying themselves as police officers as well as commanding Mr. Rivera to stop his actions with the vehicle as well as to comply with orders such as "show us your hands" and "get out".

Mr. Rivera did not comply.  Instead he continued in his efforts to escape by trying to free the Astro van from the interior of the garage. All three officers (Dunn, Azervand and Nesbitt) perceived the vehicle's continued rearward movement as a developing lethal threat.  When Mr. Rivera still did not comply with their commands, each of the three used lethal force to protect themselves and their fellow officers.

The vehicle stopped its rearward movement and in response, the officers stopped their use of lethal force.   With the threat apparently diminished, the officers present formed a plan to remove Mr. Rivera from the vehicle.  Due to the Astro van's position inside the garage, this could not be accomplished through the driver's or passenger side doors.    Instead another officer—Det. Nhem—crawled through a window into the vehicle.   He moved the gear shift lever from "reverse" to "park".  Nimh then dragged Mr. Rivera out of the driver's seat to a point where officers outside could assist in extracting Mr. Rivera from the vehicle.   Almost as soon as he was placed on the ground outside the Astro van, Paramedics from the Stockton Fire Department began emergency first aid.  Unfortunately, the extent of Mr. Rivera's wounds were fatal.

11.   GENERAL  ISSUES
The objectively reasonable use of deadly force by San Joaquin County Sheriff's personnel is based on the U. S. Supreme Court "Graham v. Connor" decision and is spelled out in that agency's policy Section 300.4 which reads:

**Use of deadly force is justified in the following circumstances:**
**(a)  A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.**
**(b) A deputy may use deadly force to stop a fleeing subject when the deputy has probable cause to believe that the**

person has committed, or intends to commit, a felony involving the infliction or threated infliction of serious bodily injury or death, and the deputy reasonably believes that there is an imminent risk of serious bodily injury or death to any person if the subject is not immediately apprehended.   Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous.  An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone.  For example, an imminent danger may exist if a deputy reasonably believes any of the following:

1. The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the deputy or another
2. The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer possessing the same information and faced with the same circumstances as the officer who actually used force.

It is the policy of this Department that personnel may use only that force which is "objectively reasonable" to:

• Defend themselves;
• Defend others;
• Effect an arrest or detention;
• Prevent escape; or,
• Overcome resistance

Law enforcement officers are authorized to use deadly force to:

• Protect themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily injury; or,
• Prevent a crime where the subject's actions place person(s) in imminent jeopardy of death or serious bodily injury; or
• Prevent the escape of a violent fleeing felon when there is probable cause to believe the escape will pose a significant threat of death or serious bodily injury to the officer or others if apprehension is delayed.   In this

> **circumstance, officers shall, to the extent practical, avoid using deadly force that might subject innocent bystanders or hostages to possible death or injury.**

Learning Domains are standardized and detailed workbooks on relevant topics prepared by the California Commission on Peace Officers' Standards and Training (POST).   These are used in law enforcement academies throughout our state in order to provide consistent policy guidelines to new police officers as well as reference material for veteran officers.  The California POST Learning Domain #20 (Use of Force) states:

> **An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.  This includes:**
> **The severity of the crime**
> **The nature and extent of the threat posed by the subject**
> **The degree to which the subject resists arrest or detention**
> **Any attempts by the subject to evade arrest by flight**

In respect to Use of Force, Learning Domain #20, also cites California Penal Code Section 835a which states:

> **"Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance."**

> **"A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance."**

12.    OPINIONS
The following are the detailed analysis and opinions that I will offer in this case as well as the basis and reasons for those opinions.

First, it is pertinent to consider the criminal actions and what I believe to be Mr. Rivera's mindset leading up to the events of July 22nd, 2010.  To begin with, we know that on May 9th, 2010, Mr. Rivera escaped from the San Joaquin County Juvenile Justice Center (a detention facility) in French Camp, CA.  According to various reports, Mr. Rivera

was being held there for felony violations of California law. On the heels of Mr. Rivera's escape, a warrant was issued for his arrest. In addition, even at his young age, by July 22nd, 2010 Mr. Rivera had already created a track record of criminal and anti-authority behavior. This is clearly documented in Section 10 of this Report and the below facts.

In early June of 2010, Mr. Rivera was reported as the suspect in a burglary of a relative's home. This was accompanied by Mr. Rivera threatening innocent civilians and reports that he was in possession of a firearm. This reported criminal behavior prompted the Stockton Police Department to issue a wanted flyer for Mr. Rivera.

The following month, reports of Mr. Rivera's negative behavior continued. This includes the above incident where Officer Azervand's patrol vehicle was hit head on with a stolen golf cart operated by Mr. Rivera. In my opinion, this is a relevant incident. It may not have been an accident but rather an intentional act on the latter's part. I believe Mr. Rivera took this radical action in the hopes of activating the patrol unit's driver's side air bag. The air bag's impact could conceivably render Officer Azervand unable to react. It would give Mr. Rivera and the other suspects a range of opportunities including in the extreme allowing an assault on the defenseless officer.

On July 20th, two separate reports documented his violent behavior. In the first, he was identified as an armed robbery suspect. He was then also named as a suspect in a vandalism case. The next day (July 21st, 2010) a Chevy Astro van was taken at gunpoint. Subsequent information from a citizen informant identified Mr. Rivera as responsible for this carjacking. It seems clear to me that Mr. Rivera's behavior pattern indicated an ongoing escalation in the seriousness and accompanying violence of his criminal acts.

That leads us to Mr. Rivera's actions on July 22nd. Overall, it is clear to me that while still only 17, Mr. Rivera already possessed the mindset of a "career criminal". The range of his previous violations of the law and disrespect for authority are well documented. In some cases he was positively identified as criminally responsible. In others, circumstantial reports lead to the opinion that he was involved in other unlawful events. I believe that Mr. Rivera had no regard for the law and the safety of others. In my opinion, on this day he was predisposed to flee from the police as evidenced by his earlier escape from Juvenile Center.

I believe that Mr. Rivera's criminal behavior now took on a new dimension when he was located at the wheel of the stolen Astro van.

Stockton P.D. Officer Hughes attempted to stop the van through the use of his marked unit's overhead emergency lights and siren as prescribed by the California Vehicle Code. Without a doubt, from this point forward Mr. Rivera knew that he was being pursued by law enforcement.

While he had ample opportunity to do so, Mr. Rivera never yielded to the officers' lawful attempts to stop the stolen van. A cooperative suspect would cease his evasive actions and then follow the lawful orders of the officers present. As we shall see, instead of complying and thereby deescalating the incident, Mr. Rivera continued his dangerous efforts to escape. This is contrary to the law and good decision making. Had Mr. Rivera made the simple, common sense decision to stop and comply at any time during this pursuit, we would not be analyzing the subsequent events.

Instead, Mr. Rivera drove through residential areas faster than the speed limit. Estimates by the involved officers' make it clear that his desire to escape prompted him to operate the vehicle at unsafe and reckless velocities:   Along with various California Vehicle Code violations, during the pursuit he lost control of the van, went up on a residence's front lawn, rammed through a cyclone fence and knocked down a Stop sign. In addition, he took evasive action when a spike strip was placed in the vehicle's path as well as driving head on towards responding units. Despite all of these events, Mr. Rivera kept pushing the van onward whereas a reasonable person would have realized the collective danger and stopped. At two moments during the pursuit, Mr. Rivera even displayed what I would characterize as a cavalier attitude towards the current circumstances: One civilian witness recounted how Mr. Rivera smiled as he drove past. Another witness stated that as Mr. Rivera went by, the suspect gave him a "What's Up" head gesture.

Clearly, Mr. Rivera's operation of the Astro Van constituted a serious danger. In fact, he was not even licensed to be at the wheel. To me, it appears that his focus was on escaping with no regard for the safety of the civilians in the neighborhood and the officers involved. He never yielded to the officers' authority. In truth, I believe it can be said that this goal surpassed Mr. Rivera's concern for even his own safety. Going further, it is also my opinion based on the above facts that had Mr. Rivera succeeded in escaping, he would have continued his lawless behavior, perhaps even escalating his use of violence as part of his criminal enterprise.

As the pursuit began, Det. Nesbitt observed Mr. Rivera coming directly at him in the Astro van. During the pursuit, Det. Nesbitt observed Mr.

Rivera driving through the residential neighborhood at speeds estimated peeking at between 50 and 60mph. Eventually, Mr. Rivera was stopped through the combination of a PIT maneuver and then the van crashing through the side of the Bancroft building.

At this point, an analysis of Det. Nesbitt's actions has to take into consideration a number of factors.  This includes the involved officers' knowledge of Mr. Rivera's ongoing potential for continued violence and lawlessness.  This certainly applies to Det. Nesbitt as he exited his vehicle just after the Astro van slammed into the building at 9559 Bancroft Ave, Stockton, CA. Further, Det. Nesbitt knew of at least some of Mr. Rivera's prior criminal activities and his escape from Juvenile Hall.  For example, Det. Nesbit recounts his possession of a flyer outlining Mr. Rivera's behavior. He was well aware that Mr. Rivera was subject to arrest for the armed carjacking of this same van.  In addition, he had discussed this matter with Det. Nhem.  The latter had informed Det. Nesbitt of Mr. Rivera's carjacking activities while armed with a shotgun as well as assaults with deadly weapons (ADW) allegations and a possible robbery with a gun.   Det. Nesbitt also understood that Mr. Rivera had been seen by witnesses driving the stolen Astro van.

Det. Nesbitt—as well as the other officers involved--was confronted with a situation requiring good decision making. It surely must have been a chaotic scene.  To say the least, this would cause even the most experienced officers to consider it as highly unusual. Most notably, the van's high velocity had caused it to penetrate so deep into the structure that it was almost fully lodged inside. Only the van's back bumper area remained outside the building. Mr. Rivera was still at the wheel of the vehicle with its engine running.   Close by, a parked vehicle—a red Chevy Cavalier--had been hit by the van seconds before and been thrown up onto the grass by the force of the impact. More police units were arriving with lights and sirens.

Det. Nesbitt and other officers began to deal with this unique pursuit termination.   Det. Nesbitt hoped that it was nearing a peaceful resolution.  It would seem reasonable that Mr. Rivera would realize the futility of continuing his escape attempts.   The officers however, still had to be on guard for their safety due to the potential for violence.

To this end, I believe that Det. Nesbitt now relied on his training and experience, specifically in the area of high risk car stops.   The latter is a procedure commonly used to minimize danger to officers in such situations as well as the task of arresting the suspect.   Instead of officers moving up alongside an occupied, stopped felony vehicle— especially with an unusual setting with the Astro van—they adapt their

15

tactics, experience and prior training to resolve the situation.   In addition to commands, officers use the various tools techniques available to persuade or force the suspect to exit the vehicle. Typically, the suspect then decides to cooperate and is taken into custody. On occasion however, it is common knowledge that a suspect will resume his escape efforts or even worse, shoot at officers. The latter is a very real scenario that Det. Nesbitt and the other officers had to keep in mind.

Det. Nesbitt told me that he has received Academy training in high risk car stop tactics followed by similar training sessions as part of the Department's Advanced Officer Training.  In addition, he estimated that he has participated in "hundreds" of on-duty high risk car stops.  None of these ended in a manner similar to the confrontation with Mr. Rivera.

Det. Nesbitt was wearing a Department approved tactical vest that he had donned prior to the pursuit.  The garment included identification that he was a law enforcement officer.  He was armed with a Department approved handgun which he drew as he left his vehicle. Det. Nesbitt moved to a position of cover consistent with high risk car stop training.  For this he selected a large metal community mail box that was in line with rear of the Astro van. (When Witness Lorenzo Fonseca was interviewed, he related seeing an officer—most likely Nesbitt--take up such a defensive position at the mailbox.) Det. Nesbitt had a direct line of sight from his position to the rear of the Astro van. He estimated that he was 15 feet from the vehicle.  He could see Mr. Rivera's head through the rear window. Det. Nesbitt began yelling commands such as "show your hands" and "get out" at Mr. Rivera, trying to communicate steps he wanted the suspect to follow in order to peacefully resolve this confrontation.

Probation Officer Correll--who was riding with Det. Nesbitt—also recalled him telling Mr. Rivera to "show your hands" and "get out of the car". Other officers did the same. In addition, numerous civilian witnesses interviewed on the heels of this event recounted hearing commands.  No one specifically attributed them to Det. Nesbitt but the fact remains that collectively the officers were heard trying to verbally gain Mr. Rivera's compliance.

From his vantage point at the mailbox, Det. Nesbitt noted to his left two Stockton Police Department officers.  Closest to him was Officer Dunn. The latter was on the driver's side of his marked patrol unit. Beyond was Officer Azervand.  As Det. Nesbitt watched this unfold, I believe he took into consideration an event from only moments prior:  At one point during the pursuit, Mr. Rivera lost control of the Astro van.  The vehicle ended up on the front lawn of a house near its porch. Det.

16

Nesbitt has related how "We all stopped, waiting to see what he was going to do." I believe the officers were considering the implementation of high risk car stop tactics at this point.   However, this became irrelevant when Mr. Rivera backed up towards the police cars.  As he did so, Det. Nesbitt thought that Mr. Rivera was going to hit one of the police cars.  Mr. Rivera then drove forward and the pursuit resumed.

Det. Nesbitt now saw the Astro van begin to rock back and forth. This action was contrary to his experience and expectations.  Det. Nesbit told me that he anticipated that Mr. Rivera would surrender after crashing through the building.   The detective was still yelling commands while holding his handgun pointed towards the van. Det. Nesbitt told me he felt that this unexpected development was an indicator of Mr. Rivera's continuing efforts to escape.

In my opinion, I agree with this assessment.  It was clearly a conscious effort on Mr. Rivera's part to free the vehicle under his control and back it out of the structure.  Since there were police officers and at least one marked unit within that escape route, it is my opinion that Mr. Rivera was more than willing to use the van as a deadly weapon in the process.  A Google search for statistics on a 1995 Chevrolet Astro van shows the gross weight at just over 4,000 pounds.   One must understand that this truly makes the vehicle a weapon capable of killing or seriously injuring anyone in its path.  Even at a low speed, the kinetic energy generated by such an impact could be fatal.

But in this case, the van's deadly potential is only part of the use of force equation.  It should be remembered that Mr. Rivera was believed to be in possession of a shotgun.  Had he succeeded in freeing the Astro van from the interior of the garage, the potential lethality of such a weapon's field of fire would have opened up by a wide margin.  By design, a shotgun can be used as a "point and shoot" firearm where within range, it does not have to be visually aimed in order to be lethal. In addition, during the carjacking a rifle and a handgun had also been used. Further, while only Mr. Rivera had so far been seen, the potential for other criminal associates to be hiding inside the vehicle was a real safety concern.  During some of the prior crimes, Mr. Rivera had acted in concert with 2-3 other suspects who were sometimes armed. Officers had to keep in mind that these individuals and/or weapons could be inside the stolen van.  The potential for such lethality added another dimension to Det. Nesbitt's threat assessment.  I believe that the absence of other suspects or weapons during a subsequent search has no relevance.  What is relevant is that Det. Nesbitt's state of mind most likely included the above factors at the moment the van was about to break free

Det. Nesbitt estimated that the Astro van's back and forth movement went on for approximately one minute.   Clearly Mr. Rivera was in control of the vehicle, not only shifting gears repeatedly from "Reverse" to "Drive" but also mashing the accelerator--thereby revving up the engine—as he sought to extricate it from its position.   There are multiple accounts of the noise generated by the van's tires and engine throughout this process.   (This even extends to Witness Shante Todd who from his location heard the engine noise and described it as "loud".) As this continued, Det. Nesbitt related how he saw that Mr. Rivera was on the verge of accomplishing his goal.   The van seemed to lurch upwards as if it was about to clear the obstructions and break free.

One should take into account that throughout this tense confrontation, Det. Nesbitt had his handgun pointed at Mr. Rivera inside the van but did not fire.   It is my opinion that Det. Nesbitt was following his Department's use of force guidelines in that while dangerous, the situation had not yet escalated to the point where he would be justified in using lethal force.

It is my belief that this demonstrated Det. Nesbitt's ability to accurately evaluate and respond to the situation.   This is especially true in the context of monitoring the increasing threat to not only himself but also to the other officers present.   In my opinion, Det. Nesbitt's ongoing decision making was reasonable and appropriate.   This was still a rapidly evolving scene with no guarantee of a peaceful end even though officers were attempting to achieve that goal. The situation was surely very tenuous and chaotic.   This grew worse as Mr. Rivera amplified his escape efforts. As we have previously noted, Mr. Rivera was driving the Astro van back and forth inside the garage in an obvious attempt to propel it out of the building.   He had already seen Mr. Rivera operate the vehicle in a similar fashion moments before.

With Mr. Rivera now on the verge of dislodging the van, Det. Nesbitt recognized the rearward movement as further escalating this dangerous confrontation into an imminent life or death situation.   He perceived it to be of increasing danger of death or great bodily harm to Officer Dunn, Officer Azervand and himself. Det. Nesbitt was emphatic on this point stating that he believed officers would be run over. It was reasonable for him to perceive this as a deadly threat. By extension, the safety of the community was in jeopardy should Mr. Rivera succeed in leaving the scene.   Simply put, I believe that Det. Nesbitt evaluated the totality of the circumstances before him as being so dangerous that it became imperative to immediately stop Mr. Rivera.

This led to Det. Nesbitt's conscious decision to defensively use lethal force to protect him and the others.  His focus was on ending Mr. Rivera's aggressive actions. Det. Nesbitt fired his handgun, telling me later that there was "no doubt" in his mind that he had to use lethal force.  He added that he did so only after seeing the van lurch back towards the officers as if it was about to finally break free. His point of aim specifically targeted Mr. Rivera's position "straight through the back window to the drivers' seat".   Det. Nesbitt fired until the vehicle stopped its rearward movement.  In response, the van settled into a stationary position and Det. Nesbitt discontinued his use of lethal force. When Det. Nhem later crawled into the van, he found that the gear shift was still in the "Reverse" position.  Because of the circumstances, I believe that it was only through the use of lethal force that  caused Mr. Rivera's pressure on the accelerator pedal to cease.

While an alternative may have been for the officer to hold his fire or retreat, I believe that under the circumstances as faced by Det. Nesbitt neither step would have been safe or tactically sound . Moving from his position of ballistic protection would have exposed Det. Nesbitt while leaving the other officers still in the vehicle's path.  Holding his fire would have allowed the Astro van to continue on its course towards the officers. Mr. Rivera's actions lead me to believe that had he not been stopped, the outcome could very well have been deadly for law enforcement personnel. For Det. Nesbitt, the lethal force decision was a reasonable progression.  It is pertinent to return to California Penal Code Section 835a:

**"A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested;**

It is my opinion that prior to this moment, the law enforcement personnel involved had taken reasonable steps in their attempts to resolve this incident through means other than the use of lethal force. Prior to the pursuit, officers had attempted to stop Mr. Rivera while he was still in control of the Astro van. They had also used tried spike strips to halt the pursuit. Mr. Rivera could have ended it himself when he came to a halt on the front lawn of a residence midway through the pursuit or at any other time during the chase. At the Bancroft scene, officers issued numerous verbal commands trying to gain Mr. Rivera's compliance.  He never did. A police unit was positioned behind Mr. Rivera's vehicle employing standard police tactics. The unit provided cover as well as a quick method to hopefully block in the van. One often sees similar positioning of police units after the use of the PIT maneuver.

It must be remembered that in addition to Det. Nesbitt at least two other officers were pointing weapons at Mr. Rivera.  They also held

their fire until they felt compelled to do so. Obviously, up to that moment, they had not yet consciously developed sufficient concern for their safety that would make the use of lethal force reasonable. In and of itself, just the pointing of a law enforcement firearm constitutes a very serious warning to a suspect that he should comply with the officers' orders. Without a doubt, Mr. Rivera had to have known of the officers' presence.  All officers were in clearly identifiable police garb. Right behind the Astro van was Officer Dunn's patrol unit.  It was well marked as were units that participated in the pursuit moments earlier. Emergency lights were still active.  Mr. Rivera surely knew that the officers were armed and focused on him. I believe that his desire to escape was so strong that this was of little or no concern to him. I also believe that the lives of other human beings were of no consequence to his thought process.

Due to Mr. Rivera's decisions and his known criminal history, it should be understood that law enforcement's options at the moment were limited.  It would be outside the realm of good tactics and common sense had the officers closed the distance on the suspect.  Attempts to gain control by going inside the structure or the van and/or using law enforcement tools such as a Taser or pepper spray would not be tactically sound.  Instead, the officers involved decided to hold their positions and wait for Mr. Rivera to respond rather than advancing on the vehicle.  This was in my opinion a reasonable decision on the officers' part reflecting current standards of training and tactics.

Had Mr. Rivera not tried to free the van from the garage, it is my belief that this event would have then been treated as a barricaded suspect in a vehicle.  This is fairly common at a pursuit's termination.  With this, Sgt. Reynosa, Det. Nesbitt and the other law enforcement personnel present would have likely initiated standard police practices for such events starting with a "hasty plan".  This consists of courses of action developed in "real time" and close proximity that are geared towards providing law enforcement with some degree of stabilization and control.

As outlined in Cmdr. Charles Heal's (L.A.S.D. ret.) book "Field Command", the other two types of plans are a "deliberate plan" and a "contingency plan". (This volume is widely accepted as a "must read" textbook for law enforcement tactics and decision making.) Had this incident progressed with Mr. Rivera remaining inside a stationary van, it is clear to me that the officers would have moved into a deliberate plan approach as time and circumstances allowed.  The considerable resources of law enforcement—more uniformed officers, a greater supervisory presence, evacuations of nearby citizens, less lethal options, a command post element for centralized decision making and

an armored rescue vehicle for example—could all have possibly been brought to bear to resolve this dangerous situation. However, Mr. Rivera's actions did not allow for circumstances to reach this level of law enforcement response and planning.   For a balanced perspective, one must also consider that the San Joaquin County Sheriff's Office Policy Manual.  Specifically, Section 300.3 states:

"**It is also recognized that circumstances may arise in which deputies reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department.   Deputies may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting.**"

10.   CONCLUSIONS

This analysis returns to the San Joaquin County Sheriff's Office Policy Manual's Use of Force component.  Section 300.3.2 (Factors Used to Determine The Reasonableness of Force) lists a number of relevant factors for personnel to consider.  Below are listed those policy factors that in my opinion have a direct relationship to Det. Nesbitt's decision to use lethal force:

(a) **Immediacy and severity of the threat to deputies or others**
(b) **The conduct of the individual being confronted as reasonably perceived by the deputy at the time**
(e) **Subject's mental state or capacity**
(f) **Proximity of weapons or dangerous improvised devices**
(h) **The availability of other options and their possible effectiveness**
(i) **Seriousness of the suspect offense or reason for contact with the individual**
(j) **Training and experience of the deputy**
(k) **Potential for injury to deputies, suspect and others**
(l) **Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the deputy**
(m)   **The risk and reasonably foreseeable consequences of escape.**
(n) **The apparent need for immediate control of the subject or a prompt resolution of the situation**
(p) **Prior contacts with the subject or awareness of any propensity for violence.**
(q) **Any other exigent circumstances**

Within the context of these Department policy factors, it is my opinion that Det. Nesbitt's use of lethal force was a reasonable course of action.   As we have seen, numerous steps were taken by law enforcement geared towards a peaceful resolution prior to that point. At the termination scene, Det. Nesbitt and others repeatedly tried to

gain Mr. Rivera's compliance with lawful orders.  Mr. Rivera was duly warned but did not respond as directed. Det. Nesbitt knew of his criminal behavior and believed him to be armed. In fact, here the vehicle itself fits the description of a weapon.  In my opinion, Mr. Rivera's actions and potential for further violence necessitated the use of lethal force.  While this outcome was tragic, had Mr. Rivera just followed the officers' repeated commands, it is my opinion that he would have been detained without the use of that force.

As this analysis closes, the landmark court case of Tennessee v. Garner (471 U. S. 1{1985}) has focused relevance for all that has been discussed:

**"if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.**

In conclusion, it is my opinion that Det. Nesbitt possessed an objective fear that Mr. Rivera was an imminent lethal threat thereby necessitating the use of deadly force.  The basic truth is that Det. Nesbitt was in fear for his life and that of other officers. In my opinion, the above steps by Det. Nesbitt and other law enforcement personnel were reasonable and within standard police practices for such a criminal driven event.   Det. Nesbitt's use of deadly force in response to the totality of the circumstances was reasonable and consistent with the San Joaquin County Sheriff's Office policy, POST's Learning Domains and the law.   I am in agreement with the findings of the San Joaquin County's Office of the District Attorney.

13.   I, Ronald K. Miller, do hereby state and affirm under penalty of perjury that the above expressed expert opinions are well considered and clearly based on recognized police standards and my own experience as a law enforcement officer.  I will so testify under oath in a Court of Law if so called.  At this time, this concludes my opinions in this matter. I do anticipate receiving relevant additional materials and information in the future. When this takes place, I reserve the right to supplement and/or update this opinion as appropriate.

SIGNED:   *Ronald K. Miller*

At Orange, CA on December 15, 2016

22

## TESTIMONIAL RECORDS

**EXPERT WITNESS EXPERIENCE OF  R. K. MILLER**

2015:    Expert Witness for the City of Los Angeles in the matter of Jonathan Christian v. City of Los Angeles (United States District Court Case No. CV 14-08924 ODW (MRWx)

2014:    Expert Witness for the City of Los Angeles in the matter of Diego & Corrales v. City of Los Angeles.  (L.A. County Superior Court Case # BC496533)

2013:   Expert Witness for the City of Los Angeles in the matter of Timothy Bedford v. City of Los Angeles.  L.A. County Superior Court Case #BC475365

2012: Expert Witness for the City of Long Beach (California) in the matter of Lidia Amesquita v. City of Long Beach  Case # CV 12-3113PA (FFMx)

2011:  Expert Witness for the City of Long Beach (California) in the matter of Garduno v. City of Long Beach  Case # NC053710

2011:   Designated Expert Witness for the District Attorney for the County of Multnomah, Portland, Oregon in the matter of William Kyle Monroe, Case # DA 222376

2010:    Expert Witness for the City of Long Beach (California) in the matter of Wooten v. City of Long Beach  Case # NC053151

2010:  Expert Witness for the City of Long Beach in the matter of Lakesha Wright vs. City of Long Beach  Case # BC404505

2009:   Expert Witness for the City of Long Beach in the matter of Grant v. City of Long Beach  Case # NC051384

2005:  Designated Expert Witness for the City of Long Beach (California) in the matter of DAVID WILLINGHAM, PENELOPE GRONBECK, SHERMAN AUSTIN, CARLOS CONTRERAS, LAUREN ALTES, JEFFREY HENDRICKS, CANDACE KHAOKHAM AND RANDALL METZ vs. the CITY OF LONG BEACH, et al.  Case No: CV02-03473RSWLC(CWx)

2003:    Designated Expert Witness and "Person Most Knowledgeable" for the City of Long Beach in the matter of Betty G. Crowder vs. City of Long Beach, et al.  Case No. CV02-04999-NM (VKx)

2002:  Designated Expert Witness and "Person Most Knowledgeable" for the City of Huntington Beach (California) in the matter of James Martin Davis vs. City of Huntington Beach, et al.   Case No. 00CC09935

1996 Designated Expert Witness for the Orange County District Attorney's Office in the matter of the People of California vs. Jonathan (Rusty) Kennedy, et al. HBPD Case No. 93-013519

1996    Designated Expert Witness for the Orange County District Attorney's Office in the matter of the People of California vs. Chad Salisbury.   Case No. 95CF2100

1995    Designated Expert Witness for the Orange County District Attorney's Office in the matter of the People of California vs. Donald James, et al.  HBPD Case No 95-20303

1993    Designated Expert Witness for the Tulare County District Attorney's Office in the matter of the People of California vs. Rich Moran, Case No. 935640

1991    Designated Expert Witness for the Orange County District Attorney's Office in the matter of the People of California vs. David Richman, et al.  Case No. C88574

1991    Designated Expert Witness for the Santa Clara County District Attorney's Office in the matter of the People of California vs. Joshua Huff

24

# R. K. Miller
## Police Practices Consultant
**Use of Force/Police Tactics/Firearms**
**P. O. Box 5268, Orange, CA 92863**
**Phone: 714 363-1569 Fax: 714 637-7523**
**E-MAIL: rkmiller@socal.rr.com**

## Fee Schedule

**INITIAL CONSULTATION**                                    **$500.00**
This fee is charged upon initiating a case file and includes the preliminary case review and assessment, fixed office costs and operating expenses.

**CASE REVIEW AND PREPARATION**                  **$150.00 per hour**
This hourly fee applies to all activities subsequent to the Initial Consultation, and includes in depth case review, analysis, research, preparation and production of requested documents and reports.  Included in this category are:
- Review of case documents and/or exhibits
- Debriefing or witness interviews
- Meetings, report writing or teleconferencing
- Production of documents, exhibits or displays
- Site surveys and photography/videotaping.

**CASE PRESENTATION:**                              **$350.00 per hour**
This basic hourly fee applies to all depositions, hearings and/or court appearances and is in compliance with the Federal and State rules governing "expert witnesses".  This fee is separate and distinct from other fees such as preparation, travel, lodging, meals, etc.

**DIRECTED TRAVEL**                                       **(At Cost)**
All travel related expenses, including transportation, insurance, lodgings, rental cars, parking and meals will be billed at actual costs.  Costs of airfare may include insurance and other expenses associated with such purchases. Travel time and non-activity days away from Orange County may be billed at a reduced hourly rate as appropriate.

**STATEMENT OF ACCOUNT**
Itemized billings (Statement of Account) will be prepared and submitted on a periodic basis consistent with the activities of the account.  Payment is due upon receipt of a billing.  Late charges may be assessed on overdue accounts at the rate of 1.5% interest per month on the unpaid balance.  Payment for Mr. Miller's services is the responsibility of the contracting firm or agency unless other arrangements are made at the time of retention.

(Revised 11-15)

# PROFESSIONAL RESUME:
## R.K. MILLER

**P. O. Box 5268, Orange, CA 92867**
**Phone: (714) 363-1569  Fax: (714) 637-7523**
rkmiller@socal.rr.com

**FORMAL EDUCATION** (Graduated "Cum Laude" from both institutions)
1975—Bachelor's Degree, Long Beach State University, Long Beach, Calif.

1972---Associate Arts Degree, Cerritos Jr. College, Norwalk, Calif.

**LAW ENFORCMENT EXPERIENCE**

| | |
|---|---|
| 2005 - Present | Reserve Police Officer, Orange Police Dept. |
| 2003- Present | Officer in Charge, Golden West College Basic SWAT Academy |
| 2003- 2005 | Watch Commander, Uniform Division Huntington Beach Police Department (Retired, 3-04-05) |
| 2003 - Present | Board of Directors, California Association of Tactical Officers (CATO) |
| 2003- 2004 | Executive Officer, Uniform Division Huntington Beach Police Department |
| 2002 | Promoted to Lieutenant and assigned to Uniform Division as a Watch Commander |
| 2001 | Field Supervisor, Uniform Division. |
| 1998-2001 | Training Unit Supervisor.  Responsible for overseeing the Department's training programs and managing the expenditure of funds.  Also worked with California POST to ensure compliance with mandated law enforcement training. |
| 1992-2001 | SWAT Team Leader with responsibility for planning and execution of training, tactical operations and other specialized tasks as needed. |
| 1991 | Promoted to Sergeant and assigned Field Supervisor duties |
| 1989-2001 | Assigned to the Department's Trauma Support Team, initially as a member and later as a supervisor. |
| 1987 | Various assignments |

- Summer Beach Detail
- Department's SWAT Team as a collateral duty.
- Department instructor for firearms, tactics & chemical agents.
- Special Enforcement Unit as a detective working investigations including gang and parolee enforcement, narcotics/vice investigations and other

26

matters at the direction of the Chief of Police.
- Developed expertise in white hate groups including skinheads.

1986    Police Officer, City of Huntington Beach, CA

1984    Various Assignments
- Assigned to the Investigation Bureau, Orange P. D. with experience in General Investigations, Robbery/Sex Crimes and Narcotics
- Promoted to Master Police Officer with part-time supervisory responsibilities.
- Assigned as SWAT Assistant Team Leader
- Field Training Officer

1982    Police Officer for the City of Orange, CA
Assigned to the Department's SWAT team as a collateral duty.

1980    Assigned as a Field training Officer.  Responsible for evaluating and developing newly hired officers for field duties

1976    Sworn in as a Police Officer for the City of Downey, CA
after graduating from Los Angeles Sheriff's Academy

**CALIFORNIA POST CERTIFICATIONS**
- Basic
- Intermediate
- Advanced
- Supervisory
- Management
- POST SLI and Management Courses graduate

**COURT QUALIFIED EXPERT**
- Heroin Influence
- Street Gangs
- White Supremacists & Skinheads
- Less Lethal Munitions
- Use of Force Issues

**ARTICLES PUBLISHED BY:**
- The Tactical Edge (NTOA)
- The CATO News
- The Dispatcher
- Tactical Response
- The Firearms Instructor
- The Tactical Response Association
- Law Officer Magazine (Monthly columnist)
- Caliber Press

**MILITARY EXPERIENCE**
- 3 years United States Marine Corps, (1966-1969)
- Honorable Discharge as a Sergeant

## INSTRUCTIONAL EXPERIENCE

**2002-Present**       **President, National Training Concepts, Inc.**
- Expert Witness case review & testimony
- Customized Firearms & Tactical Instruction
- Patrol Rifle Instructor
- Diversionary Device Instructor
- Less Lethal Munitions Instructor
- Active Shooter Response Instructor
- Tactical Weapon Operator's Course'
- Tactical Team Leader Update Course
- Critical Incident Management

**2008-Present**       **Combined Tactical Systems, Jamestown, PA**
- Various Instructor Level Courses

**1999-2015**       **NRA/Law Enforcement Division, Fairfax, VA**
- Various Instructor Level Law Enforcement Firearms courses

**1996-2002**       **International Training Resources, San Francisco, CA**
- Firearms
- SWAT Supervision, Operations & Tactics
- Less Lethal Munitions
- Diversionary Devices
- Critical Incident Management

**1993-Present**       **Singleton International, Warrenton, VA**
- Firearms, SWAT Operations & Tactics

**1991-1996**       **Chapman University, Orange, CA**
- SWAT/Hostage Negotiations
- Racist Groups and Street Gangs

**1991-1993**       **Heckler & Koch International Training Division, Sterling, VA**
- Firearms & SWAT Tactics

**1990-Present**       **Golden West College Criminal Justice Training Center, Huntington Beach, CA**
- Basic Police Academy Training Advisor
- SWAT Academy Officer in Charge
- Firearms & Tactics
- Chemical Agents
- Street Gangs
- Leadership Development

**1990-Present**       **California POST**
- Subject Matter Expert and Contributor for various POST training committees, projects and videos

**1986-2005**       **Huntington Beach Police Dept.**
- Field Training Officer
- Firearms Instructor
- Officer Safety & SWAT Tactics
- Chemical & Less Lethal munitions & Diversionary Devices
- Street Gangs
- Trauma Support

**1982-1986**       **Orange Police Dept.**
- Master Police Officer (Corporal position)
- Firearms Instructor

28

- Field Training Officer

**1976-1982**          **Downey Police Dept.**
- Field Training Officer

**PROFESSIONAL ORGANIZATIONS**
- California Association of Tactical Officers (CATO)
- California Association of Police Training Officers (CAPTO)
- California Police Officers' Association
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- National Rifle Association (NRA)
- National Tactical Officers' Association (NTOA)

# EXHIBIT B

Case No. 2:10-CV-002495-MCE-CKD

<u>Fed. Rules Civ. Proc., rule 26(a)(2)(B)</u> report of

## Craig Fries

submitted by

Defendant John Nesbitt



115 South Church Street
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com



# Expert Report of Craig Fries

# Smith-Downs, et al
## vs.
# Eric Azarvand, et al

# USDC Case No.: 2:10-cv-02495-MCE-CKD

# February 1, 2017

### _Expert Report of Craig Fries_

### **Smith-Downs vs. Eric Azarvand, et al**

### **USDC Case No.: 2:10-cv-02495-MCE-CKD**

February 1, 2017

### Qualifications

I am the CEO and founder of Precision Simulations, Inc. I am an expert in the field of Accident and Crime Scene Documentation and Analysis, 3D Laser Scanning, 3D Animation & Modeling, Forensic Video and Audio Analysis, Photogrammetry and Ballistic Trajectory Modeling. I am a board member of the Forensic Expert Witness Association, a member of the Association for Crime Scene Reconstruction, The California Association of Criminalists and the California Association of Accident Reconstruction Specialists. I have provided you with a true and correct copy of my CV, my past publications, fee schedule and my recent testimony. **_(See Exhibit A, attached – Craig Fries Curriculum Vitae, Trial Testimony History and Fee Schedule.)_**

I have personal knowledge of the contents of this report to the extent indicated below, and, if called upon to testify, I could testify competently to its contents.

**Requested Tasks**

I was provided materials related to this incident.

***(See Exhibit B, attached – List of Supplied Materials.)***

I was instructed to complete an independent analysis of the available evidence and witness testimony related to the shooting of Mr. James Rivera by Stockton PD Officer's Gregory Dunn and Eric Azarvand and San Joaquin Sheriff's Deputy John Nesbitt on July 22, 2010 at approximately 1037 hours.

**Event Summary**



*Aerial Photo of Incident Location*

In the morning of July 22, 2010, several officers from the Stockton PD and Deputies with the San Joaquin Sherriff's Office became engaged in a high speed pursuit of a stolen Blue Chevrolet Astro van stolen and driven by James Rivera within the city of Stockton. According to information available to the officers, Mr. Rivera had stolen the van at gunpoint using a shotgun the previous night. The pursuit began in the area of Cody Way and Colt Drive and continued for approximately 2 miles, terminating with the stolen vehicle crashing into a residence at 9559 Bancroft Way after a vehicle intervention by Officer Gregory Dunn. Throughout the pursuit Stockton Police Officer Eric Azarvand transmitted updates regarding location and speed during the pursuit, noting speeds of up to 60 mph. According to Officer Azarvand's transmission,  the post-event testimony of other officers involved in the pursuit and physical evidence along the pursuit route, the driver of the stolen vehicle drove erratically, ran stop signs, ran over a spike strip laid to impede his flight, nearly collided with officers standing on the sidewalk, drove on the sidewalk and lawn areas of adjacent houses, ran over cyclone fencing and nearly struck officer's patrol vehicles until his progress was stopped by the vehicle intervention of Officer Dunn. After the stolen vehicle came to rest with the majority of the vehicle embedded in the exterior wall of the residence at 9559 Bancroft Way, Stockton PD Officer's Eric Azarvand and Gregory Dunn, San Joaquin Sheriff's Deputy John Nesbit and other personnel from both agencies exited their vehicles with firearms drawn, approached the stolen vehicle and commanded the driver to stop the vehicle and show his hands.  Mr. Rivera did not comply with the commands given and attempted to drive the van back out of the hole in the exterior wall, striking Officer Dunn's patrol vehicle multiple times. Officer's Azarvand and Dunn were both positioned behind the van and stated they were in immediate danger from being struck by the van or crushed between the van and the patrol vehicles. As the officers continued to give commands to stop the vehicle, Mr. Rivera continued to attempt to back the van out of the hole, and after striking the patrol vehicle adjacent to Officer Dunn again, Officers Dunn, Azarvand and Deputy Nesbitt discharged their firearms at the driver, firing a total of 29 times and striking the driver 9 times, fatally wounding him. After the shooting, Officer Dunn backed his patrol vehicle away from the van to facilitate removing the driver and provide medical aid.

*(See Exhibit C, attached and below – Aerial View of Pursuit Route.)*



## Analysis

To complete my analysis, I undertook the following tasks:

- I reviewed the 3D laser scan data of the scene compiled by the California DoJ's Bureau of Forensic Services.
- I reviewed the scene, Officer and vehicle photos taken by the Stockton PD, CHP and DoJ.
- I reviewed the reports generated by the Stockton PD.
- I reviewed the reports generated by the San Joaquin Crime Lab.
- I reviewed the reports generated by the California DoJ.
- I developed a 3D working model of the crime scene based upon the 3D laser scan data, the available photography and the measurements of evidence derived by the Stockton PD and the DoJ.

- I reviewed the 3D laser scan data of the Astro van and the ballistic trajectory analysis performed by the California DoJ.

- I derived a 3D model of the Astro van with the bullet trajectories and imported this model into the 3D working model for advanced analysis of the trajectories and physical evidence at the scene.

- I reviewed Dr. Bennet Omalu's autopsy report and created a 3D model of the gunshot wounds and wound paths received by James Rivera.

- I reviewed the interview and depositions of the witnesses and involved officer's.

- I used the 3D Working Model to compare the witness statements, including Officer Azarvand's, Officer Dunn's and Deputy Nesbitt's, to the physical evidence.

- I reviewed the CAD report and the associated radio transmissions to determine overall timeframe of the event.

- I derived vehicle kinematics for the Astro van and Officer Dunn's patrol vehicle.

- I derived shot timing for the three shooting officers.

- I created a PowerPoint presentation depicting the pursuit path and events that occurred during the pursuit.

- I created a real-time 3D animation of the shooting phase of the event based upon the 3D working model, physical evidence, ballistic trajectories, and witness and Officer statements.

- *Review and utilization of input data from DoJ 3D laser scan:*

  - I received the 3D laser scan data of the incident scene compiled by the California DoJ Bureau of Forensic Services. 3D laser scanning uses a laser beam to survey the environment around it, measuring both spatial location and color of everything with its line of sight. The resultant 33,000,000 data points provide a detailed 3D model accurate to within 6mm and were used directly in the analysis. I pioneered the use of 3D laser scanning in forensic analysis in 1998 and was the first person to get laser scan data admitted into trial in 1999. I introduced the technology to the accident reconstruction experts in the US and am among the foremost experts in the field in the utilization of this data for

forensic analysis. The data I received covered an area of approximately 14,000 sq. ft. of Salter Drive at the intersection with Bancroft Way and included the roadway, curbs, houses, trees, driveways, mailboxes, vehicles, physical evidence and textural details of the incident area. I used the scan data as the foundational basis for the 3D working model, 3D ballistic trajectory analysis and 3D animation.

**(See Exhibit D, attached and below – 3D Laser Scan Data Imagery.)**



- *Develop a 3D working model of the crime scene based upon the 3D laser scan data, the available photography and the measurements of evidence derived by the Stockton PD and the DoJ:*
  - Review of the physical evidence located at the scene.
    - The physical evidence found at the scene consisted of number of critical items.
      - The point of rest of the Astro van after it stopped moving within the hole it created in the residence at 9559 Bancroft Way.
      - The location of the 29 expended casings from the three-shooting officer's Sig Sauer .40 caliber firearms.

- The location of the Officer Dun's patrol vehicle after he moved it backwards to allow access to the Astro van.
- The location of the Chevy Cavalier that was struck by the Astro van prior to the van striking the mailboxes and colliding with the residence. Prior to being struck by the Astro van this vehicle was parked normally on the street and was moved and rotated by the force of collision.
- The location of the two stand of mailboxes adjacent to 9559 Bancroft Way. Two of these mailboxes were also struck by the Astro van and knocked off their foundations. One of these boxes ended up adjacent to the passenger side of the Astro van and the other ended up underneath the Astro van within the residence.
- The location of Officer Azarvand's patrol vehicle. This vehicle was not moved after the event.
- The location of the additional civilian and police vehicles at the scene.

***(See Exhibit E, attached – Stockton PD Physical Evidence Locations Diagram.)***

o To reconstruct the spatial and temporal aspects of this event, I compiled all the physical evidence locations as measured by the DoJ laser scan, the 3D laser scan model of the scene, the 3D laser scan model of the Astro van and the ballistic trajectory analysis and the 3D gunshot wound model of James Rivera into the 3D working model. This model maintains fidelity to the spatial and temporal aspects of its individual parts, while allowing fine analysis in the computer and adding the ability to animate and move these elements over time. Using the 3D working model I can see the spatial and temporal relationships between the evidence, the Astro van and the officer's and determine which relationships match the physical evidence and which do not. Additionally, the statements made by witnesses and involved parties can be compared to the physical evidence to determine which are supported and which are not. I undertook this

process both to match the relationships to the evidence and to test the statements of the witnesses to the evidence.

***(See Exhibit F, attached and below – The 3D Working Model.)***



- *Review and utilization of the 3D laser scan data of the Astro van and the ballistic trajectory analysis performed by the California DoJ:*
  - o In addition to the laser scan data of the incident scene, I received laser scan data for the subject Astro van. The Astro van was scanned on two occasions – once while it was still resident at its point of rest (POR) within the hole it created in the residence, and again at a facility used by the DoJ. The value of the first scan is to provide a specific location and orientation of the van at its POR; the second was to provide access to the entire van in order to better measure the impact strikes on the van's exterior and interior and perform ballistic trajectory

testing to describe the path of some of the rounds fired by the officers. The laser scan performed by the crime lab included straight-line trajectories of 12 of the rounds fired into the van. These trajectories describe the path of the bullet as it leaves the officer's firearm and travels toward and into the van.

***(See Exhibit G, attached and below – 3D Laser Scan Data with Bullet Trajectories as per DoJ.)***



I reviewed the report and the 3D data generated by the DoJ and found the trajectories to be generally accurate representations of the alignment of the rods inserted into the impact sites.

- *Creation of 3D model of the Astro van with the bullet trajectories and imported this model into the 3D working model for advanced analysis of the trajectories and physical evidence at the scene:*

o   I made small refinements to better align the 3 trajectories with the 3D laser scan data, resulting in changes on the order of 1 to 2 degrees. Based upon experience from previous testing I have performed *(See Exhibit H, attached – PSI Ballistic Trajectory Study.)*, as well as published work by Mike Haag, I illustrated the predicted officer locations when each round was fired with a +/- 5-degree cone, to properly account for the variability in this type of data measurement. The resultant vehicle dimensions and bullet trajectories were modeled in 3D and inserted into the 3D working model.

*(See Exhibit I, attached and below – 3D Laser Scan Data of Astro van with Bullet Trajectory Cones.)*



o   The completed 3D model of the Astro van with bullet trajectories was imported into the 3D laser scan data of the scene and aligned with the location of the Astro van at its POR.

*(See Exhibit J, attached and below – 3D Model of Astro Van with Bullet Trajectory Cones Aligned in 3D Scene.)*



- *Develop a 3D Gunshot Wound Path Model based upon Dr. Omalu's Autopsy of James Rivera:*
  - o I used the measurements and descriptions of the wounds in Dr. Omalu's autopsy report to create a 3D model of Mr. Rivera and the entry and rest/exit locations for each gunshot wound detailed in the report. I created a bipedal model that matched the 68-inch height of James Rivera and then located the bullets entry and exit/rest locations on this 3D model as listed in the autopsy report. From Mr. Omalu's autopsy report:
    - ▪ Mr. Rivera suffered wounds from 9 separate bullets. Seven rounds entered the torso; one round entered the left arm and one entered the left side of the head.

**Gunshot Wound D/V**

ENTRY D:
7.0 cm below top of the head. 3.7 cm right of the posterior midline.

DIRECTION:
Forward, upward and left.

LODGMENT V:
 Right medial parietal bone underneath an elevated fracture piece of right parietal bone.

PATH:
Right occipital - parietal scalp, fracture of the right parietal-occipital bone, perforation and laceration of the right dorsal meninges, the right occipital lobe and the right parietal lobe, the right dorsal meninges and fracture of the right parietal bone.

SHOOTER:
Officer Dunn

**Gunshot Wound E/U**

ENTRY E:
30.2 cm below top right posterior shoulder. 15.4 cm right of the posterior midline.

DIRECTION:
E: Forward, right and upward.
U: Ricochet, left and upward.

LODGMENT U:
Right superior trapezius muscle.

PATH:
Right posterior shoulder. Fracture of the right lateral scapular bone adjacent to the right shoulder joint. Internal ricochet perforated the soft tissues of the right superior shoulder. Penetration of the right trapezius muscle.

SHOOTER:
Unknown

**Gunshot Wound F/S**

ENTRY F:
Left lateral axillary back. 42.5 cm below top of the head. 10.7 cm left of the posterior midline.

DIRECTION:
Right, forward and upward.

LODGMENT S:
Jacket recovered left lower lung lobe. Deformed bullet recovered embedded in left lateral 6th thoracic vertebra.

PATH:
The left back through the intercostal space soft tissues. Through the left posterior and medial pleura. Through the paravertebral soft tissues of the mid thoracic spine. Penetration and fracture of the left lateral 6th vertebral body.

SHOOTER:
Unknown

**Gunshot Wound G/Q**

ENTRY G:
Right lateral rostral lumbar in the back. 57.4 cm below top of the head. 10.5 cm right of posterior midline.

DIRECTION:
Forward, right and upward.

LODGMENT Q:
Mesocolon of the right transverse colon.

PATH:
The right lumbar back through the right retroperitoneum, the right peri-renal soft tissues, the mesentery and mesenteric vessels.

SHOOTER:
Unknown

**Gunshot Wound H/R**

ENTRY H:
Left medial caudal thoracic back. 55 cm below top of the head. 3 cm left of posterior midline.

DIRECTION:
Forward, left and downward.

LODGMENT R:
Left kidney. 59 cm below top of the head. 11cm left of anterior midline.

PATH:
Soft tissues of the back and of the left lower chest. Through the left costo-diaphragmatic recess and the left diaphragm, left retroperitoneum and peri-renal soft tissues, the posterosuperior pole of the left kidney.

SHOOTER:
Unknown

**Gunshot Wound I/T**

ENTRY I:
Left medial caudal lumbar back. 66.5 cm below top of the head. 4.5 cm left of the posterior midline.

DIRECTION:
Downward, right and forward.

LODGMENT T:
Embedded in soft tissue of the left ischial region (lower back hip/pelvis).

PATH:
Perforation of the skin and soft tissues of the left lumbar back, the soft tissues of the left gluteal region, pelvic wall and of the left ischial region.

SHOOTER:
Deputy Nesbitt

**Gunshot Wound J/A**

ENTRY J:
Left medial lumbar back. 61.8 cm below top of the head. 4.5 cm left of the posterior midline.

DIRECTION:
Forward, right and downward.

EXIT A:
Right lower peri-umbilical abdomen. 68.7cm below top of the head. 1.5cm right of the anterior midline.

PATH:
The left lumbar back. Perforation and laceration of the left retroperitoneum, the peritoneum, the omentum, mesentery, the head and body of the pancreas, the loops of the bowel, soft tissues and
skin of the anterior lower abdominal wall.

SHOOTER:
Unknown

**Gunshot Wound K/P**

ENTRY K:
Left lumbar back. 62 cm below top of the head. 13.8 cm left of the posterior midline.

DIRECTION: Right, forward and downward.

LODGMENT P:
Left lower abdomen. 64 cm below top of the head. 22 cm left of the posterior midline.

PATH:
The left back through the left lateral lower abdomen.

SHOOTER:
Unknown

**Gunshot Wound L/C/P**

ENTRY L:
Left posterolateral mid-arm. 42 cm below top of the head. 16 cm below left acromion.

RE-ENTRY B:
Chest, 39.5 cm below the top of the head. 20 cm left of the anterior midline.

DIRECTION: Forward, right and upward.

EXIT C:
Left medial and proximal arm.

PATH L:
Left posterolateral mid arm, fracture of the mid diaphysis of the left humerus.

PATH B:
Left lateral chest and medial axillary wall. Impacted the left lateral rib cage, without penetrating the pleural cavity.

SHOOTER:
Unknown

- o The resultant 3D model was imported into the 3D working model, positioning the model in the driver's seat of the Astro van.

*(See Exhibit K, attached and below – 3D Gunshot Wound Model of James Rivera.)*



ENTRY D:
7.0 cm below top of the head. 3.7 cm right of the posterior midline.

DIRECTION:
Forward, upward and left.

SHOOTER:
Officer Dunn

LODGMENT V:
Right medial parietal bone underneath an elevated fracture piece of right parietal bone.

PATH:
Right occipital - parietal scalp, fracture of the right parietal-occipital bone, perforation and laceration of the right dorsal meninges, the right occipital lobe and the right parietal lobe, the right dorsal meninges and fracture of the right parietal bone.

GUNSHOT WOUND D/V

- *Review of statements made by officer's and witnesses:*

  There are three officers who fired in this event – each gave an interview. As of the time of this report, Officer Dunn and Officer Azarvand gave deposition testimony in addition to their interview. The officers who discharged their firearms had the best view of the event and provided the most specific details regarding the commands, locations and actions of the officers and the Astro van. Multiple civilians and officers who did not discharge their firearms witnessed portions of the event and provided statements. In some areas, there is agreement between the firing officers and other witnesses; in others there are dissimilarities between their statements. I reviewed in detail the transcripts of each of the statements they provided and noted that Officer

Azarvand and Officer Dunn generally gave consistent testimony when comparing their individual interviews with the testimony they gave at their respective depositions.

- o *Areas of agreement:*
  - ▪ There is no dispute that James Rivera was the driver of the Astro van.
  - ▪ There is no dispute that Officer Dunn and Deputy Nesbitt fired 13 times and Officer Azarvand fired 3 times. Officer Azarvand recalled that he fired 2 times during his deposition and 3 to 4 times during his initial interview. From the DoJ Physical Examination Report:
    - • SUMMARY/RESULTS
      - o Three of the expended Winchester 40 S&W cartridge cases (Items 34J, 34M, and'34N) were cycled through and most likely fired in the pistol associated with Officer Azarvand (Item 2A).
      - o Seven of the expended Winchester 40 S&W cartridge cases (Items 34D-34G, 341, 34IC, and 340) were fired in the pistol associated with Officer Dunn (Item 3A). The six remaining expended Winchester cartridge cases (Items 34A-C, 34H, 34L, and 34P) were cycled through and most likely fired in this pistol (Item 3A).
      - o Eleven of the expended Federal 40 S&W cartridge cases (Items 35A-35G, 351, and 35K-35M) were fired in the pistol associated with Deputy Nesbitt (Item 1 A). The two remaining expended Federal cartridge cases (Items 35H and 35J) were likely fired in this pistol (Item IA).
      - o None of the expended cartridge cases (Item 34A-34P or 35A-35M) were fired in the pistol associated with Officer Benatar (Item 4A).
  - ▪ There is no dispute that the officers fired their shots consecutively, without a noticeable pause.
  - ▪ There is no dispute that Officer Dunn performed a PIT- style maneuver.
  - ▪ There is no dispute that the Astro van struck a parked Chevy Cavalier and mailboxes on the way to crashing into the side of the residence at 9559 Bancroft Way.
  - ▪ There is no dispute that after the Astro van initially stopped within the residence, Officer Dunn, Officer Azarvand and Deputy Nesbit exited their

respective vehicles, drew their firearms and positioned themselves in the area generally behind the Astro van.

▪ There is general agreement that upon exiting their patrol vehicles, Officer Dunn and Deputy Nesbitt issued verbal commands to turn off the car, get out of the car and show hands.

- **Officer Dunn –**
  Deposition, page 43
  - o  14  Q Okay. So you started yelling commands?
    15  A Yes.
    16  Q And you had drawn your gun, correct?
    17  A Yes.
    18  Q And what commands were you yelling?
    20  A Stop the car. Show your hands.
    20  Q Okay. And did there appear to be any response
    21  to that?
    22  A No.

- **Deputy Nesbitt -**
  *Interview Summary, Nesbit 000111-000112*
  - o  "Deputy Nesbitt stated he started yelling out commands to the driver to put his hands up and that he was the police. Deputy Nesbitt stated that he yelled commands several times at the suspect."

- **Officer Hughes -**
  *Interview Summary, Nesbit 000102*
  - o  "Officer Hughes said that the other officers were yelling at the suspect to come out of the vehicle to which they got not reply."

- **Officer Azarvand -**
  *Interview Summary, Nesbit 000098*
  - o  "Officer Azarvand said he didn't give the driver any commands and doesn't know if any other officers gave commands, but he didn't remember hearing any commands given."

▪ Witnesses Dorothy Wyatt, CHP Officer Stickels, Detective Nhem, Probation Officer Wendy Correl, Probation Officer Kelsi Knoll, Roger Ulmer, Christopher Young, Shante Todd, Ramona Young and Henry McDaniels all stated they heard the officers giving the suspect driver commands.

▪ There is general agreement that as the Officers were issuing commands to the driver, the Astro van's engine was "revving".

- **Officer Dunn –**
  *Deposition, page 44*

- 1 Q And could you hear the engine revving?
  2 A Yes.
  3 Q Can you describe that?
  4 A A loud engine sound.
  5 Q Okay. Sure. But you have engines when they
  6 rev, they get louder, right, if a person is
  7 accelerating, pushing the accelerator, right?
  8 A Sure.

- **Deputy Nesbitt -**
  *Interview Summary, Nesbitt 000113*
  - "Deputy Nesbitt stated that the (s) vehicle's engine was racing and was moving back and forth."

- **Officer Hughes -**
  *Interview Summary, Nesbitt 000102*
  - "Officer Hughes said that he could hear the suspect vehicle revving its engine and could see the suspect vehicle moving backwards at which time he heard several gunshots."

- **CHP Officer Stickels -**
  *Interview Summary, Nesbitt 000128-000129*
  - "Officer Stickels said that when he got out of his car the suspect vehicle engine "was at a high rev" and was "winding out"."

- **Detective Nhem -**
  *Interview Summary, Nesbitt 000113*
  - "He said after he heard the gunshots he looked to his left and he could hear the suspect vehicle revving and it sounded very loud. He said it was at this point the officers were firing at the vehicle. I asked Detective Nhem if the vehicle was moving in any manner at that point. He said yes. He said when he heard the vehicle revving it appeared as if the driver was attempting to back up however the patrol vehicle was in its way."

- There is general agreement that as the officers were issuing commands, Officer Dunn was positioned directly behind the Astro van, was boxed in by his vehicle and the Chevy Cavalier and was in danger of being injured if the Astro van were to move backwards.

  - **Officer Azvarand -**
    *Deposition Page 44*
    - 13 A I saw the situation that Officer Dunn was in.
      14 Officer Dunn was pinned with the way the vehicle that
      15 was hit -- that was parked on Salters and the way his
      16 door was, Officer Dunn was pinned by the door, his

17   vehicle and the other vehicle.

18   Q So Officer Dunn was like in the V of his door?

19   A Yes.

20   Q And then the other vehicle was blocking the way

21   out of his door?

22   A Right. He opened up the door and the vehicle

23   was parked here, and his vehicle was here, so he was

24   basically trapped.

....

*Deposition, page 113*

o  4  Q Okay. I'm trying to understand, because you

5   said even before his car started to move back he was

6   trapped.

7   A He was trapped in the -- like you described it,

8   the V of his door, so he was able to open up the door.

9   Q So he was able to open up the door, stand or be

10   located in the V, but not get around his car door?

11   A Correct.

- **Officer Dunn -**
  *Deposition, Page 42-43*
  o  18  Q Okay. And what's the next thing that happened?

  19   A I got out of my car. I drew my weapon, pointed

  20   at him and began yelling commands.

  21   Q And where were you standing?

  22   A Right outside my open -- right in between my

  23   open car door and the doors, it was extended open.

  24   Q You heard me refer to it as the V of the car

  25   door?

  1   A Yes.

  2   Q And you understand that to be the opening

  3   between the actual door and the frame of the -- of your

  4   patrol vehicle, correct?

  5   A Yes, I think it would be better described as a

  6   triangle, because I had the opening of my car door, the

  7   open car door, and then the rear of that red car door

  8   that got pushed up on the lawn, so I was essentially in

  9   the middle of the triangle.

- **Deputy Nesbitt -**
  *Interview Summary, Nesbitt 000112*
  o  "Deputy NESBITT stated there were two Stockton Police Department uniform officers to the left side, behind the van at that time. Deputy NESBITT stated the van was rocking back and forth for about a minute. Deputy NESBITT stated the (S) was trying to get the van out of being stuck into the residence. Deputy NESBITT said at one point the van had lifted up out of the hole it was in and the two officers were behind the (S) vehicle, near a police car that he thought would also be hit into him. Deputy

NESBITT stated the two officers were going to get hit or the police car would be struck straight into him, so he fired his weapon in defense."

- **CHP Officer Benatar –**
  *Interview Summary, Nesbitt 000204*
  - o **"**The K9 officer (Dunn) was in the "V" of his door. Officer Azarvand's car was to the left and behind the suspect car. Benatar stated Azarvand was out in the open. Benatar said they were approximately 6' from the back of the suspect vehicle."

- There is general agreement that as the officers were issuing commands, Officer Azarvand was positioned behind and to the left of the Astro van.

  - **Officer Azarvand -**
    *Deposition Page 132*
    - o 5 Q So you told investigators -- this is at Bates
      6 Nesbitt 97. "Officer Azarvand said that he positioned
      7 himself close to the suspect vehicle without cover,
      8 because he didn't know if there was an access door from
      9 the garage into the house. Officer Azarvand said that
      10 he was in fear that the suspect would enter the
      11 residence and take hostages or be able to escape into
      12 the neighborhood and be a danger to citizens in the
      13 area."
      14 Do you recall that being why you placed
      15 yourself where you did?
      16 A Right. I was trying to move closer to the
      17 vehicle, and based on Mr. Rivera's action, I didn't have
      18 time to take cover and concealment.
      ...
    *Deposition, page 97*
    - o 10 Q Okay. And you actually -- so where did you
      11 park relative to his vehicle?
      12 A It would have been on the lawn, just east of
      13 the vehicle, the van.
      14 Q Okay. And east of it, meaning?
      15 A If you're looking at that garage from Salters,
      16 it would have been to the left.

  - **Officer Dunn -**
    *Deposition, Page 50*
    - o 19 Q Okay. How many -- can you tell how many other
      20 officers you heard firing?
      21 A I knew that there was gunshots from my right,
      22 and I remember seeing Officer Azarvand in my periphery
      23 to my left.

  - **Deputy Nesbitt -**
    *Interview Summary, Nesbitt 000112*

- o "Deputy NESBITT stated there were two Stockton Police Department uniform officers to the left side, behind the van at that time. Deputy NESBITT stated the van was rocking back and forth for about a minute. Deputy NESBITT stated the (S) was trying to get the van out of being stuck into the residence. Deputy NESBITT said at one point the van had lifted up out of the hole it was in and the two officers were behind the (S) vehicle, near a police car that he thought would also be hit into him. Deputy NESBITT stated the two officers were going to get hit or the police car would be struck straight into him, so he fired his weapon in defense."

- **CHP Officer Benatar –**
  - *Interview Summary, Nesbitt 000111*
  - o **"**The K9 officer (Dunn) was in the "V" of his door. Officer Azarvand's car was to the left and behind the suspect car. Benatar stated Azarvand was out in the open. Benatar said they were approximately 6' from the back of the suspect vehicle."

- There is general agreement that as the officers were issuing commands, Deputy Nesbitt was positioned behind a set of mailboxes and to the right of the Astro van.

  - **Deputy Nesbitt -**
    - *Interview Summary, Nesbitt 000204*
    - o "Deputy Nesbitt stated he too cover to the right of the minivan by some metal mailboxes, just west of the mininvan"

  - **Detective Nhem -**
    - *Interview Summary, Nesbitt 000133*
    - o "Detective Nhem said that he knew there were officers behind and to the east of the suspect vehicle; however the only officer he had a good view of was Detective Nesbitt who was standing next to a community mailbox"

  - **Detective Inskip -**
    - *Interview Summary, Nesbitt 000138*
    - o "I asked him where Detective Nesbitt was when he was firing his weapon. Detective Inskip said Detective Nesbitt was more to the west side of the vehicle."

- There is general agreement that as the officers were issuing commands, the tires of the van were spinning as the engine was revving.

  - **Probation Officer Kelsi Knoll -**
    - *Interview Summary, Nesbitt 000147*
    - o "I asked Knoll if she heard anything prior to the shots being fired. She said yes. I asked her what she heard and she said, "The revving up of the car real loud and I heard tires spinning.""

- o "I asked Knoll if she could describe what she heard. She said it sounded like, "just tires spinning on dirt: really, mud. I asked her if she could also hear the engine of the vehicle. ,..She. said yes"

- **Officer Dunn -**
  *Interview Summary, Nesbitt 000100*
  - o "Officer Dunn said the van then stopped and shifted into drive and the tires spun which sprayed dirt all over his patrol vehicle"

- **CHP Officer Benatar -**
  *Interview Summary, Nesbitt 000204*
  - o "Benatar said he could hear the engine "screaming" like the driver was trying to move the vehicle. There was mud and debris coming from the back of the car flying around because the tires were spinning."

- ▪ There is general agreement that the firing started after the Astro van began to move backwards towards the officer. The officers who saw the van make contact with Officer Dunn's patrol vehicle agreed that the shots commenced after contact was made at least one time.

- **Officer Azarvand -**
  *Deposition, Page 114*
  - o 16  Q When did you fire? When in the sequence of
    17  events did you fire?
    18  A Right around the second or third time that the
    19  vehicle was rammed, from what I remember.

- **Officer Dunn -**
  *Deposition, Page 47-48*
  - o 24 Q Okay. And so at some point you discharge your
    25 gun, correct?
    1 A Yes. When I realized -- you know, after
    2 putting my hand down on the car, thinking like I'm going
    3 to hold it back from smashing me, then this is when
    4 my -- I started having time slow down and stuff, I was
    5 realizing that's a dumb move, because I can't hold two
    6 vehicles back with one hand and that was kind of the
    7 thing for me. I remember yelling out, "He's ramming
    8 me," and realizing there's nothing else I could do to
    9 stop him, and that's when I fired.

- **Deputy Nesbitt -**
  *Interview Summary, Nesbitt 000112*
  - o "Deputy NESBITT stated there were two Stockton Police Department uniform officers to the left side, behind the van at that time. Deputy NESBITT stated the van was rocking back and forth for about a minute.

Deputy NESBITT stated the (S) was trying to get the van out of being stuck into the residence. Deputy NESBITT said at one point the van had lifted up out of the hole it was in and the two officers were behind the (S) vehicle, near a police car that he thought would also be hit into him. Deputy NESBITT stated the two officers were going to get hit or the police car would be struck straight into him, so he fired his weapon in defense"

- **Officer Hughes  -**
  *Interview Summary, Nesbitt 000102*
  o  "Officer Hughes said that he could hear the suspect vehicle revving its engine and could see the suspect vehicle moving backwards at which time he heard several gunshots."

- **Detective Nhem –**
  *Interview Summary, Nesbitt 000133*
  o  I asked Detective Nhem if the officers had their guns drawn and he said yes. I asked him what the suspect vehicle was doing at that point. He said he did not see the suspect doing anything. He said after he heard the gunshots he looked to his left and he could hear the suspect vehicle revving and it sounded very loud. He said it was at this point the officers were firing at the vehicle. I asked Detective Nhem if the vehicle was moving in any manner at that point. He said yes. He said when he heard the vehicle revving it appeared as if the driver was attempting to back up however the patrol vehicle was in its way."

- There is general agreement among the officers who saw the van make contact with Officer Dunn's patrol vehicle that the shots commenced after contact was made at least one time.

  - **Officer Azarvand -**
    *Deposition, Page 114*
    o  16  Q When did you fire? When in the sequence of
       17  events did you fire?
       18  A Right around the second or third time that the
       19  vehicle was rammed, from what I remember.

  - **Officer Dunn -**
    *Deposition, Page 47-48*
    o  24 Q Okay. And so at some point you discharge your
       25 gun, correct?
       1 A Yes. When I realized -- you know, after
       2 putting my hand down on the car, thinking like I'm going
       3 to hold it back from smashing me, then this is when
       4 my -- I started having time slow down and stuff, I was
       5 realizing that's a dumb move, because I can't hold two
       6 vehicles back with one hand and that was kind of the
       7 thing for me. I remember yelling out, "He's ramming

8 me," and realizing there's nothing else I could do to
9 stop him, and that's when I fired.

- ▪ There is general agreement between Officer Azarvand and Officer Dunn that Officer Dunn's patrol vehicle was moving backwards towards Officer Dunn as the Astro van pushed into/against it. From my review of the statements provided by the witnesses, I did not find any other witnesses who were asked or mentioned whether Officer Dunn's patrol was actually being moved by the Astro van.

  - • **Officer Azarvand -**
    *Deposition, Page 113-114*
    - o 23 Q Okay.  So the suspect – strike that.
      24  Mr. Rivera, the car that he was driving, it
      25  Hit – how many times did it hit –did it hit officer
      1 Dunn's car before you fired?
      2 A At least, from what I remember, probably around
      3 three times.
      4 Q Okay. And so it would hit it, it would pull
      5 forward, it would back up again and it hit some more?
      6 A Correct.
      7 Q And each time it hit it, Officer Dunn's car
      8 went backwards more?
      9 A Yeah, a little bit, yeah, starting going back.

  - • **Officer Azarvand -**
    *Deposition, Page 109*
    - o 17  Q Okay. And then did -- did the strike cause
      18  Officer Dunn's vehicle to move back further?
      19  A I noticed Officer Dunn's vehicle moving
      20  backwards.

  - • **Officer Dunn -**
    *Deposition, Page 47-48*
    - o 24 Q Okay. And so at some point you discharge your
      25 gun, correct?
      1 A Yes. When I realized -- you know, after
      2 putting my hand down on the car, thinking like I'm going
      3 to hold it back from smashing me, then this is when
      4 my -- I started having time slow down and stuff, I was
      5 realizing that's a dumb move, because I can't hold two
      6 vehicles back with one hand and that was kind of the
      7 thing for me. I remember yelling out, "He's ramming
      8 me," and realizing there's nothing else I could do to
      9 stop him, and that's when I fired.

....
*Deposition, Page 50*
- o     11   Q Okay. And can you tell me if your vehicle was
           12   still being pushed backwards prior to finishing that
           13   first clip of ammunition?
           14   A Yes.

- o   *Areas of testimony with functionally significant differences:*

  Unlike the above areas of testimony where the witness statements are in general agreement as to what occurred, the following areas have significant differences in the witness statements. These differences are in areas of importance for reconstructing the event and are valid candidates for further scrutiny and analysis to determine which are supported by the evidence and which are not.

  - ▪ There are differences in the testimony regarding whether Officer Dunn's patrol vehicle initially came into contact with the Astro van as it was positioned within the residence or if there was a gap between the front of Dunn's patrol vehicle and the rear of the Astro van. This area of inquiry is important as it affects whether there was in fact relative motion between the Astro van as it backed up and Officer Dunn's patrol vehicle; or, if the sound of the revving engine and the energy of the Astro van pushing against Dunn's patrol vehicle was in fact what the officers saw.

    - • **Officer Dunn** –
      *Interview Summary, page 000100*
      - o "Officer Dunn said that he used his patrol vehicle to pin the van into the residence"

      *Deposition, page 40-42*
      - o 21 Q And then you pinned him with your car, correct?
        22 You pinned him in that garage, correct?
        23 A Yeah, if you want to use the word pinned. I
        24 stopped my car behind him to stop him from being able to
        25 get out and the pursuit continue.

      ....
      - o 13 Q And you told investigators then that you used
        14 your patrol vehicle to pin that vehicle, the one -- the
        15 carjacked vehicle, to pin that van into the residence,

Page **26** of 47

16 correct?
17 A Correct. I think that's still a fair
18 description of what I described.
19 Q So when you say, pin, you mean that you had
20 your bumper against his, correct?
21 A I don't remember if my bumper was touching his
22 or not.
23 Q Okay. It wasn't like five feet away, though?
24 A No.
25 Q It was very close, if not touching, correct?
1 A Yes.

- **Officer Azarvand** –
  - *Deposition, Page 99*
    - o 7 Q Okay. And how far was Officer Dunn's vehicle
      8 from the rear -- how far was the front of his vehicle to
      9 the rear of the van when it stopped?
      10 A I -- I don't know. Probably -- I don't know.
      11 Q Would you say more than ten feet?
      12 A It was less than ten feet.
      13 Q Okay. Would you say less than five feet?
      14 A Yeah, probably between around five, maybe less
      15 than five. I wouldn't say more than five feet.
      16 Q A few feet?
      17 A Again, no more than five.
  
  ….
  *Deposition, Page 106*
    - o 17 Q Okay. And it's your understanding that Officer
      18 Dunn did not park his car against Mr. Rivera's vehicle
      19 when he stopped it; is that correct?
      20 A Correct.
      21 Q He did not do that?
      22 A Yeah, I don't recall his vehicle being directly
      23 up against.

- **Detective Nhem** – Detective Nhem describes seeing the vehicles "bumper to bumper" and that the Astro van appeared to attempt to move backwards but Dunn's patrol vehicle was "in the way". These suggest that Nhem recalls that there was not a space between the two vehicles.

  *Interview Summary, page 000133*
    - o "He said when he heard the vehicle revving it appeared as if the driver was attempting to back up however the patrol vehicle was in its way."
    - o "I then asked Detective Nhem where the marked units were located. He said there was a marked unit directly behind the suspect vehicle and this vehicle was "bumper to bumper" with the suspect vehicle."

- **CHP Officer Benatar** –
  *Interview Summary, page 000204*

○ "The push bumper of the SPD K9's car was pushed against the van."

▪ Related to the above issue – There is a clear consensus between those that gave statements regarding the attempted movement of the Astro van that it was in reverse and pushing against the patrol vehicle. There are differences in the testimony regarding whether the Astro van "rammed" into Officer Dunn's patrol vehicle, thereby closing the gap between the two vehicles or whether the Astro van was pushing back against the bumper of Dunn's patrol vehicle. The potential differences relate solely to whether the Astro van moved backwards prior to making contact or if it was already against the patrol vehicle.

- **Officer Azarvand** –
  *Deposition, Pages 102-103*
  ○ 19 Q Okay. When you got out of your vehicle, did
  20 you see Officer Dunn was outside of his vehicle?
  21 A I saw him outside his vehicle, but I don't know
  22 if he was outside before me or after me.
  23 Q Okay. And what was happening with Mr. Rivera's
  24 vehicle?
  25 A Mr. Rivera's vehicle started to back up and ram
  1 the front of Officer Dunn's patrol vehicle.
  ….
  *Deposition, Pages 103*
  ○ 16 Q Right. And then it hit the garage, and were
  17 you able to hear the sound of its engine?
  18 A I remember the -- right now, as I recall it, I
  19 remember the vehicle going backwards and striking
  20 Officer Dunn's -- the front of Officer Dunn's vehicle.
  21 I can't recall at this point whether I heard the engine
  22 or not. I may have. If I remember correctly seeing the
  23 brake lights to -- the backup lights come on in the
  24 vehicle.
  ….
  *Deposition, Pages 106*
  ○ 6 Q Okay. And so you saw the car move; is that
  7 correct?
  8 A Correct.
  9 Q And how fast did it move?
  10 A I don't know.
  11 Q Did it move slowly?
  12 A No.
  13 Q How far did it move?

14 A The distance from where it was to however far
15 back Officer Dunn's vehicle was. I don't recall the
16 distance. It was within five feet.
17 Q Okay. And it's your understanding that Officer
18 Dunn did not park his car against Mr. Rivera's vehicle
19 when he stopped it; is that correct?
20 A Correct.
21 Q He did not do that?
22 A Yeah, I don't recall his vehicle being directly
23 up against.

….
*Deposition, Pages 113-114*
- o   23 Q Okay. So the suspect -- strike that.
  24 Mr. Rivera, the car that he was driving, it
  25 hit -- how many times did it hit -- did it hit Officer
  1 Dunn's car before you fired?
  2 A At least, from what I remember, probably around
  3 three times.
  4 Q Okay. And so it would hit it, it would pull
  5 forward, it would back up again and it hit some more?
  6 A Correct.
  7 Q And each time it hit it, Officer Dunn's car
  8 went backwards more?
  9 A Yeah, a little bit, yeah, starting going back.
  10 Q And at some point shots were fired, correct?
  11 A Correct.
  12 Q All right. And when did -- when were shots
  13 fired?
  14 A I don't know who shot first, but I remember
  15 firing into the vehicle.
  16 Q When did you fire? When in the sequence of
  17 events did you fire?
  18 A Right around the second or third time that the
  19 vehicle was rammed, from what I remember.


- **Officer Dunn** –
  *Deposition, Pages 45-47*
  - o   22 Q And what happened -- you yelled commands a
    23 couple times, then what happened?
    24 A And then he began ramming into my vehicle with
    25 the van.
    1 Q You say, ramming, was the van -- the van was in
    2 reverse?
    3 A Yeah, it was moving backwards and colliding
    4 with my car.
    5 Q Was he just pushing against it?
    6 A No, it was actually bumping into it, because I
    7 remember my car door like swinging towards me and moving
    8 backwards.

....
22 A I'm just not sure on how I remember that. I
23 mean, my photograph snapshot of my memory, was my door
24 coming at me, actually putting my hand down on the frame
25 of my door like, to hold it.
....
4 Did he ever move the vehicle forward?
5 A Did he move the vehicle?
6 Q His vehicle forward. Did he drive it forward
7 after backing into yours, pushing into it, or whether he
8 pushed into it or accelerated backwards into it, did he
9 ever move his van forward after that?
10 A I believe he was moving it in both directions.
11 Q Then what happened? Do you recall him pushing
12 it in both directions more than once -- moving his car
13 in both directions?
14 A Yes, it was more than once. I'm not sure how
15 many times. Just kind of a shock that it was actually
16 happening -- you know.
17 Q Okay.
18 A I felt we were going to be at the point of a
19 felony stop and the chase would be over, but now he's
20 trying to get out anyway he could.

- **Deputy Nesbitt** – Detective Nesbitt's description suggests actual relative movement between the Astro van and Officer Dunn's patrol vehicle
  *Interview Summary, Nesbitt 000123*
  o "Deputy NESBITT stated he fired into the (S) vehicle because the vehicle had launched backwards coming out of the hole it was in at the two officers who were standing there."

- **Detective Nhem** – Detective Nhem describes seeing the vehicles 'bumper to bumper" and that the Astro van appeared to attempt to move backwards but Dunn's patrol vehicle was "in the way". These suggest that Nhem recalls that there was not a space between the two vehicles

  *Interview Summary, page 000133*
  o "He said when he heard the vehicle revving it appeared as if the driver was attempting to back up however the patrol vehicle was in its way."
  o "I then asked Detective Nhem where the marked units were located. He said there was a marked unit directly behind the suspect vehicle and this vehicle was "bumper to bumper" with the suspect vehicle."

- **CHP Officer Benatar** –
  *Interview Summary, page 000204*
  o "The push bumper of the SPD K9's car was pushed against the van."

- *Use the working model to compare the witness statements with the available evidence:*

After reviewing all the statements made by the witnesses, I used the working model containing all the available evidence to test each of the statements that had significant points of disagreement. As previously discussed, the working model contains the location of: the physical evidence collected at the scene; the exact measurements of the environment; the location of vehicles on the street and adjacent to the Astro van (the position of officer Dunn's patrol vehicle during the event is unknown as it was moved prior to documentation of the scene); the exact dimensions of the Astro van; the location of the bullet impacts within the Astro van interior; The derived bullet trajectories and the gunshot wound paths in James Rivera's body. This 3D working model allows for accurate representation and analysis of locations and time.

For each statement, I entered the appropriate value into the working model and determined whether the statement could be matched with the evidence or if it did not fit the evidence. I also tested the spatial and temporal variables necessary to reconstruct the event and determine the valid ranges for each.

The critical areas of analysis for the reconstruction:

- Did the driver of the Astro van in fact attempt to move the van backwards and forwards as described by many of the witnesses? This question also encompasses whether there is evidence to support the statements that the Astro van engine was "revving" during the event.

- If the Astro van did in fact attempt to move did it "ram" against Officer Dunn's vehicle or push against it? This encompasses the issue of whether there was a gap between Dunn's vehicle and the Astro van. How far back did the Astro van have to move to make contact with Officer Dunn's vehicle?

- Was there sufficient space for Officer Dunn's patrol vehicle to be moved backwards as the Astro van pushed against it and if so, what was the available distance?

- If the Astro van did move or attempt to move in both forward and reverse directions, what are the timing/motion associated with these maneuvers? This is bounded by the total available time for the event to occur?

-

- What are the shot timings associated with the rounds fired by the three officers?

## Results

*Issue #1 – Did the driver of the Astro van in fact attempt to move the van backwards and forwards as described by many of the witnesses? This question also encompasses whether there is evidence to support the statements that the Astro van engine was "revving" during the event.*

I first reviewed the available scene photos depicting the Astro van at its point of rest within the residence at 9559 Bancroft Way. The photos show that at its point of rest, the Astro van was tilted at an upward angle with the front wheels elevated due to debris under the van itself, most notably one of large mailboxes that it struck prior to striking the exterior wall. The van appears to have a flat left rear tire and the right rear tire appears to be partially submerged in mud/wet dirt adjacent to the residence.

***(See Exhibit L, attached and below – Photos of Chevy Astro Van at Point of Rest.)***



I then reviewed data on the 1995 Chevy Astro van itself, with particular focus on the type of drivetrain available on this vehicle. According to Edmunds.com and Keely Blue Book, the 1995 model was equipped with rear-wheel drive, with an option for all-wheel drive. The vehicle was not available with a front-wheel drive option. With either the RWD or AWD configuration, the vehicle would be capable of moving in either direction with the front tires elevated if the rear tires were in contact with the ground, which they appear to be in the available photos.

Many of the witnesses stated that the saw the van either "rocking back and forth" or actually moving in both directions. This would require the driver operate the transmission in both "Drive" and "Reverse" modes. Detective Nhem stated that he personally placed the Astro van in "Park" after the shots were fired and further that he did not move the van in doing so. He also stated that he moved the van from the "Reverse" position to park, meaning the van was last placed in reverse by Mr. Rivera. Therefore Mr. Rivera placed the van into reverse at least one time.

Officer Dunn stated that as the driver of the Astro van moved forward, the rear tires spun in the mud and sprayed it on his patrol vehicle. CHP Officer Benatar also witnessed this happening. In reviewing the photos, I noted mud spattered on Officer Dunn's vehicle and the rear face of the still standing mailboxes. Given that the mud was sprayed backwards towards the patrol vehicle and mailbox, the Astro van must have been in "Drive" for this to occur, as the tires would be spinning counter-clockwise if in reverse and therefore only spray mud away from the location of the patrol vehicle and mailboxes. In addition, the photos also show mud spatter on the side of the residence, forward of the Astro vans right rear tire – indicating that at some point, the rear tire was spinning with the transmission in reverse. Therefore, the vehicle was operated in both forward and reverse while the accelerator was depressed.

*(See Exhibit M, attached and below – Photos of Mud Spatter on Patrol Vehicle, Mailboxes and Siding.)*



Given that the vehicle was operated in both directions and that the tires were spinning in both directions, it follows that the engine could be heard "revving" and seen either moving or rocking in both directions.

*Issue #2 – If the Astro van did in fact attempt to move did it "ram" against Officer Dunn's vehicle or push against it? This encompasses the issue of whether there was a gap between Dunn's vehicle and the Astro van.*

Officer Azarvand clearly stated that he saw a gap between Officer Dunn's patrol vehicle and the rear of the Astro van. Officer Dunn stated in his interview that he used his patrol vehicle to "pin" the Astro van inside the residence. During his deposition, he clarified that there was likely a gap between the vehicles. Detective Nhem stated that he saw the two vehicles "bumper to bumper on it, kinda" and Officer Benatar stated that the patrol vehicle was up against the van. It is important to note that in his interview, Officer Benatar states that by the time he got to his position to the left of

Azarvand and saw the vehicles in contact that he also had heard the Astro van's engine "screaming"; Detective Nhem stated he saw the vehicles "bumper to bumper on it, kinda" after hearing the revving of the Astro van engine and seeing it "trying to back up". Therefore, it is likely that the van had already had the opportunity to move backwards and make contact with Officer Dunn's patrol vehicle. Given their respective positions relative to the area in question, it is likely that Officers Dunn and Azarvand had the best vantage point from which to make this distinction, and Officer Dunn himself was driving the patrol vehicle and is arguably in the best position to make the determination. However, given the conflicting testimony I reviewed the evidence for either scenario.

I first looked at the Astro van's location at the point of rest. This location either represents the position of the Astro van after moving forward and backward as some stated or it represents the position the Astro van remained in after first entering the residence, perhaps "rocking back and forth" as other stated but not actually translating an appreciable distance. The photos of the van, as well as the available data from the 3D laser scan show that the van is about as far forward into the hole it created as it can go, with little or no room between it and the farthest advance of the debris and the interior wall into which it collided. This suggests that the van could not have been even farther forward at any point during this event and that if it did move, it never moved past this position in a forward direction.

*(See Exhibit N, attached and below – Photos of Chevy Astro Van at Point of Rest Relative to Interior Wall.)*



Next I reviewed the available data for the location of Officer Dunn's patrol vehicle after he drove it up on the sidewalk and parked behind the Astro van. There is no direct documentation of this position as Officer Dunn moved his vehicle to allow access to the van and assist in reaching the driver, Mr. Rivera. However, the location of the Astrovan and the location of the Chevy Cavalier that was spun up onto the sidewalk/grass area provide information about the possible locations for patrol vehicle. Officer's Dunn and Azarvand described Dunn as being within a triangular-shaped area bounded by Dunn's patrol vehicle, his open driver's door and the rear of the Chevy Cavalier. I used the 3D working model to view this orientation and confirm that it matched the available evidence.

**(See Exhibit O, attached and below – 3D Working Model – Orientation of Officer Dunn Within Triangular Area.)**



This orientation is possible and would require that Officer Dunn drove his patrol vehicle forward enough relative to the Chevy Cavalier to allow Dunn to open and close his patrol vehicle door. Officer Dunn stated that when instructed to move his patrol vehicle, he had to pull in his side-view mirror to avoid striking the Cavalier. He made no mention of not being able to close his door, and in fact must have been able to perform the rearward maneuver. The 3D laser scan data provided by the DoJ clearly shows the moved location of Officer Dunn's patrol vehicle approximately one car length behind its location during the event.

*(See Exhibit P, attached and below – 3D Working Model – Required Space to Move Officer Dunn's Patrol Vehicle After Shooting.)*



Given that the Astro van is as far forward as it can go (or very nearly so) and given that Officer Dunn's patrol vehicle must be at least far forward enough to open his door, it is possible to use the 3D working model to assess the range of available distances between the two vehicles. That range is between 0 and 15 inches.

***(See Exhibit Q, attached and below – 3D Working Model – Available Distance Between Officer Dunn's Patrol Vehicle and Rear of Astro Van.)***



Therefore, the physical evidence supports either a "ramming" motion with up to 15 inches of backward motion before contact or a "pushing" motion where there is no gap between the vehicles and the Astro van pushes back against the van. It is important to note that either scenario could appear to Officer Dunn as ramming as his vehicle could be moved backwards in either case, whether it translated or moved on its suspension.

*Issue #3* - *Was there sufficient space for Officer Dunn's patrol vehicle to be moved backwards as the Astro van pushed against it and if so, what was the available distance?*

Officer's Azarvand and Dunn both stated that they fired their weapons in response to the Astro van repeatedly ramming against Officer Dunn's patrol vehicle. In addition, both officers stated that they witnessed Officer Dunn's patrol vehicle moving backwards towards Dunn and closing the small space within which Officer Dunn was standing. Combining both Officer's statements regarding the gap between Dunn's vehicle and the rearward motion of Dunn's vehicle as a result of being pushed by the Astro van with the physical evidence shows that both statements are supported. It is consistent with the physical evidence that some of the available 15 inches was used by the Astro van's rear travel to impact with Dunn's vehicle and the remainder was used by the Astro van moving Dunn's vehicle backwards as both he and Azarvand stated. The total range of this movement backwards is the same as for the Astro van – 0 to 15 inches.

**Issue #4 -** *If the Astro van did move or attempt to move in both forward and reverse directions, what are the timing/motion associated with these maneuvers?*

In deriving timing for the motion of the Astro van, I took multiple data points into account:

   a.   The total available time for the event.

   b.   The number of motions of the van as per the testimony.

   c.   The performance characteristics of the van and the condition of the van and its orientation within the residence.

   d.   The actions required by the driver to execute the maneuvers.

The time available for the event is bounded by the radio transmissions and their respective times. Per the Incident History Detail of the radio traffic, Officer Azarvand transmitted during the pursuit that the Astro van was crossing Otto at 10:37:14. Officer Nhem transmitted "Shots Fired" at 10:37:50.

**(See Exhibit R, attached and below – Incident History Detail.)**

```
                      INCIDENT HISTORY DETAIL:  P102030233


      TTIATE: 10:14:22  07/22/10    CALL NUMBER:     P0233
      RY:     10:16:25              CURRENT STATUS: CLEARED
      PATCH:  10:19:11              PRIMARY UNIT:    2A54
ONSCENE: 10:23:10                   CASE NUMBER:     PD1000029672
CLOSE:                              DISPOSITION:



LOCATION: 8805 KELLEY DR ,SKN (CHARLESTON CT & WORCHESTER WY)
LOCATION COMMENTS:
DAREA:     BEA
BEAT:      BW                   OLD TYPE: 937    FINAL: 245 ASSAULT W/WEAPON
RD:        0281                 PRIORITY: 1
            HAZARD PRIORS



10:37:14 CCP1 MISC     2A76, NB BANCROFT CROSSING OTTO
10:37:15 CCP2 MISC     2A76, SALTERS/BANFROCT ...CROSSING OTTO, ON BANCROFT
                       .. N/B
10:37:29 CCP2 BACK-ER  2A76 2A54
10:37:29 CCP2 ID       2A54 <1514>FOGG,SCOTT
10:37:50 CCP2 MISC     2A76, SHOTS FIRED
10:37:54 CCP1 MISC     V383, SHOTS FIRED SALTERS/BANCROFT
10:37:57 CCP2 MISC     2A76, SALTERS/BANCROFT
10:38:00 CCP2 CHGLOCOS 2A76 SALTERS DR/BANCROFT WY ,SKN
10:38:06 CCP1 MISC     2A76, SHOTS FIRED
10:38:18 CCP1 BACK-ER  2A76 2A64
```

This leaves 36 seconds between the Astro van crossing Otto and the officers transmission of shots fired. Using Google Earth I estimated the travel distance for the Astro van from the point where it crossed Otto to its impact with the house. Considering that the van knocked over a stop sign and a cyclone fence as well as driving on the lawn of another residence, I estimated the travel distance as approximately 360 feet.

*(See Exhibit S, attached and below – Travel Distance for Astro Van After Crossing Otto.)*



After crossing Otto, the Astor van nearly lost control and spun almost 180 degrees, likely losing much if not all of its forward momentum and thereby restarting towards the SW from a low speed. Using an estimate of 15 to 20 mph average for the rest of the travel distance into the house provides a range of 12 to 16 seconds to cover that distance, reducing the amount of time for the ramming/shooting phase of the event to 20 to 24 seconds. Officer Dunn arrived behind the van by a small margin and needed some time to get out of his vehicle and begin to issue commands. In addition, Detective Nhem and Officer Azarvand would have some delay after shots were fired to transmit this fact. Therefore, I estimated the total available time from Officer Dunn being out of his car and issuing commands to the cessation of firing and the vans attempted motion as approximately 15 to 20 seconds.

Officer Azarvand testified that he fired after the Astro van had backed into Officer Dunn's patrol vehicle "right around the second or third time that the vehicle was rammed…". Officer Dunn testified that his vehicle was pushed "more than once…". According to Edmunds. Com and Kelly Blue Book, the van was equipped with a 200 hp engine and weighed nearly 6000 pounds, characteristics that suggest below average

acceleration capability. The van was elevated upon a pile of debris within the garage and had one flat rear tire, further restricting its ability to accelerate. In addition, the passenger side rear tire appeared to be nearly devoid of tread. Given these factors I looked at an lower-end acceleration rate of approximately .15 g – the typical acceleration rate for a normal pull away from a stop sign. Although this estimate is admittedly loose, given the short distances traveled, the actual rate of acceleration used makes a very small difference in the overall time for the forward and rearward maneuvers to be performed – the approximate distance of 1 foot takes about 0.6 seconds; using twice the acceleration rate reduces the time by only 0.15 seconds.  The larger factor is the time it would take for the driver to press the brake pedal, use the gear shifter to switch gears, release the brake pedal and press the accelerator. This series of motions would be needed for each change in direction. Using an average value of 1 second for the gear change and another 1 second for the braking and actuating of the accelerator plus the travel time of approximately 0.6 seconds, I concluded that there would be time for two motions backwards and forwards. Given that the Astro van was found in its forward-most position and with the gear selector in "Reverse", the allows for one movement backwards and forwards, and then one more movement backwards and forwards. According to Officers Azarvand and Dunn, it was during this second motion backwards that they began firing.

*Issue #5* - *What are the shot timings associated with the rounds fired by the three officers?*

For firing rate, I relied on my own experience in analyzing police dashcam and bodycam footage as well as audio from security cameras and cellphones that record officer involved shooting events. In these cases, the typical rate of fire I have observed is about 4 rounds/second. This value is similar to those found by other investigators. From the DoJ Physical Examination of the officer's firearms, it is known that Officer Dunn and Deputy Nesbitt each fired 13 times and Officer Azarvand fired 3 times. Officer Dunn stated that he fired first. Using a rate of 4 rounds/second, I calculated that Officer Dunn and Deputy Nesbitt would fire for 3.25 seconds and Officer Azarvand would fire for 0.75 seconds. No statements were made by any of the officers or

witnesses that there were pauses in the firing. The officers and the witnesses were consistent in their description that when the gunshots ended, the van was no longer moving and the engine was no longer revving. For the purposes of animating the shot timing, I depict Officer Dunn firing first as the Astro van backs into his patrol car the second time, with Detective Nesbitt and Officer Azarvand commencing firing one half second later.

- *Create a video presentation depicting the pursuit:*
  - o  Upon completion of my analysis I created an animated video depicting the pursuit route. I used the radio transmission audio file to follow the progress along the route. I used the testimony of CHP Officers Benatar and Stickels to locate the spike strip they deployed. I used photographs taken of the latter portion of the route to illustrate the property damage caused by Mr. Rivera as he fled from the police in the stolen Astro van. I compiled these assets into a Windows video file that has the audio overlaid and synchronized to the movements depicted.

  **(See Exhibit T, See Disc -  *Video Presentation of Events Leading up to the Shooting.*)**

- *Create a real-time 3D animation of the shooting phase of the event based upon the 3D working model, physical evidence, ballistic trajectories, and witness and Officer statements:*

  I have been a Forensic Animation expert for 25 years, creating the first animation admitted at trial in Santa Clara County (Silicon Valley), the first animation based upon 3D laser scan data, the first animation based upon the 3D Working Model and over 1200 animations since 1995. Using my review of the physical evidence, the witness testimony, the 3D working model and my analysis detailed in the pages above, I visualized the results in a real-time 3D animation. Animation provides an intuitive, easy to understand view of the totality of the evidence, testimony and conclusions of the expert, seen against a

background of the actual environment. This allows the viewer to synthesize the large amount of data and consider it in a format that maintains fidelity to the spatial and temporal aspects of the event.

To create the animation, it is necessary to have a timeframe for the events depicted as well as a spatial foundation. The spatial foundation comes directly from the physical evidence and the results of the analysis as depicted in the images attached to this report. The temporal aspects were derived from the analyses described above and bounded by the available time as per the incident history.

Once the spatial relationships and the temporal aspects of the motion were derived, I visualized the entire event from the perspective of Officer Dunn as he was the first officer to fire and was most directly in the path of the Astro van if it moved. I added audio to the visualization to comport with the testimony regarding the engine revving and the commands given by the officers, for which there was general agreement among the witnesses. I also added the sound of gun fire to ensure the audio contained all the elements related to the event. Details such as brake lights, reverse lights were added as they were mentioned by the officers and would be evident during the actual event. The spray of mud was added as there was sufficient testimony and physical evidence to support it and it provided a critical evidentiary link to the testimony regarding the Astro van's motion in each direction.  The final result is rendered as a Windows Media file, viewable on any recent computer and is attached to this report

***(See Exhibit U, See Disc – 3D Visualization of Event.)***

- *General observations:*
  - *Order of shots*

    I made no attempt at determining the specific order of shots. One observation I made was that the head wound D/V was noted in Dr. Omalu's autopsy report as potentially fatal. Given the nature of the brain injury this gunshot wound likely ended Mr. Rivera's motor functions and therefore happened at the very end of the event. Given the round was listed as coming from Officer Dunn's weapon and the direction of the wound path was upward and from right to left, Mr. Rivera would likely have been in a position with his head rotated forward and to the right. **(See Exhibit K.)**

  - *Positions of the officer who fired*

    Officer's Dunn and Azarvand and Deputy Nesbitt described their respective locations relative to the Astro van and the scene. Their locations were supported by statements given by other officers as well. Reviewing the working model and the bullet trajectories, the officers were accurate in their descriptions as they align well with the bullet trajectories. **(See Exhibit J.)**

## Conclusions

1. The testimony of the officers that Mr. Rivera moved his vehicle both forward and rearward is confirmed by the evidence.
2. The total distance available for Mr. Rivera to move the Astro van before colliding with Officer Dunn's patrol vehicle is 0 to 15 inches.
3. The total distance available for Officer Dunn's patrol vehicle to move backwards due to being pushed by Mr. Rivera is 0 to 15 inches.
4. The most likely scenario is that the available 0 to 15-inch distance was split between the rearward motion of Mr. Rivera's vehicle and the distance it pushed Officer Dunn's patrol vehicle.
5. The testimony of the officers that Mr. Rivera's tires were spinning as he attempted to move the vehicle is confirmed by the evidence.
6. The testimony that mud and debris were sprayed behind the Astro van and towards Officer Dunn's location is confirmed by the evidence.

7. The testimony that Mr. Rivera pushed his Astro van against Officer Dunn's patrol car is supported by the evidence.

8. The testimony of the officers that Mr. Rivera physically moved Officer Dunn's patrol car is supported by the evidence.

9. The testimony that the officers gave multiple commands to stop the car and exit the car and that these commands were ignored by Mr. Rivera is confirmed by the evidence.

10. The testimony that the officers who fired waited until Mr. Rivera attempted to move his car into Officer Dunn's patrol vehicle before firing are supported by the evidence.

11. The testimony given by the officers who fired regarding their respective locations is confirmed by the evidence.

12. When reviewed carefully, the statements made by the officers regarding whether there was room for the Astro van to physically move backwards are consistent, given the timeframe of Officer Benatar's and Detective Nhem's observations.

13. The physical evidence is also consistent with a scenario where the Astro van makes multiple gear changes from forward to reverse but does not actually move backwards as Officer Dunn's patrol vehicle is up against it. This scenario does not preclude Officer Dunn and Officer Azarvand's statements that Dunn's patrol vehicle was physically moving.

14. The physical evidence and the officer's testimony regarding when they fired is supported by the evidence and aligns well temporally with the statement given by many of the witnesses that the van stopped moving and revving after the shots were fired.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of February, 2017, in Grass Valley, California.

*Craig Fries*

Craig Fries, CEO



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819 Fax
http://precisionsim.com

Case 2:16-cv-02495-KJD  Document 97   Filed 02/08/17   Page 92 of 206

# Exhibit A -
# Craig Fries Curriculum Vitae,
# Trial Testimony History
# and
# Rate Schedule



# CURRICULUM VITAE

**CRAIG T. FRIES**
Precision Simulations, Inc.
Phone: (530) 477-5820
Fax: (530) 477-5819
craig@precisionsim.com
TIN: 91-1842702

**SUMMARY:**

Craig Fries founded Precision Simulations, Inc. (PSI) after working as director of computer simulations for Visual Forensics, a senior analyst for Visual Science Research Corporation and a lead research assistant for NASA sponsored studies.

As a leading proponent of the use of computer generated simulations and forensics animations, Craig developed the first forensic animations developed using laser scanning data admitted into a court trial in the United States.

Since Craig founded Precision Simulations Inc. in 1997, the company has become one of the foremost forensic analysis and animation firms in the United States. In this role he has created or directed over 1,000 3D forensic animations and presentations for use in criminal and civil litigation as well as eminent domain. Craig has written articles on accident and crime reconstruction and animation that were published in Forensic Magazine, Claims Magazine, the California District Attorneys Association Quarterly Journal, Right of Way Magazine and other publications.

Over the last 10 years he has created a library of case studies and methodology documents that have been distributed widely at conferences, conventions and through Internet delivery.

Craig has taught extensively in the areas of 3D animation, Laser scanning, Photogrammetry, Video Analysis, 3D Ballistic Trajectory Analysis and admissibility of animation.

## PROFESSIONAL HISTORY:

*1997 - Present*
**PRECISION SIMULATIONS, INC.,** - Founder and CEO. Combining scientific analysis with 3D computer technology, Craig created a unique process to produce 3D computer generated reconstructions and animations.  These animations are very precise and accurate, earning PSI a record of never being excluded in the courtroom over a twenty one (21) year period.  Craig has pioneered the adaptation of Laser Scanning to add accuracy and realism to computer generated reconstruction of crimes and accidents.  PSI created the first laser generated 3D reconstruction and animation to be admitted into court in the US.

These tools are now being routinely used to recreate computer accident and crime scenes where evidence has been lost or compromised and where access to the scene is severely restricted or totally prevented.  Craig previously pioneered the use of computer generated 3D graphics in condemnation litigation and the use of 3D visualization and animation to create virtual environments, to show "drive throughs" and "fly-overs" of planned projects.

*1992 – 1997*
**VISUAL FORENSICS**- Director of Computer Animation. Developed forensic visualization programs and created complex aviation animations for cases involving US government. Directed and created first computer animation accepted in Santa Clara superior court. Contributed to first human vision simulation based on empirical data to be accepted into trial in US. Developed image processing techniques to display visual function for litigation.

*1992 - 1997*
**VISION SCIENCES RESEARCH CORPORATION**- Senior Analyst. Active in research and development of advanced functional vision test methods and products. He designed and built a unique Night Driving Simulation System (NDSS), approved for use in FDA protocols and clinical trials. He pioneered the use of the NDSS in vision related litigation. Designed and created EyeView™, a patented software system to measure and demonstrate human functional vision levels. Worked extensively on mathematical analyses for injury accident cases.

*1991 - 1992*
**CALIFORNIA STATE UNIVERSITY, HAYWARD** - Lead Research Assistant, working on NASA funded basic research into sense and perception of astronauts. Performed statistical analysis for study data and presented extensively at NASA meetings at the Ames Research Center.

**EDUCATION:**
B.A.  Psychology, California State University, Hayward, 1991.

**AFFILIATIONS:**
Member California Attorneys for Criminal Justice
Member California Association of Accident Reconstruction Specialists
Member California Association of Criminalists
Member International Right of Way Association
Member Transportation Research Board – Task Force on Visualization
Member Forensic Expert Witness Association
Member Association of Crime Scene Reconstructionist

**PATENTS:**
Co-Inventors, Dr. Arthur P. Ginsburg, Lawrence H. Tessler and Jonathan Tifft, "Objective Patient Vision Comparison Process and Apparatus", No. 5,552,842.

**PUBLICATIONS:**
Right of Way Magazine – "Virtual Valuation-Simulating an "After" Condition" Nov/Dec 2005
Claims Magazine – "New Tools for Reconstruction" - February 2006
Forensic Magazine – "Reconstruction with 3D Laser Scanning" - August/September 2006
Prosecutor's Brief – The California District Atty. Association Quarterly Journal – Sept. 2006
Plaintiff Magazine – "Caught in the act!" – August 2007
Advocate Magazine – "Accident reconstruction from video footage" - Sept. 2007

**BOOK CITATIONS:**
Edited by: Gregory A. Elmes, Geirge Roedl and Jamison Conley. Forensic GIS, The Role of Geospacial Technologies for Investigating Crime and Providing Evidence

**PEER REVIEW PAPERS:**
*Catching A Bullet: Gunshot Wound Trajectory Analysis Used To Establish Body Position.* Butler B, Fries C, Panock J, Jorden M and Melinek J. Images in Forensic Pathology -
Academic Forensic Pathology (accepted with minor revisions August 2016)

*Gunshot Wound Trajectory Analysis Using Forensic Animation to Establish Relative Positions of Shooter and Victim.* Galligan A, Fries C, Melinek J. Forensic Science International. (in press, accepted for publication December 2016)

**CASE STUDIES / METHODOLOGY DOCUMENTS / RESEARCH PAPERS:**
The 3D Working Model - Head-on Automobile Collision
3D Laser Scanning and Photogrammetry - Automobile Chase and Officer Involved Shooting
Construction and Municipal Bus Accident Reconstructions
Nighttime Visibility Study - Big Rig Nightime Collision
Accident Reconstruction from Surveilence Video
Complete Ballistics Study - AR15 rifle and .45 caliber handgun
Complex Officer Involved Shooting Reconstructions
Complex Rural Single Vehicle Accident Reconstruction
Reconstruction of a Power Line Wire Strike Event
Reconstruction of an Officer Involved Shooting using 911 Audio for Timeline of Events

**SEMINARS / COURSES TAUGHT:**

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|---|---|---|
| 10/04/2016 | Sacramento Safety and Health Summit | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |
| 12/02/2015 | PARMA - Public Agency Risk Management Association Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |
| 10/14/2015 | PARMA - Public Agency Risk Management Association Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |
| 10/08/2015 | IRWA - International Right of Way Association - Sacramento, CA | 3D Laser Scanning and Visualization for Future Developments |
| 05/20/2015 | CSAC - California State Association of Counties - Webinar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |
| 05/07/2015 | CAC - California Association of Criminalists - Semi Annual Seminar | 3D Ballistic Trajectory Analysis |
| 02/16/2015 | AAFS - American Academy of Forensic Sciences - Annual Meeting | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |
| 10/23/2014 | CAARS - California Assocation of Accident Reconstruction Specialists - Fall Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 10/22/2014 | CAC - California Association of Criminalists - Semi Annual Seminar | 3D Ballistic Trajectory Analysis |
| 10/21/2014 | CACLD - California Association of Crime Laboratory Directors - Fall Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 10/15/2014 | World Forensic Festival - Seoul Korea - IAFS - International Association of Forensic Sciences, AFSN - Asian Forensic Sciences Network, APMLA - Asian Pacific Medico Legal Agencies, WPMO - World Police and Medical Officers | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis, The Future of Forensics Presentations - New Technology |
| 07/14/2012 | FARO Technologies - 8 Hour Course | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |

**SEMINARS / COURSES TAUGHT CONTINUED:**

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|------|----------------------|------------------------------|
| 06/05/2012 | Hexagon Geosystems - Worldwide Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |
| 03/07/2012 | CHIA - California Homicide Investigators Association Annual Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |
| 02/22/2012 | CalFire - California Department of Forestry and Fire Protection Quarterly Meeting | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Fire Scene Reconstruction |
| 02/14/2012 | ACSR- Association of Crime Scene Reconstruction - Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 02/09/2012 | CAARS - California Assocation of Accident Reconstruction Specialists - 8 Hour Course | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 01/24/2012 | CDAA - California District Attorneys Assocation - Annual Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |
| 01/11/2012 | Riverside County Risk Management Division - Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |
| 01/09/2012 | CAARS - California Assocation of Accident Reconstruction Specialists - Southern California Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 11/18/2011 | CACLD - California Association of Crime Laboratory Directors - Fall Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 10/06/2011 | CSAC EIA - California State Association of Counties Excess Insurance Authority - Annual Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Scene Reconstruction |
| 05/17/2011 | CAC - California Association of Criminalists - Semi Annual Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |

**SEMINARS / COURSES TAUGHT CONTINUED:**

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|------|---------------------|----------------------------|
| 04/14/2011 | CAC - California Association of Criminalists - Quarterly Meeting | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 09/20/2010 | SWAFS - Southwest Association of Forensic Scientists - Annual Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |
| 12/11/2008 | IBA West - Insurance Brokers and Agents of the West & CPCU - Chartered Property Casualty Underwriters - Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 03/05/2008 | Spar Point Research & IAFSM - International Association of Forensic and Security Metrology | 3D Laser Scanning  - Capturing and Managing Existing Conditions Data for Design / Construction Operations |
| 02/13/2008 | FEWA - Forensic Expert Witness Association, San Francisco Chapter | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Scene Reconstruction |
| 09/27/2007 | Center for Judicial Education and Research / Eduction Division - 2007 Bench-Bar Biannual Conference | Admissibility of 3D Laser Scanning Data and Animations in Trial |
| 06/05/2007 | CLE International - Continued Legal Education International | 3D Laser Scanning in Eminent Domain from Appraisal Issues to Tiral Techniques |
| 03/27/2007 | IAFSM - International Association of Forensic and Security Metrology | Measurements and 3D Data Capture for Investigations, Reconstructions and Security |
| 12/12/2006 | CLE International - Continued Legal Education International | 3D Laser Scanning in Eminent Domain Creating Exhibits and Using Experts |
| 05/11/2006 | CLE International - Continued Legal Education International | Creating Compelling Graphics for Eminent Domain Trials and Settlements |
| 11/03/2005 | CLE International - Continued Legal Education International | Computer Visualization for Eminent Domain Trials |
| 09/07/2005 | 2005 California Statewide Judicial Branch - Annual Conference | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry |

## CLE - CONTINUED LEGAL EDUCATION PRESENTATIONS:

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|------|----------------------|------------------------------|
| 05/17/2016 | Municipal Pooling Authority - Police Liability Workshop - Walnut Creek, California | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 10/30/2015 | Stanislaus County, California | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 03/31/2015 | San Luis Obispo, California District Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 01/15/2015 | CSAC - California State Association of Counties - Oakland | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 10/06/2014 | PG&E - Pacific Gas and Electric | Preserving Existing Conditions with 3D Laser Scanning and Laser Assisted Photogrammetry |
| 07/17/2014 | The City of Oakland, California | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 05/28/2014 | Caltrans - California Department of Transportation | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 08/29/2013 | San Diego, California City Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 04/04/2013 | Napa County, California Sheriff's Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |
| 03/14/2013 | San Bernadino, California Public Defenders Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 01/18/2013 | Portland, Oregon District Attorneys and Law Enforcement | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |

**CLE - CONTINUED LEGAL EDUCATION PRESENTATIONS:**

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|---|---|---|
| 10/26/2012 | ABOTA - American Board of Trial Advocates | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 10/18/2012 | CALI - California Assocation of Licenced Investigators | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 08/17/2012 | Portland, Oregon District Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 02/07/2012 | Sedgwick Attorneys at Law | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 12/07/2011 | Solano County, California District Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime Scene Reconstruction |
| 11/11/2011 | The Arnold Law Firm | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 11/1/2011 | Sacramento, California City Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 07/27/2011 | California Attorney General's Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry, 3D Ballistic Trajectory Analysis |
| 04/14/2011 | NCIB - National Insurance Crime Bureau | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 01/12/2011 | McNamara Law Firm | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 12/07/2010 | Bremer, Whyte, Brown & O'Meara | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |

**CLE - CONTINUED LEGAL EDUCATION PRESENTATIONS:**

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|---|---|---|
| 09/30/2010 | Gordon Rees Scully Mansukhani | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 07/23/2010 | Knox Ricksen, LLP | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 07/22/2010 | The City of Oakland, California | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 02/26/2010 | The Arnold Law Firm | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 06/26/2008 | NBI - National Business Institute Annual CLE Seminar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 05/07/2008 | City of New York, New York City Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 04/05/2008 | American College of Trial Lawyers | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 02/29/2008 | Stanislaus County, California Bar Association | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 02/05/2008 | Morris, Polich & Purdy | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 01/11/2008 | Los Angeles, California City Attorneys Office | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 09/28/2007 | California State Bar Association | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |

**CLE - CONTINUED LEGAL EDUCATION PRESENTATIONS:**

| DATE | ORGANIZATION / EVENT | SEMINAR / COURSE DESCRIPTION |
|------|----------------------|------------------------------|
| 05/24/2007 | Santa Barbara, California Bar Association | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 03/15/2007 | Arizona Claims Association | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 03/08/2007 | Sacramento Claims Association | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 02/21/2007 | DRI - The Voice of the Defense Bar | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Crime & Accident Scene Reconstruction |
| 09/07/2006 | IRWA - International Right of Way Association | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Eminent Domain |
| 01/18/2006 | NBI - National Business Institute | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |
| 07/22/2005 | Lorman | The 3D Working Model - 3D Laser Scanning, Animation, Laser Assisted Photogrammetry in Accident Scene Reconstruction |

116 South Church Street
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819    Fax
http://precisionsim.com

**Trial Testimonies given by Craig Fries since January 2005:**

- June 22, 2005 – Garcia vs. Paramount Citrus
- July 19, 2005 – Fyfe vs. State of Hawaii
- Sept. 29, 2005 - US 95 Masonic/NV
- Oct. 7, 2005 - Mitchell vs. CCSF
- Feb. 3, 2006 - Mendenhall vs. State of CA
- June 28, 2006 - Baires vs. CCSF
- Sept. 20, 2006 - Kennedy vs. CCSF
- Oct. 5, 2006 - Megison vs. General Motors
- Dec. 4, 2007 - Mauck vs. City of Sacramento
- Sept. 8, 2008 - Ridgley vs. City of Sacramento
- Dec. 18, 2008 - Allen vs. Bottlomley Distributing
- Nov. 24 & 25, 2009 – Torrente vs. CCSF
- Sept. 7, 2011 – People vs. Topete
- Jan. 17, 2012 – Pinasco vs. State of CA
- Jan. 26, 2012 – Hechavarria vs. CCSF
- August 14, 2012 – Vallejo – People vs. Keith Ford
- October 22, 2012 – Sacramento – Jacobs v SRTD
- September 12, 2013 - Quincy - Plumas County vs. Wallin-Reed
- February 10, 2015 - Sebastopol - Bertoli vs. City of Sebastopol
- June 22, 2015 - Fairfield - People vs. Henry Smith
- March 7, 2016 - San Francisco - Nieto vs. CCSF
- April 29, 2016 - Napa - People vs. Joseph Brooks Conkright
- October 6, 2016 - San Jose - Carpio vs. Aubin
- December 5, 2016 - Eureka - Anderson vs. CalTrans

**PSI** PRECISION SIMULATIONS

115 South Church Street
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# 2016 RATE SCHEDULE
## TIN: 91-1842702

*\*\* Rates listed below are hourly or approximate.*
*A specific quote will be given for all projects when project specifications are known.*

**Forensic animation and the design, development and production of 2D and 3D computer generated graphics and visualizations.**

Principals…………………………....$450/hour to include travel time
Associates…………………..$225 to$325/hour to include travel time

**Consultation Fee on projects where PSI does not produce animation or graphics, such as review of opposing animation.**

Principals…………………………....$475/hour to include travel time

**Travel and Transportation Expenses:**

Reimbursement for actual travel, lodging and subsistence expenses.

**Retention policy:**

Retainer is 50% to 75% of project estimate (see specific project contract), with first $3,000 non-refundable.

**Expert Testimony:**

Depositions……………………………..................................$475/hour
Trial Testimony/Admissibility Hearing…$2,200 minimum for up to half day (4 hours) and $4,400 for full day, not including travel time or expenses.

**Laser Scans:**

$15,000/day for scanning in the field. Most jobs completed in one day.

Projects with a due date less than thirty (30) days from date of signed contract and receipt of retainer, may incur a rush charge of fifty (50%) percent.

For Principals, after hour and weekends, (after hour rates begin before 8:00 AM and after 5:00 PM, Monday through Friday at client's request) add $325 per hour to hourly rates listed above. Overnight fees due to client scheduling morning inspections and / or appearances are invoiced at $1500 per night not including incurred expenses.  For national holidays: New Year's Day, Memorial Day, Independance Day, Labor Day, Vetran's Day, Thanksgiving Day and Christmas Day,  add $650 per hour to hourly rates listed above.



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819    Fax
http://precisionsim.com

# Exhibit B –
# List of Supplied Materials

**3D ANIMATION • LASER SCANNING • CRIME, FIRE & ACCIDENT RECONSTRUCTION • FORENSIC VIDEO
DOCUMENTATION • ANALYSIS • PRESENTATION AND VISUALIZATION • NEVER EXCLUDED**

CAD Printout Including Transmissions During Pursuit
Crime Scene Log
Officer Faine Incident Report
Officer Parino Incident Report
Officer Azarvand Incident Report
Officer Zavala Incident Report
Officer Fogg Incident Report
Officer Oaks Incident Report
Officer Manor Incident Report
Officer Webb Incident Report
Officer Var Incident Report
Officer Holt Incident Report
Officer Breckenridge Incident Report
Officer Guthrie Incident Report
Officer Perry Incident Reports
Officer Nunez Incident Report
Officer Graviette Incident Report
Officer Southwick Incident Report
San Joaquin District Attorney Summary
Officer Reynolds Incident Reports
Officer Silva Incident Report
Officer Nance Incident Report
Interview of Firefighter Vickers
Interview of Firefighter Parrett
Interview of Paramedic Intern Mochetti
Interview with Witness Green
Interview with Witness Marez
Interview with Witness Wisyanski
Interview with Witness Nitschke
Interview of Tina Sherill, Alleah Martinez, and
Kevin Burcham
Documented Report of Officer Oliver
Documented Reports of Officer Johnson
Documented Reports of Officer Mears
Documented Reports of Officer Ming
Officer De Simone Incident Reports
Officer Harris Incident Reports
Officer Shlafer Incident Reports
Officer Weldon Incident Reports
Stockton Police Department Money Tally Sheet
Officer Beggs-Cassin Incident Reports
Physical Evidence Diagrams
Field Investigation Report of Sarah Yoshida
Physical Evidence Examination Report of
Sarah Yoshida
Field Investigation Reports of Kristie Lawson
San Joaquin County Office of the Coroner, Report by
Steve Moore
Autopsy Report of Steve Moore
Stockton Police Department Property Record
Critical Reach System – Wanted Ad

San Joaquin County Incident Report
San Joaquin County Mugshot Profile
California Department of Motor Vehicles Image
Record
DoJ Replies
GSET Daily
Officer Berg Incident Reports
Officer Trunk Incident Reports
Officer Mosher Incident Report
Officer Mazzuola Incident Report
Officer Cruz Incident Report
Officer Thrush Incident Reports
Stockton Police Department Motor Vehicle Report
Nationwide Insurance
Officer Wagner Incident Report
Officer Ray Incident Report
Officer Fields Incident Report
Officer Mohammed Incident Report
Officer Lestrange Incident Report
Officer Chelli Incident Report
Officer Gonzalez Incident Report
News Articles from The Record
Letters to the Editor
City of Stockton – Stockton Police Department
Investigations Division/Investigations Section
Evidence Code Section 1070
Superior Court of California, County of San Joaquin
Stockton Judicial District Search Warrant
Affidavit for Search Warrant
Sketches and Photos of Scene
AMR Dispatch Times
ArcIMS Viewer
Google Map Images
Officer Involved Shooting Bancroft Command
Attachment D – Introduction of Employer Agency
Civil Investigator Present During Task Force Interviews
of Employer Agency Employees
Nesbitt Commission on Peace Officer Standards and
Training Confidential Profile Report
Office of Sheriff – Coroner, Tape Request Form
Stockton Police Department Official Request for
Information
Office of the District Attorney San Joaquin County
Memorandum
Investigative Summary
Civilian Witness Reports
DoJ Physical Evidence Submission Form
BFS Technical Review Checklist
BFS Administrative Checklist
Central Valley Laboratory Assignment Notification
Report
Cartridge Case Worksheets

Bullet Worksheets
Deposition of Officer Azarvand
Deposition of Officer Dunn
Witness Interviews
Officer Interviews
Overhead Scene Photos
Autopsy Photos
Stockton PD FET Photos
Officers Photos
PD Photos Nesbitt
Scene Photos
Suspect Photos



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit C –
# Aerial View of Pursuit Route

**3D ANIMATION • LASER SCANNING • CRIME, FIRE & ACCIDENT RECONSTRUCTION • FORENSIC VIDEO DOCUMENTATION • ANALYSIS • PRESENTATION AND VISUALIZATION • NEVER EXCLUDED**



Beginning of Pursuit

Path of Pursuit

End of Pursuit
9559 Bancroft Way

**Aerial View of Pursuit Route**



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit D -
# 3D Laser Scan Data Imagery

**3D ANIMATION • LASER SCANNING • CRIME, FIRE & ACCIDENT RECONSTRUCTION • FORENSIC VIDEO DOCUMENTATION • ANALYSIS • PRESENTATION AND VISUALIZATION • NEVER EXCLUDED**



**3D Laser Scan Data Imagery**



**3D Laser Scan Data Imagery**

**3D Laser Scan Data Imagery**

**PSI**
**PRECISION SIMULATIONS**

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit E -
# Stockton PD Physical Evidence Locations Diagram







**LEGEND**

Mail Boxes

Police Unit

**PHYSICAL EVIDENCE**

| Label | Description |
|---|---|
| 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A, 9A, 10A | Expended casings "Winchester 40 S&W" |
| 13A, 14A, 15A, 16A, 17A, 18A, 19A, 20A | Expended casings "Federal 40 S&W" |
| 11A | Gun magazine with a label "DUNN 1587" |
| 12A | Gun magazine with a label "JTN" |
| 21A | License plate # 1134813 |
| 22A – 23A | Black shoes |
| 24A – 25A | White socks |
| 26A | Black undershirt |
| 27A | Black sweatshirt |
| 28A – 29A | Black gloves |
| 30A | A pair of scissors |
| 31A, 33A | Needle caps |
| 32A, 34A | Empty packages |
| 44A | Bullet "WIN 9 mm Luger" |
| 37A, 41A | Expended bullets |
| 45A | Bullet "FC 06" |
| 46A | Expended casing "FC 9 mm Luger" |
| 48A – 50A | Metal pieces |

STOCKTON POLICE DEPARTMENT
DR. # 10-29672.  Sketch A
DATE OF OCC.: 07-22-2010
LOCATION: SALTERS DR/BANCROFT WY
DRAWN BY: T.SHLAFER, # 2362
DATE DRAWN: 07-29-2010

NESBITT000314

**Stockton PD Physical Evidence Locations Diagram**







## PHYSICAL EVIDENCE

| | |
|---|---|
| 11 - 10 , 17 - 18 , 35 - 36 , 47 , 62 | Expended casings "Winchester 40 S&W" |
| 33 - 16 , 19 - 20 , 38 - 44 , 48 | Expended casings "Federal 40 S&W" |
| 11 | Gun magazine with a label "DUNN 1587" |
| 12 | Gun magazine with a label "JTN" |
| 37 | Expended bullet |

### LEGEND

Mail Boxes

Blue Chevrolet Astro

STOCKTON POLICE DEPARTMENT
DR. # 10-29672.  Sketch B
DATE OF OCC.: 07-22-2010
LOCATION: SALTERS DR
DRAWN BY: T.SHLAFER, # 2362
DATE DRAWN: 07-31-2010

NESBITT000315

## Stockton PD Physical Evidence Locations Diagram



NESBITT000316

**Stockton PD Physical Evidence Locations Diagram**



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit F –
# The 3D Working Model



**The 3D Working Model**

**PSI** PRECISION SIMULATIONS

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit G –
# 3D Laser Scan Data with Bullet Trajectories as per DoJ



**3D Laser Scan Data with Bullet Tranjectories as per DoJ**



**3D Laser Scan Data with Bullet Tranjectories as per DoJ**



**3D Laser Scan Data with Bullet Tranjectories as per DoJ**



**3D Laser Scan Data with Bullet Tranjectories as per DoJ**



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit H –
# PSI Ballistic Trajectory Study

3D ANIMATION • LASER SCANNING • CRIME, FIRE & ACCIDENT RECONSTRUCTION • FORENSIC VIDEO
DOCUMENTATION • ANALYSIS • PRESENTATION AND VISUALIZATION • NEVER EXCLUDED



115 S. Church Street • Grass Valley, CA 95945 • (877) 339-7378 • info@precisionsim.com • precisionsim.com

# Ballistic Trajectory Analysis

This study was conceived as a method to test a previous theory regarding predicting a shooter's location from multiple gunshot strikes into the sheet metal of a patrol car.

In 2010, I testified in a tragic capital punishment case involving a deputy shot at seventeen times with an AR15 from approximately 80 feet away. One round pierced the deputy's chest plate and he died shortly after. In analyzing the available physical evidence to locate the shooter's specific location, I used Mike Haag's previously derived "error" or variance rate of +/- 5 degrees for each individual trajectory. When visualized in the 3D Working Model, this variance value appears as a 3 dimensional cone surrounding the derived trajectory. The cone's base grows in size as one moves farther away from the impact point for each round, developing into a fairly large area at the distances we were analyzing. This large area made determining whether the shooter was inside or outside the adjacent residence difficult, as the variance extend to a diameter of approximately 16 feet for each individual shot.



I noted, however, that if I analyzed the shots as a group as opposed to individually, a different picture began to emerge. When visualized in 3D as a group, there was an area where all the trajectories over-lapped – an area within which all the data was being matched, and therefore an area that contained locations for the shooter that were consistent with all of the physical evidence.




© 2016 Precision Simulations Inc, All Rights Reserved

At the time of the trial, I calculated and testified that the statistically most likely location for the shooter was at the geometric center of this overlap area. This location had the lowest mean squared error when compared to the individual derived trajectories. (See more at: http://tinyurl.com/kk8ec4w)

The current study provided an opportunity to test this theory and potentially provide a method to increase the accuracy of our prediction of the shooter's location over that afforded by using the trajectories individually.

## GENERAL SETUP:

The study was comprised of eight different test conditions – two caliber/weapon types (.45 caliber handgun vs .223 caliber AR15 semi-automatic rifle), two targets  (dual-ply drywall with 4 inches of airspace between them vs. car doors) and two angles of impact (90 degrees vs 45 degrees).

Each test was conducted at a distance of 90 feet to avoid drop in the relatively slow handgun rounds.

| Gun Type | Target Type | Target Angle |
|---|---|---|
| .223 AR15 Rifle | Drywall | 90° |
| .223 AR15 Rifle | Drywall | 45° |
| .45 Handgun | Drywall | 90° |
| .45 Handgun | Drywall | 45° |
| .223 AR15 Rifle | Car Door | 90° |
| .223 AR15 Rifle | Car Door | 45° |
| .45 Handgun | Car Door | 90° |
| .45 Handgun | Car Door | 45° |

The weapons were located in a fixed position using a Ransom Rest to lock down the AR15 and to support the .45 handgun. The targets for each weapon type were laid out side by side and fired in series before switching them out for the next weapon type. The entire scene, including the weapon location in the Ransom Rest and the targets were documented through a 3D laser scan using our Leica® Geosystems ScanStation C10.

Each target/angle setup was fired at twelve times from each weapon. Each round fired was clocked using radar to determine the speed of the round at a distance of approximately 1 foot after leaving the weapon's muzzle.



After the twelve rounds were fired, each impact location was fitted with a custom made trajectory rod. The rods used in the study were powder coated a flat primer gray to increase the resolution of the scan data and limit the artifacts often seen with traditional trajectory rods. After the set of twelve impact sites were fit with the trajectory rods, each rod was documented for azimuth and elevation with the ScanStation.

Once all the test data had been captured with the ScanStation, it was imported into Autodesk's 3D Studio MAX software for 3-dimensional analysis. Each of the eight test conditions were analyzed separately in the computer. The trajectory rods that were scanned in each impact site were traced back in a straight line to the plane of the weapon's muzzle. One of many benefits of doing this work in the computer and using the 3D Working Model, is that if the computer is good at anything, drawing straight lines is certainly one of them. Given the lack of drop expected in the rounds over a distance of 30 yards, a straight line is the best model of the bullet's true trajectory. Performing this work in the field would add unnecessary error to the underlying analyses as projecting truly straight lines would prove all but impossible.

For each test condition, the location of the straight line traceback (predicted shooter's position) where it crossed the plane of the muzzle was visualized and compared to the known location of the weapon. This comparison resulted in a 2-axis Cartesian grid, with the weapon's known location located at the grid's origin and each individual predicted location (the point where the traceback intersected the muzzle's plane at 30 yards or 90 feet) shown on the grid. This method provided an intuitive and functional data set for visualizing and measuring both the spread of the data and the accuracy.







*.45 Handgun - Drywall - 90° - 1 Foot Grid*

*As shown in the above diagram, the known location of the weapon is located at the origin of the grid, with1 foot intervals for the gridlines.*
*The blue boxes illustrate the predicted location of the weapon for each of the twelve rounds fired, based upon the traceback's position at the plane of the weapon's muzzle at 90 feet.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*

## Analysis of the data:

Using the grid method illustrated above, each test condition was reviewed and important data extracted regarding the relative accuracy and spread of the predicted locations. Basic data compiled included sample size, maximum/minimum errors from known accuracy of predicted locations - individual, maximum/minimum and average spread of error (standard deviation of error/precision).



Each trajectory was fitted with the currently accepted +/- 5 degree cone of uncertainty and the overlap of these cones was visualized on the 2D grid. In the example below, the known weapon location is at the grids origin, the predicted locations are shown as blue boxes, the +/- 5 degree cones are shown in green and their overlap area is shaded in light blue:



*.45 Handgun - 45° Incidence Angle Drywall -*
*Default 5° Cones - 1 Foot Grid*

What we discovered was that, although using the geometric center of the overlap area did indeed increase the accuracy over the individual trajectories, it was not the most accurate indicator to fall out of the data. As it turned out, the geometric center of the group of predicted locations was the most accurate indicator, reducing the error in predicted locations by as much as 20 times over using the average error across the dataset. In the above example, the red star illustrates the predicted location using the geometric center of the individual tracebacks – an error of less than 0.5 feet over 90 feet! The following graphics illustrate this effect for all 8 test conditions:



**The following images illustrate the results of tracebacks (predicted shooter location) with both weapons shot through drywall:**



*.223 AR15 - Drywall - 90° - 1 foot grid*          *.223 AR15 - Drywall - 45° - 1 foot grid*



*.45 Handgun - Drywall - 90° - 1 foot grid*          *.45 Handgun - Drywall - 45° - 1 foot grid*

*The known location of the weapon is located at the origin of the grid.*
*The blue boxes illustrate the predicted location (traceback) of the weapon.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*



**The following graphics illustrate the results of tracebacks (predicted shooter location) with both weapons shot through car door:**

Case 2:20-cv-02493-cvd   Document 97   Filed 02/03/17   Page 130 of 206



*.223 AR15 - Car Door - 90° - 1 foot grid*          *.223 AR15 - Car Door - 45° - 1 foot grid*




*.45 Handgun - Car Door- 90° - 1 foot grid*          *.45 Handgun - Car Door - 45° - 1 foot grid*

*The known location of the weapon is located at the origin of the grid.*
*The blue boxes illustrate the predicted location (traceback) of the weapon.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*



As is apparent from a brief review of the data plots, the predicted location based upon this geometric average greatly reduces the error over both the maximum error and the average error of the individual traceback locations. The following illustrates this effect numerically:

| Gun Type | Target Type | Target Angle | Average Error of Traceback at 90 Feet | |
|---|---|---|---|---|
| .223 AR15 Rifle | Drywall | 90° | 0.90° | 1.41 ft. |
| .223 AR15 Rifle | Drywall | 45° | 0.75° | 1.18 ft. |
| .45 Handgun | Drywall | 90° | 0.82° | 1.30 ft. |
| .45 Handgun | Drywall | 45° | 0.90° | 1.41 ft. |
| .223 AR15 Rifle | Car Door | 90° | 1.02° | 1.60 ft. |
| .223 AR15 Rifle | Car Door | 45° | 1.71° | 2.69 ft. |
| .45 Handgun | Car Door | 90° | 2.51° | 3.95 ft. |
| .45 Handgun | Car Door | 45° | 3.18° | 5.00 ft. |

| Gun Type | Target Type | Target Angle | Geometric Center of Individual Tracebacks at 90 Feet | |
|---|---|---|---|---|
| | | | Total Error Degrees | Total Error Feet |
| .223 AR15 Rifle | Drywall | 90° | 0.45° | 0.706 ft. |
| .223 AR15 Rifle | Drywall | 45° | 0.36° | 0.570 ft. |
| .45 Handgun | Drywall | 90° | 0.04° | 0.057 ft. |
| .45 Handgun | Drywall | 45° | 0.29° | 0.455 ft. |
| .223 AR15 Rifle | Car Door | 90° | 0.50° | 0.784 ft. |
| .223 AR15 Rifle | Car Door | 45° | 0.34° | 0.538 ft. |
| .45 Handgun | Car Door | 90° | 0.94° | 1.484 ft. |
| .45 Handgun | Car Door | 45° | 2.12° | 3.338 ft. |

*Traceback = Predicted Shooter Position*



# Confidence Intervals/Validity per test Condition

Previous work performed by others explored the concept of confidence intervals for the accuracy of any given trajectory traceback. Based upon this work, the value of +/- 5 degrees has been suggested and adopted by many who work in the field. The previous work on this issue has focused on a statistical approach based upon standard deviation of the error in large sets of predicted locations. We were unsatisfied with this approach for reasons of both mathematical validity, as well as having a single value of +/- 5 degrees for any and all measurement conditions.

A new approach was developed and applied to the data in this study. As the concept of "cones of uncertainty" presented by previous authors was well accepted and intuitive, we chose to work with the existing framework of an error cone. However, the calculation of the error cones we used was graphical as opposed to statistical.

The data in our study provided direct comparison for each round fired between the predicted location and the actual (known) location of the weapon, as previously shown. When viewed on a Cartesian grid, the predicted locations are readily compared to the known (which lies at the origin of each Cartesian grid) and the direction and amount of error for each traceback is readily apparent. This method of illustrating the resultant predicted locations as opposed to analyzing the angular components provides a more intuitive and functionally useful illustration of the ultimate goal – determining the shooters location, not the angles of the individual shots themselves.

Although none of the rounds tested exhibited zero error – none of them exactly predicted the true shooters location – the degree of and error pattern for each condition provides a visual reference for the relative accuracy. In determining what type of confidence or size of error cone would best be applied to each test condition we chose to look at the minimum size of error cone that would still result in every cone containing the known shooter's location. This approach has the benefit of being visual and intuitive – if we are after a high degree of certainty in our predictions, our error cones should always contain the known location. The resulting cones would take into account both the average error and the spread of each set of predictions, as would be expected in an analysis of validity and confidence. The tighter the spread and closer to the known location, the smaller the level of uncertainty and therefore the smaller the error cone. In addition, this method ensures that our ultimate prediction of a shooters location takes into account all of the available evidence, an important requisite when presenting this data in trial.

The following graphics illustrate this method. Each test condition is shown twice – first with the previously accepted +/- 5 degree cones and then again with the resultant cones scaled to the smallest size where all the cones contain the known shooter's location. Note that in the .45 handgun, car door, 45° impact angle condition, the cone size needed to encompass the known location was *larger* than 5 degrees*; and in the .45 handgun, car door, 90° impact angle condition, the scaled cone size need to encompass all the data *was* 5 degrees.





*.223 AR15 Rifle - 90° Incidence Angle - Drywall -
Default 5° Cones - 1 Foot Grid*



*.223 AR15 Rifle - 90° Incidence Angle  - Drywall -
Minimum Cone Radius = 1.7° - 1 Foot Grid*



*.223 AR15 Rifle - 45° Incidence Angle - Drywall -
Default 5° Cones - 1 Foot Grid*



*.223 AR15 Rifle - 45° Incidence Angle  - Drywall -
Minimum Cone Radius = 1.7° - 1 Foot Grid*

*The known location of the weapon is located at the origin of the 1 foot grid.*
*The blue boxes illustrate the predicted location (traceback) of the weapon.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*



© 2016 Precision Simulations Inc, All Rights Reserved



.45 Handgun - 90° Incidence Angle - Drywall -
Default 5° Degree Cones - 1 Foot Grid



.45 Handgun - 90° Incidence Angle  - Drywall -
Minimum Cone Radius = 2.0° - 1 Foot Grid



.45 Handgun - 45° Incidence Angle - Drywall -
Default 5° Cones - 1 Foot Grid



.45 Handgun - 45° Incidence Angle - Drywall -
Minimum Cone Radius = 1.80° - 1 Foot Grid

*The known location of the weapon is located at the origin of the 1 foot grid.*
*The blue boxes illustrate the predicted location (traceback) of the weapon.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*





*.223 AR15 Rifle - 90° Incidence Angle - Car Door - Default 5° Cones - 1 Foot Grid*



*.223 AR15 Rifle - 90° Incidence Angle - Car Door - Minimum Cone Radius = 2.6 - 1 Foot Grid*



*.223 AR15 Rifle - 45° Incidence Angle -Car Door - Default 5° Cones - 1 Foot Grid*



*.223 AR15 Rifle - 45° Incidence Angle- Car Door - Minimum Cone Radius = 2.9° - 1 Foot Grid*

*The known location of the weapon is located at the origin of the 1 foot grid.*
*The blue boxes illustrate the predicted location (traceback) of the weapon.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*





*.45 Handgun - 90° Incidence Angle- Car Door -*
*Default 5° Cones - 1 Foot Grid*



*.45 Handgun - 90° Incidence Angle - Car Door -*
*Minimum Cone Radius = 5.0° - 1 Foot Grid*
*\* Minimum Radius same as Default 5.0°*



*.45 Handgun - 45° Incidence Angle - Car Door -*
*Default 5° Cones - 1 Foot Grid*
*\*Default 5° cone overlap did not encompass known location*



*.45 Handgun - 45° Incidence Angle - Car Door -*
*Minimum Cone Radius = 5.4° - 1 Foot Grid*
*\*Default 5° cone overlap did not encompass known location*

*The known location of the weapon is located at the origin of the 1 foot grid.*
*The blue boxes illustrate the predicted location (traceback) of the weapon.*
*The red "star" is the geometric center of the group of predicted locations (tracebacks).*



When analyzed numerically in this manner, the error cones, or "cones of uncertainty" are as follows for each test condition:

| Gun Type | Target Type | Target Angle | Cone Radius in Feet | Cone Radius in Degrees |
|---|---|---|---|---|
| .223 AR15 Rifle | Drywall | 90° | 2.60 ft. | 1.7° |
| .223 AR15 Rifle | Drywall | 45° | 2.60 ft. | 1.7° |
| .45 Handgun | Drywall | 90° | 3.18 ft. | 2.0° |
| .45 Handgun | Drywall | 45° | 2.85 ft. | 1.8° |
| .223 AR15 Rifle | Car Door | 90° | 4.16 ft. | 2.6° |
| .223 AR15 Rifle | Car Door | 45° | 4.63 ft. | 2.9° |
| .45 Handgun | Car Door | 90° | 7.80 ft. | 5.0° |
| .45 Handgun | Car Door | 45° | 8.50 ft. | 5.4° |

## Relative Contribution to Variance of Test Variables

When looking at the raw data, the largest contribution to the variance in predicted location accuracy comes from the target material. Of the eight test conditions, the data for the car doors displayed the lowest accuracy, occupying all four of the lowest rankings; the data for the drywall occupied all four of the highest accuracy. This affect is also illustrated by the difference in the average errors – the comparison between the four car door conditions and the four drywall conditions nets the largest difference – 2.1° for the car door data vs 0.84° for the drywall data, a difference of 1.26°.

The variable that contributed the 2nd most to the predicted variance was the weapon/caliber. The data for the AR15 rifle firing .223 caliber rounds had an average error of 1.09° versus the handgun firing .45 caliber rounds with1.85°  across test conditions. The variable that contributed the least to the variance was the angle of incidence – the 1.63° average error for the .45° condition vs the 1.31° of error for the 90° condition results in a difference of only 0.32°.



## Test Conditions Rankings in Ascending Order:

| Gun Type | Target Type | Target Angle | Average Error in Degrees |
|---|---|---|---|
| .223 AR15 Rifle | Drywall | 45° | 0.75° |
| .45 Handgun | Drywall | 90° | 0.82° |
| .223 AR15 Rifle | Drywall | 90° | 0.90° |
| .45 Handgun | Drywall | 45° | 0.90° |
| .223 AR15 Rifle | Car Door | 90° | 1.02° |
| .223 AR15 Rifle | Car Door | 45° | 1.71° |
| .45 Handgun | Car Door | 90° | 2.51° |
| .45 Handgun | Car Door | 45° | 3.18° |

## Comparison by Weapon Type:

| Gun Type | Average Error in Degrees |
|---|---|
| .223 AR15 Rifle | 1.09° |
| .45 Handgun | 1.85° |
| *Difference* | *0.76°* |

## Comparison by Angle of Incidence:

| Angle of Incidence | Average Error in Degrees |
|---|---|
| 90° | 1.31° |
| 45° | 1.63° |
| *Difference* | *0.32°* |

## Comparison by Target Type:

| Target | Average Error in Degrees |
|---|---|
| Drywall | 0.84° |
| Car Door | 2.10° |
| *Difference* | *1.26°* |



© 2016 Precision Simulations Inc, All Rights Reserved

## Errors at 90 Feet - Per Test Condition:

### .223 AR15 Rifle through Drywall at 90°
Sample Size (N)=12
Maximum Error = 2.48 ft./1.58°
Minimum Error = 0.21 ft./0.13°
Average Error = 1.41 ft./0.90°
Standard Deviation Errors = 0.72 ft./0.46°
Error from Arithmetic Average = 0.06 ft.
Error from Cone Overlap Center = 0.51 ft.

### .223 AR15 Rifle through Drywall at 45°
Sample Size (N)=12
Maximum Error = 2.51 ft./1.60 °
Minimum Error = 0.31 ft./0.20°
Average Error = 1.17ft./0.75°
Standard Deviation Errors = 0.66 ft./0.42°
Error from Arithmetic Average = 0.54 ft.
Error from Cone Overlap Center = 1.62 ft.

### .45 Handgun through Drywall at 90°
Sample Size (N)=10
Maximum Error = 3.08 ft./1.96 °
Minimum Error = 0.15 ft./0.10 °
Average Error = 1.30 ft./0.82°
Standard Deviation Errors = 0.85 ft./0.54°
Error from Arithmetic Average = 0.71 ft.
Error from Cone Overlap Center = 1.45 ft.

### .45 Handgun through Drywall at 45°
Sample Size (N)=12
Maximum Error = 2.69 ft./1.71°
Minimum Error = 0.28 ft/0.18 °
Average Error = 1.41 ft./0.90 °
Standard Deviation Errors = 0.79 ft./0.51°
Error from Arithmetic Average = 0.45 ft.
Error from Cone Overlap Center = 0.57 ft.

### .223 AR15 Rifle through Car Door at 90°
Sample Size (N)=12
Maximum Error = 4.03 ft./2.56°
Minimum Error = 0.40 ft./0.25°
Average Error = 1.60ft./1.02°
Standard Deviation Errors = 1.15 ft./0.73°
Error from Arithmetic Average = 0.784 ft.
Error from Cone Overlap Center = 1.87 ft.

### .223 AR15 Rifle through Car Door at 45°
Sample Size (N)=10
Maximum Error = 4.51 ft./2.87 °
Minimum Error = 1.30 ft./0.83°
Average Error = 2.68ft./1.71°
Standard Deviation Errors = 1.06 ft./0.67°
Error from Arithmetic Average = 0.54 ft.
Error from Cone Overlap Center = 1.62 ft.

### .45 Handgun through Car Door at 90°
Sample Size (N)=12
Maximum Error = 7.69 ft./4.89 °
Minimum Error = 1.12 ft./0.71°
Average Error = 3.94ft./2.51°
Standard Deviation Errors = 1.78 ft./1.08 °
Error from Arithmetic Average = 1.48 ft.
Error from Cone Overlap Center = 2.16 ft.

### .45 Handgun through Car Door at 45°
Sample Size (N)= 9
Maximum Error = 8.4 ft./5.3°
Minimum Error = 0.19 ft./0.12°
Average Error = 5.0 ft./3.18°
Standard Deviation Errors = 2.59 ft./1.64°
Error from Arithmetic Average = 3.34 ft.
Error from Cone Overlap Center = 2.38 ft.



© 2016 Precision Simulations Inc, All Rights Reserved

**Speed of Fired Rounds, for each Test Condition (feet per second)**

| .223 AR15 Rifle | | | | |
|---|---|---|---|---|
| **Round Number** | **45° - Drywall** | **45° - Car Door** | **90° - Drywall** | **90° - Car Door** |
| 1 | 2917 | 2879 | 2949 | 2949 |
| 2 | 2911 | 2911 | 2917 | 2909 |
| 3 | 2871 | 2917 | 2898 | 2917 |
| 4 | 2861 | 2867 | 2892 | 2917 |
| 5 | 2892 | 2898 | 2879 | 2749 |
| 6 | 2830 | 2911 | 2930 | 2930 |
| 7 | 2867 | 2904 | 2930 | 2949 |
| 8 | 2911 | 2911 | 2923 | 2873 |
| 9 | 2892 | 2390 | 2892 | 2911 |
| 10 | 2855 | 2911 | 2936 | 2898 |
| 11 | 2867 | 2930 | 2911 | 2923 |
| 12 | 2886 | 2949 | 2898 | 2867 |
| *Average Speed* | *2880* | *2865* | *2913* | *2899* |

| .45 Handgun | | | | |
|---|---|---|---|---|
| **Round Number** | **45° - Drywall** | **45° - Car Door** | **90° - Drywall** | **90° - Car Door** |
| 1 | 802 | 816 | 804 | 829 |
| 2 | 799 | 825 | 803 | 820 |
| 3 | 838 | 826 | 839 | 824 |
| 4 | 827 | 819 | 828 | 825 |
| 5 | 836 | 840 | 836 | 825 |
| 6 | 832 | 832 | 822 | 819 |
| 7 | 828 | 834 | 819 | 812 |
| 8 | 822 | 828 | 817 | 812 |
| 9 | 847 | 817 | 817 | 835 |
| 10 | 823 | 826 | 819 | 835 |
| 11 | 819 | 825 | 809 | 806 |
| 12 | 827 | 829 | 826 | 806 |
| *Average Speed* | *825* | *826* | *820* | *821* |



# Conclusion

This study was conceived in 2010 after we faced the challenge of determining the shooters location from seventeen shots fired from an AR-15 semi-automatic rifle. Upon examination of the evidence in that case and subsequent cases two things became clear: the previously derived +/- 5 degree cones of uncertainty were prohibitively conservative; and that there was functionally useful data to be gleaned from assessing the fired rounds as a set, as opposed to individually.

From visualizing the data in 3D as was first done in our 2010 case work, it was apparent that in cases with multiple rounds fired from a single location, the individual tracebacks described a s tatistical "cloud" surrounding the actual shooters location. What was needed was a method to utilize the multiple predicted locations in a way that took into account both their spread and their relative accuracy. The concept of the overlap area of the +/- 5 degree cones was appealing both visually and by the virtue of this location matching all the available evidence – a critical component of validity when testifying to the results.

After our tests were completed, analysis of the results revealed the following:

1. The intended goal of the study was to determine whether the geometric center of the overlap of the +/- 5 degree cones accurately predicted the shooters location. In all 8 test scenarios this datum did predict the shooters location with increased accuracy over using the average error of the set of traceback predictions. However it was determined that a more accurate prediction was provided by using the geometric center of the set of traceback predictions, essentially ignoring the cones and their common overlap area. It should be noted that this more accurate datum always lies within the cones overlap error – however it was not located at the overlaps geometric center.

2. For all but one of our test conditions (pistol firing .45 caliber rounds through a car door at a 45 degree angle of incidence) the previously derived +/-5 degree cones were larger than necessary to fully account for the spread and absolute values of the errors in predicting the shooter's location.

3. Given that one of our condition resulted in an error cone of 5.4 degrees and a second resulted in error cones of 5.0 degrees, the previously derived +/- 5 degree cones are valid for a broad value that applies over a wide range of conditions.

4. The test conditions that resulted in large error were both from relatively large and slow .45 caliber rounds fired into car doors. In these test conditions, many of the rounds lacked sufficient velocity to make a secondary hole in the back of the target, thereby limiting the accuracy of the resultant traceback. If encountered in live casework, it would be necessary to hold the rods resting in the single bullet hole against the "pinch or wipe" point to increase predictive accuracy. In the scenarios using the .45 caliber handgun fired into the car door at a 45 degree angle, a few of the rounds lacked sufficient momentum to make a single hole in the front side of the target, causing the data to be discarded as there was no hole into which a trajectory round could be inserted.



5. The single largest factor in resultant prediction accuracy was the target material. The ability of each caliber to fully perforate both layers of the drywall provided two points of data between which a straight line traceback could be derived. The .45 caliber handgun had particular difficulty in perforating the car door.

6. The weapon/caliber variable was the second most important variable affecting prediction accuracy.

7. The angle of incidence contributed the least to the prediction accuracy. As long as two holes were available, the accuracy in predicting the shooters location was very high regardless of weapon type.

8. The use of the ScanStation, the custom-made trajectory rods and analysis of the data in the computer using the 3D Working Model provided for very high prediction accuracy across most condition (all conditions where two holes were available.) At a distance of 90 feet from the physical evidence in the form of bullet holes, this method was able to predict shooters location to within an average of 1.6 feet in 5 of the test conditions and within 5 feet in the worst condition, using the average error.

9. Using the set of the data and analyzing the geometric center of the individual predictions of shooters location provided even greater accuracy – up to 20x better than using the average error. At 90 feet from the physical evidence, this datum predicted the shooters location to within 3.3 feet in the worst case scenario and as accurate as ***0.05 feet*** in the best.

In conclusion, the tested hypothesis was determined to be valid in that it increased predictive accuracy over previously used methods. However the better predictive accuracy was provided by a datum we had not considered previously, namely the geometric center of the "cloud" of predicted shooter locations.

Many thanks to Mike Haag for his groundbreaking work on creating the concept of cones of uncertainty and providing an overall value to work with. I would also like to thank Leica Geosystems for the incredibly valuable ScanStation C10 that was used in this study and all of our case work in this area. Although I have not personally tested the alternative method of using strings or similar methods for trackback from trajectory rods, I am confident that the accuracy and resolution provided by the ScanStation is responsible for a large portion of the accuracy we were able to demonstrate in predicting the shooters location in this study and our casework. And finally, I am grateful to the thousands of scientists from history who conceived and implemented the idea of the "working model". At PSI our use of the 3D working model has consistently allowed us to achieve the type of accuracy and foundational validity that is required for forensic analysis.





*.223 AR15 Rifle*



*.223 AR15 Rifle and Drywall Target*



*Car Door with Ballistic Trajectory Rods*



*Drywall with Ballistic Trajectory Rods*



*Leica Geosystems C10 ScanStation with Targets*



*Leica Geosystems ScanStation C10 Laser Scan of .45 Handgun Set-up*



PRECISIONSIM.com • 877.339.7378 • Turn Jurors into Witnesses

© 2016 Precision Simulations Inc, All Rights Reserved

√PSI | PRECISION SIMULATIONS

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819 Fax
http://precisionsim.com

# Exhibit I –
# 3D Laser Scan Data of Astro Van
# with Bullet Trajectory Cones



**3D Laser Scan Data of Astro Van with Bullet Trajectory Cones**



**3D Laser Scan Data of Astro Van with Bullet Trajectory Cones**



**3D Laser Scan Data of Astro Van with Bullet Trajectory Cones**

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

√PSI | PRECISION SIMULATIONS

# Exhibit J –
# 3D Model of Astro Van with
# Bullet Trajectory Cones
# Aligned in 3D Scene

**3D ANIMATION • LASER SCANNING • CRIME, FIRE & ACCIDENT RECONSTRUCTION • FORENSIC VIDEO
DOCUMENTATION • ANALYSIS • PRESENTATION AND VISUALIZATION • NEVER EXCLUDED**



**3D Model of Astro Van with Bullet Trajectory Cones Aligned in 3D Scene**



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit K –
# 3D Gunshot Wound Model of
# James Rivera

**LODGMENT V:**
Right medial parietal bone underneath an elevated fracture piece of right parietal bone.

**PATH:**
Right occipital - parietal scalp, fracture of the right parietal-occipital bone, perforation and laceration of the right dorsal meninges, the right occipital lobe and the right parietal lobe, the right dorsal meninges and fracture of the right parietal bone.

**GUNSHOT WOUND D/V**

**ENTRY D:**
7.0 cm below top of the head. 3.7 cm right of the posterior midline.

**DIRECTION:**
Forward, upward and left.

**SHOOTER:**
Officer Dunn

**Gunshot Wound D/V Top View**



**LODGMENT V:**
Right medial parietal bone underneath an elevated fracture piece of right parietal bone.

**PATH:**
Right occipital - parietal scalp, fracture of the right parietal-occipital bone, perforation and laceration of the right dorsal meninges, the right occipital lobe and the right parietal lobe, the right dorsal meninges and fracture of the right parietal bone.

**GUNSHOT WOUND D/V**

**ENTRY D:**
7.0 cm below top of the head. 3.7 cm right of the posterior midline.

**DIRECTION:**
Forward, upward and left.

**SHOOTER:**
Officer Dunn

**Gunshot Wound D/V Right View**

**LODGMENT U:**
Right superior trapezius muscle.

**PATH:**
Right posterior shoulder. Fracture of the right lateral scapular bone adjacent to the right shoulder joint. Internal ricochet perforated the soft tissues of the right superior shoulder. Penetration of the right trapezius muscle.

**GUNSHOT WOUND E/U**

**ENTRY E:**
30.2 cm below top right posterior shoulder. 15.4 cm right of the posterior midline.

**DIRECTION:**
E: Forward, right and upward.
U: Ricochet, left and upward.

**SHOOTER:**
Unknown

**Gunshot Wound E/U Top View**



**LODGMENT U:**
Right superior trapezius muscle.

**PATH:**
Right posterior shoulder. Fracture of the right lateral scapular bone adjacent to the right shoulder joint. Internal ricochet perforated the soft tissues of the right superior shoulder. Penetration of the right trapezius muscle.

**GUNSHOT WOUND E/U**

**ENTRY E:**
30.2 cm below top right posterior shoulder. 15.4 cm right of the posterior midline.

**DIRECTION:**
E: Forward, right and upward.
U: Ricochet, left and upward.

**SHOOTER:**
Unknown

**Gunshot Wound E/U Rear View**



**LODGMENT U:**
Right superior trapezius muscle.

**PATH:**
Right posterior shoulder. Fracture of the right lateral scapular bone adjacent to the right shoulder joint. Internal ricochet perforated the soft tissues of the right superior shoulder. Penetration of the right trapezius muscle.

**GUNSHOT WOUND E/U**

**ENTRY E:**
30.2 cm below top right posterior shoulder. 15.4 cm right of the posterior midline.

**DIRECTION:**
E: Forward, right and upward.
U: Ricochet, left and upward.

**SHOOTER:**
Unknown

**Gunshot Wound E/U Right View**



**LODGMENT S:**
Jacket recovered left lower lung lobe. Deformed bullet recovered embedded in left lateral 6th thoracic vertebra.

**PATH:**
The left back through the intercostal space soft tissues. Through the left posterior and medial pleura. Through the left paravertebral soft tissues of the mid thoracic spine. Penetration and fracture of the left lateral 6th vertebral body.

**GUNSHOT WOUND F/S**

**ENTRY F:**
Left lateral axillary back. 42.5 cm below top of the head. 10.7 cm left of the posterior midline.

**DIRECTION:**
Right, forward and upward.

**SHOOTER:**
Unknown

**Gunshot Wound F/S Top View**



**LODGMENT S:**
Jacket recovered left lower lung lobe. Deformed bullet recovered embedded in left lateral 6th thoracic vertebra.

**PATH:**
The left back through the intercostal space soft tissues. Through the left posterior and medial pleura. Through the left paravertebral soft tissues of the mid thoracic spine. Penetration and fracture of the left lateral 6th vertebral body.

**GUNSHOT WOUND F/S**

**ENTRY F:**
Left lateral axillary back. 42.5 cm below top of the head. 10.7 cm left of the posterior midline.

**DIRECTION:**
Right, forward and upward.

**SHOOTER:**
Unknown

**Gunshot Wound F/S Rear View**



**LODGMENT S:**
Jacket recovered left lower lung lobe. Deformed bullet recovered embedded in left lateral 6th thoracic vertebra.

**PATH:**
The left back through the intercostal space soft tissues. Through the left posterior and medial pleura. Through the paravertebral soft tissues of the mid thoracic spine. Penetration and fracture of the left lateral 6th vertebral body.

**GUNSHOT WOUND F/S**

**ENTRY F:**
Left lateral axillary back. 42.5 cm below top of the head. 10.7 cm left of the posterior midline.

**DIRECTION:**
Right, forward and upward.

**SHOOTER:**
Unknown

**Gunshot Wound F/S Left View**



**LODGMENT Q:**
Mesocolon of the right transverse colon.

**PATH:**
The right lumbar back through the right retroperitoneum, the right peri-renal soft tissues, the mesentery and mesenteric vessels.

**GUNSHOT WOUND G/Q**

**ENTRY G:**
Right lateral rostral lumbar in the back. 57.4 cm below top of the head. 10.5 cm right of posterior midline.

**DIRECTION:**
Forward, right and upward.

**SHOOTER:**
Unknown

**Gunshot Wound G/Q Top View**



**LODGMENT Q:**
Mesocolon of the right transverse colon.

**PATH:**
The right lumbar back through the right retroperitoneum, the right peri-renal soft tissues, the mesentery and mesenteric vessels.

**GUNSHOT WOUND G/Q**

**ENTRY G:**
Right lateral rostral lumbar in the back. 57.4 cm below top of the head. 10.5 cm right of posterior midline.

**DIRECTION:**
Forward, right and upward.

**SHOOTER:**
Unknown

**Gunshot Wound G/Q Rear View**



**LODGMENT Q:**
Mesocolon of the right transverse colon.

**PATH:**
The right lumbar back through the right retroperitoneum, the right peri-renal soft tissues, the mesentery and mesenteric vessels.

**GUNSHOT WOUND G/Q**

**ENTRY G:**
Right lateral rostral lumbar in the back. 57.4 cm below top of the head. 10.5 cm right of posterior midline.

**DIRECTION:**
Forward, right and upward.

**SHOOTER:**
Unknown

**Gunshot Wound G/Q Right View**

**LODGMENT R:**
Left kidney. 59 cm below top of the head. 11cm left of anterior midline.

**PATH:**
Soft tissues of the back and of the left lower chest. Through the left costo-diaphragmatic recess and the left diaphragm, left retroperitoneum and peri-renal soft tissues, the posterosuperior pole of the left kidney.

**GUNSHOT WOUND H/R**

**ENTRY H:**
Left medial caudal thoracic back. 55 cm below top of the head. 3 cm left of posterior midline.

**DIRECTION:**
Forward, left and downward.

**SHOOTER:**
Unknown

**Gunshot Wound H/R Top View**



**LODGMENT R:**
Left kidney. 59 cm below top of the head. 11cm left of anterior midline.

**PATH:**
Soft tissues of the back and of the left lower chest. Through the left costo-diaphragmatic recess and the left diaphragm, left retroperitoneum and peri-renal soft tissues, the posterosuperior pole of the left kidney.

**GUNSHOT WOUND H/R**

**ENTRY H:**
Left medial caudal thoracic back. 55 cm below top of the head. 3 cm left of posterior midline.

**DIRECTION:**
Forward, left and downward.

**SHOOTER:**
Unknown

**Gunshot Wound H/R Rear View**



**LODGMENT R:**
Left kidney. 59 cm below top of the head. 11cm left of anterior midline.

**PATH:**
Soft tissues of the back and of the left lower chest. Through the left costo-diaphragmatic recess and the left diaphragm, left retroperitoneum and peri-renal soft tissues, the posterosuperior pole of the left kidney.

**GUNSHOT WOUND H/R**

**ENTRY H:**
Left medial caudal thoracic back. 55 cm below top of the head. 3 cm left of posterior midline.

**DIRECTION:**
Forward, left and downward.

**SHOOTER:**
Unknown

**Gunshot Wound H/R Left View**



**LODGMENT T:** Embedded in soft tissue of the left ischial region (lower back hip/pelvis).

**PATH:** Perforation of the skin and soft tissues of the left lumbar back, the soft tissues of the left gluteal region, pelvic wall and of the left ischial region.

**GUNSHOT WOUND I/T**

**ENTRY I:** Left medial caudal lumbar back. 66.5 cm below top of the head. 4.5 cm left of the posterior midline.

**DIRECTION:** Downward, right and forward.

**SHOOTER:** Deputy Nesbitt

**Gunshot Wound I/T Top View**



**LODGMENT T:**
Embedded in soft tissue of the left ischial region (lower back hip/pelvis).

**PATH:**
Perforation of the skin and soft tissues of the left lumbar back, the soft tissues of the left gluteal region, pelvic wall and of the left ischial region.

**GUNSHOT WOUND I/T**

**ENTRY I:**
Left medial caudal lumbar back. 66.5 cm below top of the head. 4.5 cm left of the posterior midline.

**DIRECTION:**
Downward, right and forward.

**SHOOTER:**
Deputy Nesbitt

Gunshot Wound I/T Rear View



**LODGMENT T:**
Embedded in soft tissue of the left ischial region (lower back hip/pelvis).

**PATH:**
Perforation of the skin and soft tissues of the left lumbar back, the soft tissues of the left gluteal region, pelvic wall and of the left ischial region.

**GUNSHOT WOUND I/T**

**ENTRY I:**
Left medial caudal lumbar back. 66.5 cm below top of the head. 4.5 cm left of the posterior midline.

**DIRECTION:**
Downward, right and forward.

**SHOOTER:**
Deputy Nesbitt

**Gunshot Wound I/T Left View**

**EXIT A:**
Right lower peri-umbilical abdomen. 68.7cm below top of the head. 1.5cm right of the anterior midline.

**PATH:**
The left lumbar back. Perforation and laceration of the left retroperitoneum, the peritoneum, the omentum, mesentery, the head and body of the pancreas, the loops of the bowel, soft tissues and skin of the anterior lower abdominal wall.

**GUNSHOT WOUND J/A**

**ENTRY J:**
Left medial lumbar back. 61.8 cm below top of the head. 4.5 cm left of the posterior midline.

**DIRECTION:**
Forward, right and downward.

**SHOOTER:**
Unknown

**Gunshot Wound J/A Top View**



**EXIT A:**
Right lower peri-umbilical abdomen. 68.7cm below top of the head. 1.5cm right of the anterior midline.

**PATH:**
The left lumbar back. Perforation and laceration of the left retroperitoneum, the peritoneum, the omentum, mesentery, the head and body of the pancreas, the loops of the bowel, soft tissues and skin of the anterior lower abdominal wall.

**GUNSHOT WOUND J/A**

**ENTRY J:**
Left medial lumbar back. 61.8 cm below top of the head. 4.5 cm left of the posterior midline.

**DIRECTION:**
Forward, right and downward.

**SHOOTER:**
Unknown

**Gunshot Wound J/A Rear View**



**EXIT A:**
Right lower peri-umbilical abdomen. 68.7cm below top of the head. 1.5cm right of the anterior midline.

**PATH:**
The left lumbar back. Perforation and laceration of the left retroperitoneum, the peritoneum, the omentum, mesentery, the head and body of the pancreas, the loops of the bowel, soft tissues and skin of the anterior lower abdominal wall.

**GUNSHOT WOUND J/A**

**ENTRY J:**
Left medial lumbar back. 61.8 cm below top of the head. 4.5 cm left of the posterior midline.

**DIRECTION:**
Forward, right and downward.

**SHOOTER:**
Unknown

**Gunshot Wound J/A Left View**



**LODGMENT P:**
Left lower abdomen. 64 cm below top of the head. 22 cm left of the posterior midline.

**PATH:**
The left back through the left lateral lower abdomen.

**GUNSHOT WOUND K/P**

**ENTRY K:**
Left lumbar back. 62 cm below top of the head. 13.8 cm left of the posterior midline.

**DIRECTION:**
Right, forward and downward.

**SHOOTER:**
Unknown

**Gunshot Wound K/P Top View**



**LODGMENT P:**
Left lower abdomen.
64 cm below top of
the head. 22 cm left
of the posterior midline.

**PATH:**
The left back through the left
lateral lower abdomen.

**GUNSHOT WOUND K/P**

**ENTRY K:**
Left lumbar back.
62 cm below top of
the head. 13.8 cm left
of the posterior midline.

**DIRECTION:**
Right, forward
and downward.

**SHOOTER:**
Unknown

**Gunshot Wound K/P Rear View**



**LODGMENT P:**
Left lower abdomen.
64 cm below top of
the head. 22 cm left
of the posterior midline.

**PATH:**
The left back through the left
lateral lower abdomen.

**GUNSHOT WOUND K/P**

**ENTRY K:**
Left lumbar back.
62 cm below top of
the head. 13.8 cm left
of the posterior midline.

**DIRECTION:**
Right, forward
and downward.

**SHOOTER:**
Unknown

**Gunshot Wound K/P Left View**

**EXIT C:**
Left medial and proximal arm.

**PATH L:**
Left posterolateral mid arm, fracture of the mid diaphyses of the left humerus.

**PATH B:**
Left lateral chest and medial axillary wall. Impacted the left lateral rib cage, without penetrating the pleural cavity.

**GUNSHOT WOUND L/C/B**

**ENTRY L:**
Left posterolateral mid-arm. 42 cm below top of the head. 16 cm below left acromion.

**RE-ENTRY B:**
Chest, 39.5 cm below the top of the head. 20 cm left of the anterior midline.

**DIRECTION:**
Forward, right and upward.

**SHOOTER:**
Unknown

**Gunshot Wound L/C/B Top View**



**EXIT C:**
Left medial and proximal arm.

**PATH L:**
Left posterolateral mid arm, fracture of the mid diaphyses of the left humerus.

**PATH B:**
Left lateral chest and medial axillary wall. Impacted the left lateral rib cage, without penetrating the pleural cavity.

**GUNSHOT WOUND L/C/B**

**ENTRY L:**
Left posterolateral mid-arm. 42 cm below top of the head. 16 cm below left acromion.

**RE-ENTRY B:**
Chest, 39.5 cm below the top of the head. 20 cm left of the anterior midline.

**DIRECTION:**
Forward, right and upward.

**SHOOTER:**
Unknown

**Gunshot Wound L/C/B Rear View**



**EXIT C:**
Left medial and proximal arm.

**PATH L:**
Left posterolateral mid arm, fracture of the mid diaphyses of the left humerus.

**PATH B:**
Left lateral chest and medial axillary wall. Impacted the left lateral rib cage, without penetrating the pleural cavity.

**GUNSHOT WOUND L/C/B**

**ENTRY L:**
Left posterolateral mid-arm. 42 cm below top of the head. 16 cm below left acromion.

**RE-ENTRY B:**
Chest, 39.5 cm below the top of the head. 20 cm left of the anterior midline.

**DIRECTION:**
Forward, right and upward.

**SHOOTER:**
Unknown

**Gunshot Wound L/C/B Left View**



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit L -
# Photos of Chevy Astro Van
# at Point of Rest

NESBITT001019

**Photos of Chevy Astro Van at Point of Rest**

NESBITT001141



Photos of Chevy Astro Van at Point of Rest



**Photos of Chevy Astro Van at Point of Rest**

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819    Fax
http://precisionsim.com

√PSI **PRECISION SIMULATIONS**

# Exhibit M –
# Photos of Mud Spatter on
# Patrol Vehicle, Mailboxes
# and Siding



**Photos of Mud Spatter on Patrol Vehicle**



**Photos of Mud Spatter on Patrol Vehicle**



**Photos of Mud Spatter on Patrol Vehicle**



**Photos of Mud Spatter on Mailboxes**



**Photos of Mud Spatter on Mailboxes**



**Photos of Mud Spatter on Mailboxes**



**Photos of Mud Spatter on Siding**



**Photos of Mud Spatter on Siding**

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819    Fax
http://precisionsim.com

**√PSI** | **PRECISION
SIMULATIONS**

# Exhibit N –
# Photos of Chevy Astro Van
# at Point of Rest Relative to
# Interior Wall



**Photos of Chevy Astro Van at Point of Rest Relative to Interior Wall**



**Photos of Chevy Astro Van at Point of Rest Relative to Interior Wall**



**Photos of Chevy Astro Van at Point of Rest Relative to Interior Wall**

**PSI** PRECISION SIMULATIONS

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit O –
# 3D Working Model – Orientation of Officer Dunn Within Triangular Area

**3D Working Model - Orientation of Officer Dunn Within Triangular Area**

PSI PRECISION SIMULATIONS

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit P –
# 3D Working Model – Required Space to Move Officer Dunn's Patrol Vehicle

**Required Space to Move Officer Dunn's Patrol Vehicle  After Shooting**

**3D Working Model - Orientation of Officer Dunn Within Triangular Area**

Required Space to Move Officer Dunn's Patrol Vehicle  After Shooting

Required Space to Move Officer Dunn's Patrol Vehicle  After Shooting

PSI PRECISION SIMULATIONS

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit Q –
# Available Distance Between Officer Dunn's Patrol Vehicle and Rear of Astro Van

Between 0 and 15 Inches

**Available Distance Between Officer Dunn's Patrol Vehicle and Rear of Astro Van**



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit R -
# Incident History Detail

INCIDENT HISTORY DETAIL:  P102030233

```
 TTIATE: 10:14:22  07/22/10    CALL NUMBER:     P0233
  RY:    10:16:25                CURRENT STATUS: CLEARED
   PATCH: 10:19:11               PRIMARY UNIT:    2A54
ONSCENE: 10:23:10               CASE NUMBER:     PD1000029672
CLOSE:                          DISPOSITION:
```

LOCATION: 8805 KELLEY DR ,SKN (CHARLESTON CT & WORCHESTER WY)
LOCATION COMMENTS:
DAREA:    BEA
BEAT:     BW                    OLD TYPE: 937    FINAL: 245 ASSAULT W/WEAPON
RD:       0281                  PRIORITY: 1
                HAZARD PRIORS

```
10:16:25 CR06 ENTRY      TEXT:CHP XFER - LT BLU MINI ASTRO VAN W/ NO PLTS W/ A
                         STICKER OF MOTHER MARY W/ PRAYING HANDS ...OCC BY B/M
                         BLK HOODY SWEATSHIRT & BLU JEANS , BLK/WHI TENNIES
                         ..VEH IS NOW PARKED IFO LOC...RP BELIEVES THIS VEH IS
                         10851 AND THE SUSP
10:16:25 CR06 E911       LOCATION:8407 KELLY DR \PHONE:925/206-7105 \COMP:METRO
                         PCS (800) 571-1265 \SRC:WPH2 \LAT:38.02957100LON:-121-
                         .361610 \CONF: 95% \UNCERT:   36FT \PNUM:209/511-4034
10:16:25 CR06 PRIOR      PP 459A TODAY @ 00:25:24 (6 MORE)
10:16:49 CR06 SUPP       TEXT:IS WANTED FOR RPS 459R...
  )18:00 CR06 SUPP       TEXT:--- RELATED TO DR 10-29610/459R... LOC IS A
  }                      DUPLEX ...SUBJ IN VEH LIVES IN DUPLEX TO THE RIGHT OF
                         RPS IF FACING STREET
10:18:24 CR06 UPDATE     COMP:METRO PCS (800) 571-1265-->TANEA ANDERSON
10:18:24 CR06 SUPP       NAME:TANEA ANDERSON, NO FURTHER INFORMATION
10:19:11 CCP2 DISP-ENR 2A76
10:19:11 CCP2 ID         2A76 <1297>AZARVAND,ERIC
10:19:35 CCP2 BACK-ER    2A76 2M28 2K72
10:19:35 CCP2 ID         2M28 <9513>NELSON,ERIC
10:19:35 CCP2 ID         2K72 <1587>DUNN,GREGORY
10:19:40 CCP2 BACK-ER    2A76 2A74
10:19:40 CCP2 ID         2A74 <1092>HUGHES,MICHAEL ERIC
10:19:44 CCP2 MISC       2A76, 2S52 COPIED
10:19:51 CCP2 BACK-ER    2A76 2A56
10:19:51 CCP2 ID         2A56 <1549>NUNEZ,NICKOLAS
10:20:55 CCP2 MISC       2A76, POSS 215 VEH WHICH SUSP WAS ARMED ...ON
                         HOTSHEET, LT BLU 95 CHEV AST VAN L/3NBG374
10:21:14 CCP2 INSRVICE 2A56
10:21:17 CCP2 BACKUP     2A76 2A56
10:21:17 CCP2 ID         2A56 <1549>NUNEZ,NICKOLAS
10:21:52 M009 ENROUTE 2A56
10:23:10 CCP2 BACK-OS    2A76 V378
10:23:32 M117 ONSCENE 2A74
10:23:37 CCP2 BACK-OS    V378 V383
10:23:37 CCP2 ID         V383 <1577>NHEM, SOPHAL
  23:41 M093 ONSCENE 2A76
  )23:56 CCP2 BACK-ER    2A76 I45
   43:56 CCP2 ID         I45 <1114>THRUSH,MARK
10:24:23 M058 ONSCENE 2M28
10:24:43 CCP2 MISC       V378, VEH GOA .. WE'LL BE CHECKING N/B
10:24:48 CCP2 MISC       2M28, 937 AREA
```

NESBITT000011

```
10:25:51 M009 ONSCENE    2A56
10:26:41 CCP2 MISC       I45, VEH WAS SEEN YESTERDAY IN 700 BLK OF SAN LUCAS
10:32:46 M058 MISC       2M28, , CHECKED WENTWORTH, KELLY DR S OF HAMMER X 3
                         BLOCKS, IN-SHAPE CITY,AND SMART FOODS...UTL\
   32:53 M058 CLEAR      2M28, ASSISTED
_  34:04 CCP2 CHGLOCOS   V378 COMSTOCK DR/CODY WY ,SKN
10:34:08 CCP2 MISC       V378, OCCUPIED 215
10:34:18 CCP2 MISC       2A76, PURSUIT ....N/B THORNTON
10:34:31 CCP2 MISC       2A76, W/B STAN FROM THOR .. SPDS 40, ONE BLK MALE
```

NESBITT000012

INCIDENT HISTORY DETAIL:   P102030233

```
                           ADULT
    34:36 CCP2 MISC        2A76, PASSING CHAPPEL HILL
    34:37 CCP3 MISC        2A76, WB PEESKILL FROM THRONTON PASSING CHAPELHILL
10:34:47 CCP3 MISC         2A76, WB BURINGTON FROM LENOX
10:34:48 CCP2 MISC         2A76, S/B LENNOX FROM STANFIELD .. SPEDS 30, W/B
                           BURLINGTON FROM LENNOX
10:34:54 CCP3 MISCX        2A76, CONTINUING ON BURINGTON
10:34:54 CCP2 MISC         2A76, CONT BURLINGTON
10:35:07 CCP2 MISC         2A76, STOPPED AT BRANSTETTER...S/B BRANS, FROM
                           BURLINGTON
10:35:16 CCP1 MISC         2A76, WB PLANTATION FROM BRANSTETTER 20 MPH
10:35:16 CCP2 MISC         2A76, W/B PLNTATION FROM BRANSTETTER .. SPDS 20
10:35:30 CCP1 BACK-ER      2A76 2S52
10:35:30 CCP1 ID           2S52 <1058>REYNOSA,MIKE
10:35:37 CCP2 MISC         2A76, PLNTATION .. COMING TO END OF PLANTATION .. S/B
                           DECATUR ... SPEEDS 40
10:35:39 CCP1 MISC         2S52, GO AHEAD AND PIT IF YOU NEED TO
10:35:51 CCP1 CHGLOCOS     V383 KELLEY DR/STANFIELD DR ,SKN, W/SPIKE STRIP
10:35:58 CCP2 MISC         2A76, ADMIRAL FROM DECATUR .. SPDS 50, NO TRAFFIC NO
                           PEDS
10:36:02 CCP1 BACK-ER      2A76 2A58
10:36:02 CCP1 ID           2A58 <1524>GUTHRIE,MICHELLE
10:36:10 CCP2 MISC         2A76, ADMIRAL CROSSING BAINBRIDGE .. SPDS 60, NO
                           TRAFFIC
10:36:20 CCP2 MISC         2A76, NEVILLE ..N/B NEVILLE FROM ADMIRAL
10:36:20 CCP1 MISC         2A76, COMING UP TO NEVILLE...GOING NB FROM ADMIRAL
    36:26 CCP1 MISC        2A76, NO TRAFFIC
    36:35 CCP1 MISC        2A76, WB STANDFIELD FROM NEVILLE...BLEW LIGHT AT
                           ESTATE
10:36:36 CCP2 MISC         2A76, W/B STAN FROM NEVILLE
10:36:39 CCP1 MISC         2A76, 60 MPH
10:36:40 CCP2 MISC         2A76, SPEEDS 60
10:36:49 CCP1 MISC         2A76, EB RION FROM KELLEY
10:36:50 CCP2 MISC         2A76, KELLEY .. E/B RION FROM KELLEY
10:37:06 CCP1 MISC         2A76, SALTERS/BANCROFT NB
10:37:14 CCP2 MISC         2A76, NB BANCROFT CROSSING OTTO
10:37:15 CCP2 MISC         2A76, SALTERS/BANFROCT ...CROSSING OTTO, ON BANCROFT
                           .. N/B
10:37:29 CCP2 BACK-ER      2A76 2A54
10:37:29 CCP2 ID           2A54 <1514>FOGG,SCOTT
10:37:50 CCP2 MISC         2A76, SHOTS FIRED
10:37:54 CCP2 MISC         V383, SHOTS FIRED SALTERS/BANCROFT
10:37:57 CCP2 MISC         2A76, SALTERS/BANCROFT
10:38:00 CCP2 CHGLOCOS     2A76 SALTERS DR/BANCROFT WY ,SKN
10:38:06 CCP1 MISC         2A76, SHOTS FIRED
10:38:18 CCP1 BACK-ER      2A76 2A64
10:38:18 CCP1 ID           2A64 <1435>GRAVIETTE,SCOTT
10:38:24 CCP1 MISC         2A74, OFFICERS 907 FOR NOW
10:38:25 CCP2 MISC         2A74, START MEDS .. OFFICERS ARE 907 FOR NOW
10:38:34 CCP2 CHGLOCOS     2S52 SALTERS DR/BANCROFT WY ,SKN
10:38:40 CCP2 CHGLOCOS     2A56 SALTERS DR/BANCROFT WY ,SKN
1  38:46 CCS1 BACK-OS      2S52 WC1
    38:49 CCP1 CHGLOCOS    2K72 SALTERS DR/BANCROFT WY ,SKN
1   39:01 CCP1 MISC        2A76, HE CRASHED INTO A HOUSE AT 9559 BANCROFT
10:39:03 CCS1 MISCX        FIRE ADVISED FOR CD 3 MEDICS
10:39:03 CCP1 BACK-ER      2A76 SRO3
10:39:03 CCP1 ID           SRO3 <2445>FIELDS,RICHARD
```

NESBITT000013

```
10:39:06 CCP2 MISC      2A76, VEH CRASHED INTO HOUSE AT 9559 BANCROFT
10:39:11 CCP1 CHGLOCOS  2A74 SALTERS DR/BANCROFT WY ,SKN
10:39:13 CCP2 MISC      2A76, CAN'T GET HIM OUT OF THE VEH
·39:16 CCP3 MISC        .233, CHP STATED THEY ARE 987 AS WELL
 39:35 CCP1 MISC        ·2A76, HAVE FIRE STAGE FOR RIGHT NOW...SUSP HAS BEEN·
                        HIT
10:39:37 CCP1 BACK-ER   2A76 2A66
10:39:37 CCP1 ID        2A66 <1489>PERRY,ANTHONY
10:39:45 CCP2 MISC      2A76, HAVE .FIRE STAGE FOR NOW ... SUSP HAS BEEN HIT,
```

NESBITT000014

√PSI PRECISION SIMULATIONS

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819    Fax
http://precisionsim.com

# Exhibit S -
# Travel Distance for Astro Van After Crossing Otto



Travel Distance for Astro Van After Crossing Otto



115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819    Fax
http://precisionsim.com

# Exhibit T -
# Video Presentation of Events Leading up to the Shooting
# See Disc



**PSI | PRECISION SIMULATIONS**

115 South Church Street,
Grass Valley, CA 95945
530.477.5820 Voice
530.477.5819   Fax
http://precisionsim.com

# Exhibit U –
# 3D Visualization of Event
# See Disc